**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| SAVE JOBS USA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 15-cv-615 (TSC) |
| | ) | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, | ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff Save Jobs USA ("Save Jobs") brings this action against the U.S. Department of Homeland Security ("DHS") for violations of the Administrative Procedures Act ("APA"). Save Jobs alleges that DHS violated the APA when it issued a final rule that will allow certain H-4 visa holders to apply for employment authorization. *See* Employment Authorization for Certain H-4 Dependent Spouses, 80 Fed. Reg. 10,284 (Feb. 25, 2015) (to be codified at 8 C.F.R. pts. 214.2, 274a) (the "Rule"). Before the court is Save Jobs' motion for a preliminary injunction. Because Save Jobs has failed to show it will suffer irreparable harm absent preliminary relief, the motion is denied.

## I.    BACKGROUND

Save Jobs is an organization whose members are former technology workers at Southern California Edison ("SCE"). (Mot. 1). Save Jobs members all allegedly lost their jobs and were replaced by foreign workers authorized to work in the U.S. under the H-1B guest worker program. This case arises from Save Jobs' allegation that its members will face even more competition from foreign workers as a result of the Rule, which authorizes a subset of H-4 visa

holders to apply for employment authorization—those H-4 visa holders whose spouses have H-1B visas and are currently on the path toward legal permanent resident status.

In support of its motion for a preliminary injunction, Save Jobs submitted the affidavits of members D. Stephen Bradley, Brian Buchanan, and Julie Gutierrez.  Each of these individuals is a former employee at SCE who worked in the information technology ("IT") field.  Between April and July 2014, they were all fired and replaced with H-1B visa holders employed by Tata Consultancy Services, an Indian IT company.  (Bradley Aff. ¶ 8, Buchanan Aff. ¶ 9, Gutierrez Aff. ¶¶ 9-10).  Bradley, Buchanan and Gutierrez all allege that as a condition of receiving severance, they were forced to train their replacements.

The U.S. immigration system is complex, and the court will provide only a brief synopsis of the applicable statutes here.  Citizens from other countries are admitted into the U.S. as either immigrants, non-immigrants, or refugees.  Immigrants are those foreign citizens who are in the U.S. on a permanent basis, whereas non-immigrants are in the U.S. temporarily—for tourism, work, etc.  U.S.C. Title 8, Section 1101(a)(15) authorizes DHS to admit non-immigrants for various purposes.  Non-immigrant visas are commonly known by the letter and number of their subsection within Section 1101(a)(15).  For example, the A-1 visa for diplomats is authorized by 8 U.S.C. § 1101(a)(15)(A)(i).  Subsection H authorizes various H visas for certain categories of foreign workers.  8 U.S.C. § 1101(a)(15)(H).  Subsection H-1B allows U.S. employers to hire temporary foreign workers to perform services in a specialty occupation; these visas are particularly common in the technology field.  H-1B status is valid for an initial period of up to three years, but may be extended for up to an additional three years, for a maximum of six years.

H-1B visa holders seeking legal permanent resident status through employment-based ("EB") immigration may seek such status under five EB preference categories.  Generally, the

second (EB-2) and third (EB-3) preference categories require employers to obtain a labor certification which states that there are no U.S. workers who are able, willing, qualified, and available for the job, and that the employment of the visa holder will not adversely affect the wages and working conditions of workers in the U.S.  8 U.S.C. § 1182(a)(5)(A).

There are quotas for the total number of EB-2 and EB-3 immigrant visas, and according to DHS, they have been oversubscribed for a number of years, causing long delays before applicants in those categories (including H-1B visa holders) are able to obtain legal permanent resident status.  According to DHS, U.S. businesses employing H-1B visa holders suffer disruptions when such workers are required to leave the U.S. at the termination of their H-1B status as a result of these delays.  Congress attempted to alleviate this burden when it passed the American Competitiveness in the Twenty-first Century Act of 2000, as amended (commonly referred to as the "AC21").  That statute allowed for the extension of H-1B status past the sixth year for workers who are the beneficiaries of certain pending or approved EB immigrant visa petitions or labor certification applications.

Importantly for this case, subsection H also authorizes what are known as H-4 visas.[1] H-4 visas allow "the alien spouse and minor children of any such alien specified in this paragraph if accompanying him or following to join him" to reside in the U.S.  8 U.S.C. § 1101(a)(15)(H).  For example, the spouse of an H-1B visa holder may receive an H-4 visa that allows him or her to live—but not work—in the U.S.

The Rule—which goes into effect on May 26, 2015—would amend DHS regulations to allow certain H-4 visa holders to apply for employment authorization.  The Rule applies only to spouses of H-1B visa holders who have shown an intent to stay in the U.S. by beginning the

---

[1] These visas arise out of an unnumbered clause at the end of subsection H; because the clause follows subsection H-3, it has become known as H-4.

process of becoming a legal permanent resident.  Specifically, the Rule would allow H-4 visa

holders to work if their spouse holds an H-1B visa and is either the principal beneficiary of an

approved Immigrant Petition for Alien Worker (I-140) or has been granted H-1B status pursuant

to sections 106(a) or (b) of the AC21.  The Rule states that its primary purpose is to increase

"incentives of certain H-1B nonimmigrants who have begun the process of becoming [legal

permanent residents] to remain in the United States and contribute to the U.S. economy as they

complete this process.  Providing the opportunity for certain H-4 dependent spouses to obtain

employment authorization during this process will further incentivize H-1B nonimmigrants to

not abandon their intention to remain in the United States while pursuing [legal permanent

resident status]."  80 Fed. Reg. 10,284, 10,309.

Save Jobs argues that the Rule must be invalidated because DHS lacks the statutory

authority to allow H-4 visa holders to work, and because the Rule is arbitrary and capricious in

light of the Congressional policy of restricting H-4 visas to residency only.  Save Jobs seeks a

preliminary injunction to stop the Rule from taking effect and to preserve the status quo until the

merits of its challenge can be heard.

## II.    LEGAL STANDARD

In order to prevail on a motion for a preliminary injunction, the movant must show "that

he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the

public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  A preliminary

injunction is an "extraordinary and drastic remedy" that is "never awarded as of right."  *Munaf v.

Geren*, 553 U.S. 674, 689-90 (2008) (citations omitted).  The moving party must demonstrate a

likelihood of success on the merits, *id.*, and some injury, as "[t]he basis of injunctive relief in the

federal courts has always been irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959)).

In the past, courts in this Circuit used a "sliding scale" approach in analyzing the four preliminary injunction factors, meaning a particularly strong showing in one factor could outweigh weakness in another. It is not clear whether this approach survives after *Winter*, which suggested that a likelihood of success on the merits must always be shown. *See United States Ass'n of Reptile Keepers, Inc. v. Jewell*, No. 13-2007, 2015 WL 2207603, at *3 (D.D.C. May 12, 2015); *Arpaio v. Obama*, 27 F. Supp. 3d 185, 196-98 (D.D.C. 2014). Under either approach, however, the movant must always show irreparable harm or injury, and if a party makes no showing of irreparable injury, the court may deny the motion for injunctive relief without considering the other factors. *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C. Cir. 1995).

### III.   ANALYSIS

#### a.   Irreparable Harm

The standard for irreparable harm is particularly high in the D.C. Circuit. "[P]roving irreparable injury is a considerable burden, requiring proof that the movant's injury is *certain, great and actual*—not theoretical—and *imminent,* creating a clear and present need for extraordinary equitable relief to prevent harm." *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)) (internal quotation marks omitted) (emphasis in original). In addition, "the certain and immediate harm that a movant alleges must also be truly irreparable in the sense that it is 'beyond remediation.'" *Elec. Privacy Info. Ctr. v. DOJ*, 15 F. Supp. 3d 32, 44 (D.D.C. 2014) (citation omitted). The movant must provide some evidence of irreparable harm: "the movant

[must] substantiate the claim that irreparable injury is likely to occur" and "provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Wis. Gas Co.*, 758 F.2d at 674 (internal quotation marks and citation omitted). This is because "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

As these authorities make clear, to meet the standard for irreparable harm the movant must present sufficient evidence that the purported injury is certain, great, actual, imminent, and beyond remediation. Save Jobs has failed to do so here.

### i. Certain and Actual Harm

Save Jobs has not shown that its purported injuries are certain enough to justify emergency relief. The Rule would allow certain H-4 visa recipients to apply for employment authorization. Once they receive authorization, these H-4 visa holders would not be restricted to applying for jobs in certain fields, but could work in any field for any employer. There is no indication, and Save Jobs has not provided any evidence, that it is certain that H-4 visa holders will apply for IT jobs and compete with Save Jobs members. Save Jobs is correct that this *could* happen, and eventually it may in fact happen. But at this stage, it is entirely speculative whether any H-4 visa holders will ever apply for IT jobs at SCE, IT jobs in California (where the members of Save Jobs reside), or IT jobs at all. On the record before the court, it is just as likely that H-4 visa holders will apply for jobs in retail, in finance, or not apply for jobs at all—there is simply no evidence to establish irreparable harm with any certainty.[2] The Save Jobs members'

---

[2] Save Jobs cites advertisements from IT training and placement firms seeking H-4 visa holders as evidence that H-4 visa holders will likely apply for IT jobs. (Pl. Mot. App'x). As DHS correctly points out, most of these

allegations that "[i]f DHS starts allowing H-4 aliens to work in the computer job market, these persons will become additional competitors for me when seeking employment," *see, e.g.*, Bradley Aff. ¶ 15, are not enough without any corroborating evidence, since "[b]are allegations of what is likely to occur are of no value." *Wis. Gas Co.*, 758 F.2d at 674. Save Jobs has shown the possibility that H-4 workers may compete with its members, but that speculative injury, however possible, is not actual and certain. *Winter*, 555 U.S. at 22; *see also Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 337 (D.D.C. 2012) (in case involving Export-Import Bank action allegedly favoring foreign airline over U.S. airlines, no irreparable harm where "Air India has not announced the routes on which it will use its new planes, including whether it will increase capacity on routes for which Delta or other participating ATA members offer competing service. Indeed, there is no showing even of how long it will take Air India to deploy these planes from the date of delivery . . . Plaintiffs' own charts show direct competition will not necessarily occur.") (citations omitted).

        Save Jobs has also not shown with sufficient certainty that the Rule will result in injury from increased competition with H-1B visa holders. The affidavits Save Jobs provided do not even suggest this alleged injury; Save Jobs relies instead on the Rule itself, which states that its primary purpose is to incentivize H-1B visa holders to stay in the U.S. by allowing their spouses to work. At this point, Save Jobs has provided no evidence that any H-1B visa holder has or will stay in the U.S. as a result of the Rule. There is also no evidence that the Rule will lead to an increase in the number of H-1B visa holders seeking permanent residence and competing with Save Jobs' members. This is no surprise, as it appears that for at least the last several years the

---

advertisements are for IT training, not jobs. In addition, that these organizations (whose authenticity is less than clear) offer their services to future H-4 workers says little regarding whether those workers will actually apply for or receive IT jobs.

number of H-1B visa holders has been at capacity, so the Rule would have no impact on the number of qualifying H-1B visa holders present in the U.S.

ii. *Severity of Harm*

In its motion, Save Jobs argues that it will suffer irreparable harm because the APA does not provide monetary relief, meaning any injury it suffers is necessarily unrecoverable. (Pl. Mot. 12). At oral argument, Save Jobs further explained that its immediate injury absent preliminary relief would be the period of competition its members would face while waiting for the court (should it rule in favor of Save Jobs on the merits) to invalidate the Rule. Save Jobs argues that its members should never have to compete with H-4 visa holders, and therefore any time period in which they do constitutes irreparable harm because its members could not recover losses suffered during that time, including loss of job opportunities and loss or diminution in pay.

These highly speculative losses are not great enough to warrant the extraordinary remedy of a preliminary injunction. Save Jobs argues that its members may be deprived of job opportunities or lost wages, which are economic losses. *See Air Transp. Ass'n of Am., Inc.*, 840 F. Supp. 2d at 335; *Sataki v. Broad. Bd. of Governors*, 733 F. Supp. 2d 22, 46 (D.D.C. 2010); *Fraternal Order of Police Library of Cong. Labor Comm. v. Library of Cong.*, 639 F. Supp. 2d 20, 24 (D.D.C. 2009). Normally "economic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas Co.*, 758 F.2d at 674. However, "courts have recognized that economic loss may constitute 'irreparable harm' where a plaintiff's alleged damages are unrecoverable." *Clarke v. Office of Fed. Hous. Enter. Oversight*, 355 F. Supp. 2d 56, 65-66 (D.D.C. 2004) (citations omitted). This issue often arises in suits against government defendants, where sovereign immunity or other laws or doctrines may preclude monetary relief. "While it is true that if a movant seeking a preliminary injunction will be unable to sue to recover any monetary

8

damages against a government agency in the future because of, among other things, sovereign immunity, financial loss can constitute irreparable injury, the fact that economic losses may be unrecoverable does not absolve the movant from its considerable burden of proving that those losses are *certain, great and actual*. . . . In other words, the mere fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm." *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52-53 (D.D.C. 2011) (internal quotation marks and citations omitted) (emphasis in original).

This issue arose in *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327 (D.D.C. 2012).  In that case, plaintiffs argued that the loss of business opportunities—similar to Save Jobs' alleged injuries here—was unrecoverable against the Export-Import Bank, and that "*any* damages in a suit against a defendant with sovereign immunity are irreparable *per se*." *Id.* at 335 (emphasis in original).  As the court explained, "not only is such a rule not the law of this Circuit, but it would also effectively eliminate the irreparable harm requirement.  Any movant that could show any damages against an agency with sovereign immunity—even as little as $1—would satisfy the standard.  The wiser formula requires that the economic harm be significant, even where it is irretrievable because a defendant has sovereign immunity." *Id.* at 335-36 (citing cases where unrecoverable economic loss alone was not enough to show irreparable harm).  "Where a movant makes 'a strong showing that the economic loss would significantly damage its business above and beyond a simple diminution in profits,' or demonstrates that the loss would 'cause extreme hardship to the business, or even threaten destruction of the business,' irreparable harm may be established.  For economic harm to constitute irreparable injury, however, Plaintiffs must 'adequately describe and quantify the level of harm its members face.'" *Id.* at 336 (citations omitted).  *See also ViroPharma, Inc. v.*

*Hamburg*, 898 F. Supp. 2d 1, 26 (D.D.C. 2012) ("'[t]he mere existence of competition is not

irreparable harm, in the absence of substantiation of severe economic impact.'") (quoting *Wash.*

*Metro. Area Tran. Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 n.3 (D.C. Cir. 1977)).

This court concurs with the reasoning in *Air Transport Association* and the other

decisions in this District that unrecoverable economic losses do not automatically constitute

irreparable harm, but instead must be sufficiently severe to warrant emergency relief.  Like the

plaintiffs in *Air Transport Association*, the plaintiff here has failed to make such a showing.

Save Jobs has made no effort to quantify or even speculate as to the extent of its damages.  Save

Jobs does not explain how many IT jobs may be taken by H-4 visa holders, how many of those

jobs its members may have sought themselves, what pay or benefits its members risk losing

while the case is pending, or what other harm its members may face.  The court is left to

speculate as to the magnitude of the injury, and speculation is not enough to turn economic loss

into irreparable harm.

### iii.   Imminent Harm

Save Jobs has also not shown that harm is imminent.  When the Rule takes effect on May

26, 2015, H-4 visa holders will begin applying for employment authorization.  These

applications may take months to process, and may be followed by months of job hunting until an

H-4 visa holder actually finds employment.  There is no clear indication when additional

competition may occur.  Save Jobs has also not shown that the Rule will have any imminent

impact on H-1B visa holders.  Because the Rule only applies to spouses of H-1B visa holders

that have already begun seeking legal permanent resident status, these H-1B holders have likely

already been in the U.S. for some time.  There is no evidence that the Rule will imminently add

to or impact the overall pool of H-1B visa holders, meaning Save Jobs has not presented

sufficient proof that the harm "is certain to occur in the near future." *Wis. Gas Co.*, 758 F.2d at 674.

### iv.  *Harm Beyond Remediation*

Lastly, Save Job has not shown that the harm is "beyond remediation." *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 297 (D.C. Cir. 2006).  Should the court eventually rule in Save Jobs' favor and invalidate the Rule, H-4 visa holders would no longer be permitted to work in the U.S., thereby eliminating the competition Save Jobs complains of.  This is exactly the position Save Jobs' members would be in with or without preliminary relief. While the court may or may not be able to afford relief for any possible damages which occur in the interim, as discussed above, this is not dispositive with respect to whether Save Jobs is entitled to a preliminary injunction.[3]

### b.  Other Factors

The court need not address the other preliminary injunction factors in light of the movant's failure to show irreparable harm.  *See CityFed Financial Corp.*, 58 F.3d at 747. Nevertheless, the court finds it worthwhile to briefly address the three remaining factors as they reinforce its finding that a preliminary injunction is unwarranted.  Given the uncertainty of the "sliding scale" approach in this Circuit after *Winter*, the court will not opine on whether Save Jobs has shown a likelihood of success on the merits, except to say that it would not have tipped the balance either way on the sliding scale.  DHS offers numerous arguments why Save Jobs

---

[3] Save Jobs contends that it would be easier to preserve the status quo than to unwind the Rule once it goes into effect.  Whether or not this is correct has little impact on whether Save Jobs has shown irreparable harm.  *See Nat'l Min. Ass'n*, 768 F. Supp. 2d at 55 ("While the plaintiff's assertion that a preliminary injunction 'in this case will do nothing more than restore the regulatory environment that existed prior to the unlawful application of the [disputed regulation] may be true, the fact remains that the plaintiff has made an inadequate showing of irreparable harm.  The issuance of a preliminary injunction to 'restore' the previously existing regulatory environment would not be in line with the purposes of injunctive relief, as the ultimate inquiry would still remain 'whether there is a real and immediate threat of repeated injury.'") (citations omitted).

would not succeed on the merits, most notably on standing grounds, and Save Jobs has

responded with non-frivolous arguments why its claims might prevail.  At this early stage, the

court is not convinced either party's arguments significantly outweigh the other such that it

would have made a critical difference in the preliminary injunction analysis.  As to the balance

of equities, both sides present compelling arguments.  Save Jobs has an obvious interest in

protecting its members from additional competition in an already crowded job market,

particularly given the circumstances of their terminations from SCE.  However, DHS has a

strong interest in moving ahead with a program years in the making, and the court is cognizant of

the difficulties DHS would face if the program were delayed at this late date.  Lastly, the public

interest factor does not favor either party.  Whether American workers and the U.S. economy are

better served with more or fewer foreign workers is a policy question the court need not answer.

In sum, not only has Save Jobs not shown irreparable harm, but none of the remaining factors

swing particularly in its favor.

## IV.    CONCLUSION

For the foregoing reasons, Save Jobs' Motion for a Preliminary Injunction is denied.[4]  An

appropriate Order accompanies this Memorandum Opinion.


Date:  May 24, 2015


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

---

[4] The court notes that the foregoing analysis is not necessarily dispositive with respect to issues that may arise later in the case—particularly the certainty or imminence of Save Jobs' injury-in-fact.  *See Belbacha v. Bush*, 520 F.3d 452, 458 (D.C. Cir. 2008).