# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAVE JOBS USA,<br><br>      Plaintiff,<br><br>      v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>      Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 15-cv-0615 (TSC) |

## MEMORANDUM OPINION

In this action brought under the Administrative Procedure Act ("APA"), Plaintiff Save Jobs USA challenges the Department of Homeland Security's ("DHS") promulgation of a final rule allowing certain H-4 visa holders to apply for employment authorization. *See* Employment Authorization for Certain H-4 Dependent Spouses, 80 Fed. Reg. 10,284 (Feb. 25, 2015) (codified at 8 C.F.R. §§ 214.2, 274a) (the "H-4 Rule"). Earlier in this case, Plaintiff moved for a preliminary injunction, which this court denied on the grounds that it failed to establish imminent irreparable injury. 105 F. Supp. 3d 108 (D.D.C. 2015). Both parties now move for summary judgment, and Defendant additionally moves to strike the appendix attached to Plaintiff's motion. Having considered the parties' filings, and for the reasons stated herein, Plaintiff's motion for summary judgment is DENIED and Defendant's motion for summary judgment is GRANTED. Defendant's motion to strike is GRANTED IN PART and DENIED IN PART.

## I.     FACTUAL BACKGROUND

The facts of this case were set forth in full in this court's preliminary injunction opinion, 105 F. Supp. 3d at 110–12, and thus only a brief description is necessary here. Plaintiff, an

organization whose members are former information technology ("tech") workers who were replaced by foreign workers with H-1B visas, sued DHS under the APA to block the H-4 Rule from taking effect.

Subsection H of the Immigration and Naturalization Act ("INA") authorizes DHS to admit foreign workers into the United States to engage in certain types of labor.  8 U.S.C. § 1101(a)(15)(H).  Subsection H-1B permits employers to hire foreign workers in a "specialty occupation," most relevantly tech jobs, for an initial period of three years, extendable for three additional years.  *Id.*  Spouses and minor dependents of H-1B visa holders are permitted to reside in the U.S. with H-4 visas.  *Id.*  Employers of H-1B visa holders who wish to transition to legal permanent resident ("LPT") status must obtain a Department of Labor certification that there are no U.S. workers who are able, willing, qualified, and available to perform the job, and that the wages and working conditions of American workers will not be adversely affected.  8 U.S.C. §§ 1255(a), 1154, 1153(b)(2)–(3), 1182(a)(5)(A).  Due to frequently oversubscribed quotas for the number of H-1B visa holders who may transition to LPT status, there are long delays in this process, forcing many visa holders who have applied to transition to leave the U.S. when their visas expire.  To prevent disruption for employers and families, Congress passed the American Competitiveness in the Twenty-First Century Act of 2000 ("AC21"), which permits extending H-1B visas past the sixth year for those applying for LPT status.

The H-4 Rule at issue enables a subset of H-4 visa holders to apply for Employment Authorization Documents ("EADs"), which would allow them to work in the U.S.  To be eligible, the H-4 visa holder's H-1B spouse must be transitioning to LPT status by way of either an extension past their sixth year under the AC21 or having received an approved labor certification (called a Form I-140 petition).

2

The rule aims to alleviate the financial and emotional burden placed on H-1B visa holders and their families during this lengthy period in which only one spouse may be employed.  It underwent notice-and-comment procedures, *see* 79 Fed. Reg. 26,886 (May 12, 2014) (proposed rule), and the final rule took effect on May 26, 2015, *see* 80 Fed. Reg. 10,284 (Feb. 25, 2015). DHS expects as many as 179,600 H-4 visa holders to be able to apply for EADs in the rule's first year of implementation.  80 Fed. Reg. 10,285.

## II.    LEGAL STANDARD

In an APA action, the court's role at the summary judgment stage is to decide "as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007).  A court must set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The plaintiff bears the burden of establishing the invalidity of the agency's action. *See Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014).  The court's review is "highly deferential" and begins with a presumption that the agency's actions are valid.  *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981).  The court is "not empowered to substitute its judgment for that of the agency," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), but instead must consider only "whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors," *Fulbright*, 67 F. Supp. 3d at 89 (quoting *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995)) .  Thus, all that is required is that the agency's decisions provide "a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n*

*of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## III.   DISCUSSION

### A.  Defendant's Motion to Strike

Defendant has moved, under Federal Rule of Civil Procedure 12(f), to strike Plaintiff's

Appendix A (ECF No. 26-1), attached in support of Plaintiff's Motion for Summary Judgment

(ECF No. 28).  Defendant argues that the Appendix should be stricken, in whole or in part,

because Plaintiff may not: (1) supplement the administrative record; and (2) attempt to establish

standing with evidence that post-dates the Complaint.

As a general matter, a court must base its review of agency actions solely on the record

before the agency when it made its decision, *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir.

1997), though when necessary to establish standing, a plaintiff may "supplement the record to

the extent necessary to explain and substantiate its entitlement to judicial review," *Sierra Club v.

EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002).  However, the "existence of federal jurisdiction

ordinarily depends on the facts as they exist when the complaint is filed," *Lujan v. Defenders of

Wildlife*, 504 U.S. 555, 569 n.4 (1992), and thus a plaintiff may not supplement the record with

materials that post-date the complaint in order to establish standing.  *See Tracie Park v. Forest

Serv. of the U.S.*, 205 F.3d 1034, 1037–38 (8th Cir. 2000) (holding plaintiff may not "use

evidence of what happened after the commencement of the suit" to show "a real and immediate

threat" of injury); *see also Perry v. Village of Arlington Heights*, 186 F.3d 826, 830 (7th Cir.

1999) ("It is not enough for [the plaintiff] to attempt to satisfy the requirements of standing as

the case progresses.  The requirements of standing must be satisfied from the outset.").

Plaintiff's Appendix A contains charts, tables, and data illustrating H-1 Visa Petitions

filed and approved; quotes from the administrative record; a magazine article; job postings; and a

printout of a website.  The charts and data on pages 1–6, the Congressional Record excerpts on page 7–8, and the data tables on pages 9–12 may all be relevant for Plaintiff's standing arguments, and as such their inclusion is appropriate.  Based on the date stamps, the job listings reproduced on pages 13–26 and the excerpts from the website "H4 Visa, A Curse" on pages 27–39 all post-date the Complaint.  Plaintiff, without any supporting case law, theorizes that because it asserts standing based on an imminent injury caused by job competition, then these post-Complaint documents purportedly showing employers hiring H-4 visa holders retroactively proves the imminence of the injury at the time the Complaint was filed.  The court is unpersuaded that these documents establish any injury, whether actual or imminent, to support this theory, and therefore will grant Defendant's motion as to pages 13–39, which will be stricken.

   B.  Standing

   The court must first consider whether Plaintiff has standing to challenge DHS's promulgation of the H-4 Rule, as the court's power under Article III "exists only to redress or otherwise to protect against injury to the complaining party."  *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  The plaintiff bears the burden of proof to establish each of the elements of Article III standing.  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citing *Lujan*, 504 U.S. at 561).  Thus, Save Jobs must show: "(1) an 'injury in fact' that is 'concrete and particularized' as well as 'actual or imminent'; (2) a 'causal connection' between the injury and the challenged conduct; and (3) a likelihood, as opposed to mere speculation, 'that the injury will be redressed by a favorable decision.'"  *Ark Initiative v. Tidwell*, 749 F.3d 1071, 1075 (D.C. Cir. 2014) (quoting *Lujan*, 504 U.S. at 560–61).

   When an agency's action relates to one party but a third party alleges harm, the

5

indirectness of the injury does not deprive that third party of standing.  *Warth*, 422 U.S. at 505.

However, Plaintiff, as such a third party, faces a burden that is "substantially more difficult to

meet the minimum requirement of Art. III: to establish that, in fact, the asserted injury was the

consequence of the defendants' actions, or that prospective relief will remove the harm."  *Id.*; *see*

*also Arpaio*, 797 F.3d at 15 ("Our precedents establish that standing based on third-party conduct

. . . is significantly harder to show than standing based on harm imposed by one's litigation

adversary.")

Finally, the court analyzes standing "as of the time a suit commences."  *Del Monte Fresh*

*Produce Co. v. United States*, 570 F.3d 316, 324 (D.C. Cir. 2009).  Thus, Plaintiff must "allege

that he has been or will in fact be perceptibly harmed by the challenged agency action, not that

he can imagine circumstances in which he could be affected by the agency's action."  *United*

*States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 688–89

(1973).  The law in this Circuit is clear: "When considering any chain of allegations for standing

purposes, we may reject as overly speculative those links which are predictions of future events

(especially future actions to be taken by third parties)."  *Williams v. Lew*, 819 F.3d 466, 473

(D.C. Cir. 2016) (quoting *Arpaio*, 797 F.3d at 21).

1.  Associational Standing

Plaintiff first contends that it has associational standing.  To have standing, an association

must: (1) identify members who would have standing to sue in their own right; (2) seek to

protect interests that are germane to its purpose; and (3) show that neither the claim asserted nor

the relief requested requires an individual member to participate in the suit.  *Nat'l Envtl. Dev.*

*Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1005 (D.C. Cir. 2014).  To satisfy these

requirements, Plaintiff provides affidavits from three members—Brian Buchanan, D. Stephen

Bradley, and Julie Gutierrez—whom it alleges would have standing to bring this suit on their own. Plaintiff further argues that its mission includes "protect[ing] the economic security and working conditions of its members," and that an individual member does not have to participate in the suit in order for the organization to seek relief under the APA.

DHS failed to respond to Save Jobs' associational standing argument, and therefore the court will treat that argument as conceded. *See Wilkins v. Jackson*, 750 F. Supp. 2d 160, 162 (D.D.C. 2010) (when a party fails to respond to an argument raised in a motion, "it is proper to treat that argument as conceded").

       2.   <u>Injuries to Plaintiff's Members</u>

Plaintiff next contends that it has met the constitutional minimum requirement for standing because its members have suffered four specific injuries-in-fact caused by the H-4 Rule: (1) the rule creates increased competition for jobs from H-4 visa holders; (2) the rule creates increased competition for jobs from H-1B visa holders; (3) the rule confers a benefit on its members' H-1B competitors; and (4) the rule deprives its members of statutory protections from foreign labor. The court will address each injury individually.

       a.   *Increased Competition from H-4 Visa Holders*

Under the competitor standing doctrine, a plaintiff suffers an injury-in-fact when a regulatory change increases her exposure to economic competition. *See Mendoza v. Perez*, 754 F.3d 1002, 1011 (D.C. Cir. 2014). A party who may be injured by increased competition need not wait until she has been actually injured before bringing suit. *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010). However, Plaintiff must show that the H-4 Rule has "the clear and immediate potential" to cause H-4 visa holders to compete with its members. *See La. Energy and Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998). To demonstrate this clear and

immediate potential for injury, Plaintiff must demonstrate that its members are "direct and current" competitors, *Mendoza*, 754 F.3d at 1013, or that there is an "actual or imminent increase in competition," *Sherley*, 610 F.3d at 73.

Plaintiff argues that its members face imminent increased competition in the labor market from H-4 visa holders because, if these workers are granted Employment Authorization Documents, they may apply for the same jobs in the tech field that Plaintiff's members currently seek.  Plaintiff submitted evidence that three of its members are active participants in the labor market for tech jobs.  (Bradley Aff. ¶¶ 5, 13; Buchanan Aff. ¶¶ 6, 7, 14; Gutierrez Aff. ¶¶ 5, 12 (ECF No. 26-2)).  However, Plaintiff has failed to demonstrate more than a possibility that DHS's H-4 Rule might introduce new competitors into the market for tech jobs.

While Plaintiff correctly states that it need not prove that any competition for specific jobs has already taken place, *La. Energy*, 141 F.3d at 367, it must still present evidence beyond just mere speculation, since "[b]are allegations of what is likely to occur are of no value," *Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  Here, only a subset of H-4 visa holders will be eligible to apply for and then attain EADs, which will allow them to seek employment in any job in the entire U.S. labor market.  To support its argument that the alleged harm to Plaintiff's members from competing with this subset of H-4 visa holders is more than speculative, Plaintiff points primarily to two cases in which plaintiffs were granted standing due to increased job competition: *Mendoza* and *Washington Alliance of Technology Workers v. DHS*, 156 F. Supp. 3d 123, 132 (D.D.C. 2015), *vacated as moot*, 2016 WL 3041029 (D.C. Cir. May 13, 2016).  However, this case differs significantly from *Mendoza*, which involved individuals in the specific labor market for open-range herding jobs and a regulation directly affecting wages in that field, as well as *Washington Alliance of Technology Workers*, which involved a DHS rule

8

"explicitly intended to increase the number of foreign nationals competing for jobs" in the

science, technology, engineering, and math ("STEM") labor market.  Here, there is simply no

evidence that the H-4 Rule was targeted at the tech field,[1] or that even one H-4 visa holder has

sought or will seek a tech job in competition with Plaintiff's members.  Plaintiff's argument,

without evidence, is bare speculation, and the injury it contemplates is insufficient to establish

standing.

### b. *Increased Competition from H-1B Visa Holders*

Plaintiff argues that, as with H-4 visa holders, the increased job competition from H-1B

workers creates an injury-in-fact sufficient to establish standing.  For reasons substantially

similar to the ones stated above, the court finds that it does not.  At the core of Plaintiff's

argument is its assertion that DHS's goal in promulgating the H-4 Rule was designed "to

increase the number of H-1B workers."  In support, it points to various statements from the

Federal Register in which DHS discusses its goal of encouraging H-1B workers pursuing LPT

status to remain in the country to complete the process, when otherwise they might choose to

leave the U.S.  (Pl. App. at 7–8).  However, these statements fail to demonstrate an *increase* in

competition from H-1B visa holders; instead, it appears the H-4 Rule might simply contribute to

keeping H-1B visa holders applying for LPT status in the U.S.  This is insufficient to show that

Plaintiff's members are threatened with increased competition in the labor market from H-1B

visa holders.

Plaintiff also describes at length the number of H-1B visas granted each year, whether the

---

[1] Plaintiff's only evidence on this point is a quote from Leon Rodriguez, director of the U.S. Citizenship and Immigration Service, that H-4 visa holders "are in many cases, in their own right, high-skilled workers of the type that frequently seek H-1Bs."  (Pls. App. at 12).  Without more, this isolated quote fails to establish that DHS intended H-4 visa holders to apply for tech jobs.

program was over- or under-subscribed in certain years, and notes that H-1B eligible positions in universities and research centers do not contribute to the cap on H-1B visas.  It is unclear to the court why past data on H-1B visas is relevant to establish harm from the H-4 Rule, but even if in some years the H-1B program was undersubscribed, meaning more H-1B visas could have been approved, and in future years more visas are issued so the quota is reached, this is data concerning existing *statutory* limitations, which are not impacted by the H-4 Rule.[2]  While Plaintiff's members allege past injury from being replaced by H-1B visa holders at their previous employment, the source of that injury is unrelated to the H-4 Rule.  And, if in future years the H-1B program is again oversubscribed, Plaintiff offers no evidence that this will be due to the H-4 Rule, nor why the court should consider this an injury at all given that Congress sets the quotas for the visa program, not DHS.  Because Plaintiff offers no evidence that its members face an imminent or actual increase in competition from H-1B visa holders as a result of the H-4 Rule, this alleged injury is also insufficient to establish standing.

### c.   Conferral of a Benefit on H-1B Competitors of Plaintiff's Members

Plaintiff next argues that the H-4 Rule confers a benefit on its members' H-1B competitors, which courts recognize as causing an injury-in-fact.  *See New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002) (finding injury when a rule "provides benefits to an existing competitor").  The cases upon which Plaintiff relies typically involved government action giving commercial benefits to market competitors.  *See Nat'l Envtl. Dev.*, 752 F.3d at 1005 (agency action imposing additional costs and processing time for entities in certain

---

[2] *See* 8 U.S.C. § 1184(g)(1)(A)(vii) (capping the number of H-1B visas granted each year at 65,000), (g)(5)(A)–(B) (stating that H-1B workers employed at universities or research organizations do not count towards the 65,000 cap), (g)(5)(C) (stating that recipients of a master's or higher degree from a U.S. university do not count towards the 65,000 cap until the number of such individuals reach 20,000 a year).

regions); *Sea-land Serv., Inc. v. Dole*, 723 F.2d 975, 977 (D.C. Cir. 1983) (agency's grant of subsidy to shipping competitor).  Plaintiff alleges that the benefit here is articulated in DHS's statement of purpose in the Federal Register: "DHS expects this change to reduce the economic burdens and personal stresses that H-1B nonimmigrants and their families may experience."  80 Fed. Reg. 10,285.  Plaintiff offers no support for its position that the goal of relieving economic uncertainty and personal anxiety in H-1B workers' families amounts to an injury to Plaintiff's members.  Thus, the court rejects this theory of standing as well.

### d.   Loss of Statutory Protections

Finally, Plaintiff points to the loss of statutory labor protections as a fourth injury for Article III standing, citing *Brotherhood of Locomotive Engineers v. United States*, 101 F.3d 718, 724 (D.C. Cir. 1996) ("*BLE*"), *National Treasury Employees Union v. Chertoff*, 452 F.3d 839, 852–55 (D.C. Cir. 2006), *International Union of Bricklayers and Allied Craftsmen v. Meese*, 761 F.2d 798, 802–05 (D.C. Cir. 1985), and *Clinton v. City of New York*, 524 U.S. 417, 433 & n.22 (1998).  However, these cases are inapplicable here and do not support finding a separate injury for standing.  The first three cases, in which union members were denied collective bargaining rights or denied jobs by DHS (or its predecessor INS), involved *past* instances of harm, not speculation of future harm.  The plaintiffs in *Clinton* had standing because they were challenging the cancellation of a limited tax subsidy enacted for their specific benefit.  None of these cases help Plaintiff establish that enabling H-4 visa holders to seek jobs in the U.S. labor market is a "cancellation" or deprivation of any specific rights in the statute so as to create an injury-in-fact for standing.  Instead, as explained further below, whether Plaintiff's claims fall within the "zone of interests" of the statute is a separate inquiry from standing altogether.

In sum, the H-4 Rule enables a subset of H-4 visa holders to apply for EADs, which

permit them to apply for and secure paid employment in any job in the U.S. labor market.  While Plaintiffs may be correct in speculating that H-4 visa holders will seek tech jobs in competition with its members, there is simply no evidence before the court to show that that will happen. Therefore, because Plaintiff cannot establish that its members face an imminent or actual injury, the court need not engage in further analysis regarding causation, redressability, or ripeness, and the court concludes that Plaintiff lacks standing to proceed with this case.

C.   Zone of Interests

Having determined that Plaintiff cannot establish an injury-in-fact, the court will briefly turn to whether Plaintiff's claim would fall within the statute's zone of interests, an additional requirement for establishing an APA cause of action.  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S.Ct. 2199, 2210 (2012).  The zone of interests analysis requires courts to "determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014); *see also Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 675–676 (D.C. Cir. 2013) (Silberman, J., concurring) (stating that the zone of interests analysis asks whether "this particular class of persons ha[s] a right to sue under the substantive statute") (quoted in *Lexmark*).  This analysis is "not . . . especially demanding," and "the benefit of any doubt goes to the plaintiff. . . . The test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."  *Patchak*, 132 S. Ct. at 2210 (internal quotation marks omitted).

The D.C. Circuit has explained that, "[i]n determining whether a petitioner falls within the 'zone of interests' to be protected by a statute, 'we do not look at the specific provision said

to have been violated in complete isolation,' but rather in combination with other provisions to which it bears an 'integral relationship.'"  *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 287 F.3d 1130, 1147 (D.C. Cir. 2002) (per curiam) (quoting *Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 903 (D.C. Cir. 1996)); *see also Washington Alliance of Tech. Workers*, 156 F. Supp. 3d at 135 (finding plaintiff's claims within the zone of interests subsection (H)(1)(b) because it includes "many provisions designed to protect American labor," and that subsection (F)(1) was integrally related to (H)(1)(b) because both fall under the same section of the statute, 8 U.S.C. § 1101(a)(15)).  Plaintiff primarily argues that the H-4 Rule circumvents the labor protections Congress required under 8 U.S.C. § 1101(a)(15)(H) and related statutes for other H-type visas.  This section of the statute requires compliance with annual caps on the number of visas issued, 8 U.S.C. § 1184(g), and requires the employer to certify with the Department of Labor that it will pay the H-1B worker the same wages paid to other employees in that position, 8 U.S.C. § 1184(n), in order to prevent employers from using H-1B workers as a cheaper alternative to American workers.  Defendant argues that 8 U.S.C. §§ 1184(g) and (n) do not apply to non-immigrants and their H-4 visa holding spouses, and thus cannot encompass Plaintiff's claim in their zone of interests.

Given that these provisions are part of the larger framework offering protections for American labor, and the H-4 and H-1B visas are established in the same subsection of 8 U.S.C. § 1101(a)(15), the court would have little difficulty concluding that 8 U.S.C. §§ 1101(a)(15)(H)(1)(b) and 1101(a)(15)(H) are sufficiently "integrally related."  Therefore, the court would conclude that Plaintiff's interests in challenging the H-4 Rule are within the zone of interests of the protections offered by the statutory provision authorizing H-1B visas.  However, this determination does not provide an independent basis for Plaintiff's claim to survive.  Having

failed to demonstrate an injury-in-fact to establish Article III standing, Plaintiff's claim, though within the zone of interests of the statute, cannot proceed.

D. Statutory Authority

Despite having found that Plaintiff lacks standing, the court will also nevertheless briefly discuss the merits of Plaintiff's APA claim. For decades, Congress has delegated substantial authority to DHS and its predecessor agency to issue employment-related immigration regulations, as part of the broader scope of its power to enforce the INA and issue rules governing nonimmigrants.[3] The H-4 Rule was promulgated under this delegated authority, and DHS engaged in the required notice-and-comment rulemaking procedures. *See* 79 Fed. Reg. 26,886 (May 12, 2014) (proposed rule); 80 Fed. Reg. 10,284 (Feb. 25, 2015) (final rule).

Plaintiff articulates an interpretation of these authorizing statutes that would render DHS unable to promulgate the H-4 Rule. However, DHS is entitled to discretion in its interpretation of its statutory authority to implement the INA. Under step one of the analysis laid out in *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 844 (1984), the court determines that Congress has already spoken to the issue of whether DHS can issue employment authorization regulations, *see* 8 U.S.C. §§ 1103(a)(1), 1324a(h)(3), though not precisely to the question of whether it may do so for H-4 visa holders. When Congress is not entirely clear, the court proceeds to *Chevron* step two, which asks whether DHS acted under a "reasonable

---

[3] *See* 8 U.S.C. § 1103(a)(1) ("The Secretary of Homeland Security shall be charged with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens . . . ."); *id.* § 1184(a)(1) ("The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General may by regulations prescribe . . . ."); *id.* § 1324a(h)(3) ("[T]he term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General.").

interpretation" of the statutes. *Chevron*, 467 U.S. at 844. This court must uphold the H-4 Rule unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Id.*; *see also Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 71 (D.C. Cir. 2000) ("Under *Chevron*, we are bound to uphold agency interpretations as long as they are reasonable—'regardless whether there may be other reasonable, or even more reasonable, views.'") (quoting *Serono Lab., Inc. v. Shalala*, 158 F.3d 1313, 1321 (D.C. Cir. 1998)). Defendant argues that Congress's acquiescence in its employment authorization rulemaking, stretching back as far as the 1952 passage of INA § 1103 (delegating enforcement of the INA to the Attorney General), indicates its interpretation of its authority is reasonable. This long-standing interpretation has never been altered by Congress. Indeed, the U.S. Attorney General adopted a final rule in June 1981 which recognized its broad authority to issue employment authorization to foreign workers, *see* 46 Fed. Reg. 25,079 (June 4, 1981), and shortly thereafter Congress passed the Immigration Reform and Control Act of 1986, amending the INA and including the new § 1324a(h)(3), which affirmed the Attorney General's authority by specifically mentioning foreign workers "authorized to be so employed by this chapter *or by the Attorney General*." 8 U.S.C. § 1324a(h)(3) (emphasis added).

Moreover, the H-4 Rule is not arbitrary, capricious, or manifestly contrary to the INA. The court's role here is simply to find "a rational connection between the facts found and the choice made" by DHS. *State Farm*, 463 U.S. at 43. Plaintiff argues that DHS reversed long-standing policy without adequate explanation and improperly concluded that 179,600 additional foreign workers will have a minimal impact on U.S. workers. However, the record indicates that DHS clearly justified its change in policy, *see* 80 Fed. Reg. 10,284 (describing the purpose of the regulatory action), and carefully considered the impact the rule will have on U.S. labor markets, *see id.* at 10,295–96, 10,301. Plaintiff additionally refers to numerous provisions of the INA that

are allegedly violated by the H-4 Rule, without explaining why the rule violates these statutes. None of those provisions offer support for Plaintiff's argument that the INA bars DHS from authorizing this subset of H-4 visa holders to seek employment while transitioning to LPT status.

Given Plaintiff's lack of standing in this case, the court makes no final determination on the merits of Plaintiff's APA claim.  However, in light of the broad delegation of authority Congress conferred to DHS to set rules regarding employment authorization in §§ 1103(a) and 1324(h)(3), and its thorough consideration of the relevant factors in its decision-making, the court would likely conclude that DHS's interpretation of its authority under the INA is not unreasonable, and the H-4 Rule is a valid exercise of this rulemaking authority.

## IV.     CONCLUSION

For the foregoing reasons, the court grants Defendant's Cross-Motion for Summary Judgment and denies Plaintiff's Motion for Summary Judgment.


Date:  September 27, 2016


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge