# Exhibit A

(Slip Opinion)          OCTOBER TERM, 2019          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DEPARTMENT OF HOMELAND SECURITY ET AL. *v.* REGENTS OF THE UNIVERSITY OF CALIFORNIA ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 18–587.   Argued November 12, 2019—Decided June 18, 2020*

In 2012, the Department of Homeland Security (DHS) issued a memorandum announcing an immigration relief program known as Deferred Action for Childhood Arrivals (DACA), which allows certain unauthorized aliens who arrived in the United States as children to apply for a two-year forbearance of removal. Those granted such relief become eligible for work authorization and various federal benefits. Some 700,000 aliens have availed themselves of this opportunity.

   Two years later, DHS expanded DACA eligibility and created a related program known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). If implemented, that program would have made 4.3 million parents of U. S. citizens or lawful permanent residents eligible for the same forbearance from removal, work eligibility, and other benefits as DACA recipients. Texas, joined by 25 other States, secured a nationwide preliminary injunction barring implementation of both the DACA expansion and DAPA. The Fifth Circuit upheld the injunction, concluding that the program violated the Immigration and Nationality Act (INA), which carefully defines eligibility for benefits. This Court affirmed by an equally divided vote, and

———————
   *Together with No. 18–588, *Trump, President of the United States, et al.* v. *National Association for the Advancement of Colored People et al.,* on certiorari before judgment to the United States Court of Appeals for the District of Columbia Circuit, and No. 18–589, *Wolf, Acting Secretary of Homeland Security, et al.* v. *Batalla Vidal et al.,* on certiorari before judgment to the United States Court of Appeals for the Second Circuit.

the litigation then continued in the District Court.

In June 2017, following a change in Presidential administrations, DHS rescinded the DAPA Memorandum, citing, among other reasons, the ongoing suit by Texas and new policy priorities. That September, the Attorney General advised Acting Secretary of Homeland Security Elaine C. Duke that DACA shared DAPA's legal flaws and should also be rescinded. The next day, Duke acted on that advice. Taking into consideration the Fifth Circuit and Supreme Court rulings and the Attorney General's letter, Duke decided to terminate the program. She explained that DHS would no longer accept new applications, but that existing DACA recipients whose benefits were set to expire within six months could apply for a two-year renewal. For all other DACA recipients, previously issued grants of relief would expire on their own terms, with no prospect for renewal.

Several groups of plaintiffs challenged Duke's decision to rescind DACA, claiming that it was arbitrary and capricious in violation of the Administrative Procedure Act (APA) and infringed the equal protection guarantee of the Fifth Amendment's Due Process Clause. District Courts in California (*Regents*, No. 18–587), New York (*Batalla Vidal*, No. 18–589), and the District of Columbia (*NAACP*, No. 18–588) all ruled for the plaintiffs. Each court rejected the Government's arguments that the claims were unreviewable under the APA and that the INA deprived the courts of jurisdiction. In *Regents* and *Batalla Vidal*, the District Courts further held that the equal protection claims were adequately alleged, and they entered coextensive nationwide preliminary injunctions based on the conclusion that the plaintiffs were likely to succeed on their APA claims. The District Court in *NAACP* took a different approach. It deferred ruling on the equal protection challenge but granted partial summary judgment to the plaintiffs on their APA claim, finding that the rescission was inadequately explained. The court then stayed its order for 90 days to permit DHS to reissue a memorandum rescinding DACA, this time with a fuller explanation of the conclusion that DACA was unlawful. Two months later, Duke's successor, Secretary Kirstjen M. Nielsen, responded to the court's order. She declined to disturb or replace Duke's rescission decision and instead explained why she thought her predecessor's decision was sound. In addition to reiterating the illegality conclusion, she offered several new justifications for the rescission. The Government moved for the District Court to reconsider in light of this additional explanation, but the court concluded that the new reasoning failed to elaborate meaningfully on the illegality rationale.

The Government appealed the various District Court decisions to the Second, Ninth, and D. C. Circuits, respectively. While those appeals were pending, the Government filed three petitions for certiorari

Syllabus

before judgment. Following the Ninth Circuit affirmance in *Regents*, this Court granted certiorari.

*Held*: The judgment in No. 18–587 is vacated in part and reversed in part; the judgment in No. 18–588 is affirmed; the February 13, 2018 order in No. 18–589 is vacated, the November 9, 2017 order is affirmed in part, and the March 29, 2018 order is reversed in part; and all of the cases are remanded.

No. 18–587, 908 F. 3d 476, vacated in part and reversed in part; No. 18–588, affirmed; and No. 18–589, February 13, 2018 order vacated, November 9, 2017 order affirmed in part, and March 29, 2018 order reversed in part; all cases remanded.

THE CHIEF JUSTICE delivered the opinion of the Court, except as to Part IV, concluding:

1. DHS's rescission decision is reviewable under the APA and is within this Court's jurisdiction. Pp. 9–13.

(a) The APA's "basic presumption of judicial review" of agency action, *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 140, can be rebutted by showing that the "agency action is committed to agency discretion by law," 5 U. S. C. §701(a)(2). In *Heckler* v. *Chaney*, the Court held that this narrow exception includes an agency's decision not to institute an enforcement action. 470 U. S. 821, 831–832. The Government contends that DACA is a general non-enforcement policy equivalent to the individual non-enforcement decision in *Chaney*. But the DACA Memorandum did not merely decline to institute enforcement proceedings; it created a program for conferring affirmative immigration relief. Therefore, unlike the non-enforcement decision in *Chaney*, DACA's creation—and its rescission—is an "action [that] provides a focus for judicial review." *Id.,* at 832. In addition, by virtue of receiving deferred action, 700,000 DACA recipients may request work authorization and are eligible for Social Security and Medicare. Access to such benefits is an interest "courts often are called upon to protect." *Ibid.* DACA's rescission is thus subject to review under the APA. Pp. 9–12.

(b) The two jurisdictional provisions of the INA invoked by the Government do not apply. Title 8 U. S. C. §1252(b)(9), which bars review of claims arising from "action[s]" or "proceeding[s] brought to remove an alien," is inapplicable where, as here, the parties do not challenge any removal proceedings. And the rescission is not a decision "to commence proceedings, adjudicate cases, or execute removal orders" within the meaning of §1252(g). Pp. 12–13.

2. DHS's decision to rescind DACA was arbitrary and capricious under the APA. Pp. 13–26.

(a) In assessing the rescission, the Government urges the Court to consider not just the contemporaneous explanation offered by Acting Secretary Duke but also the additional reasons supplied by Secretary

Syllabus

Nielsen nine months later.  Judicial review of agency action, however, is limited to "the grounds that the agency invoked when it took the action."  *Michigan* v. *EPA*, 576 U. S. 743, 758.  If those grounds are inadequate, a court may remand for the agency to offer "a fuller explanation of the agency's reasoning *at the time of the agency action,*" *Pension Benefit Guaranty Corporation* v. *LTV Corp.*, 496 U. S. 633, 654 (emphasis added), or to "deal with the problem afresh" by taking *new* agency action, *SEC* v. *Chenery Corp.,* 332 U. S. 194, 201.  Because Secretary Nielsen chose not to take new action, she was limited to elaborating on the agency's original reasons.  But her reasoning bears little relationship to that of her predecessor and consists primarily of impermissible "*post hoc* rationalization."  *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402, 420.  The rule requiring a new decision before considering new reasons is not merely a formality.  It serves important administrative law values by promoting agency accountability to the public, instilling confidence that the reasons given are not simply convenient litigating positions, and facilitating orderly review.  Each of these values would be markedly undermined if this Court allowed DHS to rely on reasons offered nine months after the rescission and after three different courts had identified flaws in the original explanation.  Pp. 13–17.

    (b)  Acting Secretary Duke's rescission memorandum failed to consider important aspects of the problem before the agency.  Although Duke was bound by the Attorney General's determination that DACA is illegal, see 8 U. S. C. §1103(a)(1), deciding how best to address that determination involved important policy choices reserved for DHS.  Acting Secretary Duke plainly exercised such discretionary authority in winding down the program, but she did not appreciate the full scope of her discretion.  The Attorney General concluded that the legal defects in DACA mirrored those that the courts had recognized in DAPA.  The Fifth Circuit, the highest court to offer a reasoned opinion on DAPA's legality, found that DAPA violated the INA because it extended eligibility for benefits to a class of unauthorized aliens.  But the defining feature of DAPA (and DACA) is DHS's decision to defer removal, and the Fifth Circuit carefully distinguished that forbearance component from the associated benefits eligibility.  Eliminating benefits eligibility while continuing forbearance thus remained squarely within Duke's discretion.  Yet, rather than addressing forbearance in her decision, Duke treated the Attorney General's conclusion regarding the illegality of benefits as sufficient to rescind both benefits and forbearance, without explanation.  That reasoning repeated the error in *Motor Vehicle Manufacturers Association of the United States, Inc.* v. *State Farm*— treating a rationale that applied to only part of a policy as sufficient to rescind the entire policy.  463 U. S. 29, 51.  While DHS

Syllabus

was not required to "consider all policy alternatives," *ibid.*, deferred action was "within the ambit of the existing" policy, *ibid.*; indeed, it was the centerpiece of the policy.  In failing to consider the option to retain deferred action, Duke "failed to supply the requisite 'reasoned analysis.'"  *Id., at* 57.

That omission alone renders Duke's decision arbitrary and capricious, but it was not the only defect.  Duke also failed to address whether there was "legitimate reliance" on the DACA Memorandum. *Smiley* v. *Citibank (South Dakota), N. A.*, 517 U. S. 735, 742.  Certain features of the DACA policy may affect the strength of any reliance interests, but those features are for the agency to consider in the first instance.  DHS has flexibility in addressing any reliance interests and could have considered various accommodations.  While the agency was not required to pursue these accommodations, it was required to assess the existence and strength of any reliance interests, and weigh them against competing policy concerns.  Its failure to do so was arbitrary and capricious.  Pp. 17–26.

THE CHIEF JUSTICE, joined by JUSTICE GINSBURG, JUSTICE BREYER, and JUSTICE KAGAN, concluded in Part IV that respondents' claims fail to establish a plausible inference that the rescission was motivated by animus in violation of the equal protection guarantee of the Fifth Amendment.  Pp. 27–29.

ROBERTS, C. J., delivered the opinion of the Court, except as to Part IV. GINSBURG, BREYER, and KAGAN, JJ., joined that opinion in full, and SO-TOMAYOR, J., joined as to all but Part IV.  SOTOMAYOR, J., filed an opinion concurring in part, concurring in the judgment in part, and dissenting in part.  THOMAS, J., filed an opinion concurring in the judgment in part and dissenting in part, in which ALITO and GORSUCH, JJ., joined.  ALITO, J., and KAVANAUGH, J., filed opinions concurring in the judgment in part and dissenting in part.

Cite as: 591 U. S. ____ (2020)        1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES
_____

Nos. 18–587, 18–588, and 18–589
_____

DEPARTMENT OF HOMELAND SECURITY, ET AL., PETITIONERS

18–587                *v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT


DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS

18–588                *v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.; AND

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT


CHAD WOLF, ACTING SECRETARY OF HOMELAND SECURITY, ET AL., PETITIONERS

18–589                *v.*

MARTIN JONATHAN BATALLA VIDAL, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 18, 2020]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court, except as to Part IV.

In the summer of 2012, the Department of Homeland Security (DHS) announced an immigration program known as Deferred Action for Childhood Arrivals, or DACA. That program allows certain unauthorized aliens who entered the United States as children to apply for a two-year forbearance of removal. Those granted such relief are also eligible for work authorization and various federal benefits. Some 700,000 aliens have availed themselves of this opportunity.

Five years later, the Attorney General advised DHS to rescind DACA, based on his conclusion that it was unlawful. The Department's Acting Secretary issued a memorandum terminating the program on that basis. The termination was challenged by affected individuals and third parties who alleged, among other things, that the Acting Secretary had violated the Administrative Procedure Act (APA) by failing to adequately address important factors bearing on her decision. For the reasons that follow, we conclude that the Acting Secretary did violate the APA, and that the rescission must be vacated.

I

A

In June 2012, the Secretary of Homeland Security issued a memorandum announcing an immigration relief program for "certain young people who were brought to this country as children." App. to Pet. for Cert. in No. 18–587, p. 97a (App. to Pet. for Cert.). Known as DACA, the program applies to childhood arrivals who were under age 31 in 2012; have continuously resided here since 2007; are current students, have completed high school, or are honorably discharged veterans; have not been convicted of any serious crimes; and do not threaten national security or public

Opinion of the Court

safety. *Id.*, at 98a. DHS concluded that individuals who meet these criteria warrant favorable treatment under the immigration laws because they "lacked the intent to violate the law," are "productive" contributors to our society, and "know only this country as home." *Id.*, at 98a–99a.

"[T]o prevent [these] low priority individuals from being removed from the United States," the DACA Memorandum instructs Immigration and Customs Enforcement to "exercise prosecutorial discretion[] on an individual basis . . . by deferring action for a period of two years, subject to renewal." *Id.*, at 100a. In addition, it directs U. S. Citizenship and Immigration Services (USCIS) to "accept applications to determine whether these individuals qualify for work authorization during this period of deferred action," *id.*, at 101a, as permitted under regulations long predating DACA's creation, see 8 CFR §274a.12(c)(14) (2012) (permitting work authorization for deferred action recipients who establish "economic necessity"); 46 Fed. Reg. 25080–25081 (1981) (similar). Pursuant to other regulations, deferred action recipients are considered "lawfully present" for purposes of, and therefore eligible to receive, Social Security and Medicare benefits. See 8 CFR §1.3(a)(4)(vi); 42 CFR §417.422(h) (2012).

In November 2014, two years after DACA was promulgated, DHS issued a memorandum announcing that it would expand DACA eligibility by removing the age cap, shifting the date-of-entry requirement from 2007 to 2010, and extending the deferred action and work authorization period to three years. App. to Pet. for Cert. 106a–107a. In the same memorandum, DHS created a new, related program known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA. That program would have authorized deferred action for up to 4.3 million parents whose children were U. S. citizens or lawful permanent residents. These parents were to enjoy the same forbearance, work eligibility, and other benefits as DACA

recipients.

Before the DAPA Memorandum was implemented, 26
States, led by Texas, filed suit in the Southern District of
Texas. The States contended that DAPA and the DACA
expansion violated the APA's notice and comment require-
ment, the Immigration and Nationality Act (INA), and the
Executive's duty under the Take Care Clause of the Consti-
tution. The District Court found that the States were likely
to succeed on the merits of at least one of their claims and
entered a nationwide preliminary injunction barring imple-
mentation of both DAPA and the DACA expansion. See
*Texas* v. *United States*, 86 F. Supp. 3d 591, 677–678 (2015).

A divided panel of the Court of Appeals for the Fifth Cir-
cuit affirmed the preliminary injunction. *Texas* v. *United
States*, 809 F. 3d 134, 188 (2015). In opposing the injunc-
tion, the Government argued that the DAPA Memorandum
reflected an unreviewable exercise of the Government's en-
forcement discretion. The Fifth Circuit majority disagreed.
It reasoned that the deferred action described in the DAPA
Memorandum was "much more than nonenforcement: It
would affirmatively confer 'lawful presence' and associated
benefits on a class of unlawfully present aliens." *Id.*, at 166.
From this, the majority concluded that the creation of the
DAPA program was not an unreviewable action "committed
to agency discretion by law." *Id.*, at 169 (quoting 5 U. S. C.
§701(a)(2)).

The majority then upheld the injunction on two grounds.
It first concluded the States were likely to succeed on their
procedural claim that the DAPA Memorandum was a sub-
stantive rule that was required to undergo notice and com-
ment. It then held that the APA required DAPA to be set
aside because the program was "manifestly contrary" to the
INA, which "expressly and carefully provides legal designa-
tions allowing defined classes" to "receive the benefits" as-
sociated with "lawful presence" and to qualify for work

Opinion of the Court

authorization, 809 F. 3d, at 179–181, 186 (internal quotation marks omitted). Judge King dissented.

This Court affirmed the Fifth Circuit's judgment by an equally divided vote, which meant that no opinion was issued. *United States* v. *Texas*, 579 U. S. ___ (2016) (*per curiam*). For the next year, litigation over DAPA and the DACA expansion continued in the Southern District of Texas, while implementation of those policies remained enjoined.

Then, in June 2017, following a change in Presidential administrations, DHS rescinded the DAPA Memorandum. In explaining that decision, DHS cited the preliminary injunction and ongoing litigation in Texas, the fact that DAPA had never taken effect, and the new administration's immigration enforcement priorities.

Three months later, in September 2017, Attorney General Jefferson B. Sessions III sent a letter to Acting Secretary of Homeland Security Elaine C. Duke, "advis[ing]" that DHS "should rescind" DACA as well. App. 877. Citing the Fifth Circuit's opinion and this Court's equally divided affirmance, the Attorney General concluded that DACA shared the "same legal . . . defects that the courts recognized as to DAPA" and was "likely" to meet a similar fate. *Id.*, at 878. "In light of the costs and burdens" that a rescission would "impose[] on DHS," the Attorney General urged DHS to "consider an orderly and efficient wind-down process." *Ibid.*

The next day, Duke acted on the Attorney General's advice. In her decision memorandum, Duke summarized the history of the DACA and DAPA programs, the Fifth Circuit opinion and ensuing affirmance, and the contents of the Attorney General's letter. App. to Pet. for Cert. 111a–117a. "Taking into consideration the Supreme Court's and the Fifth Circuit's rulings" and the "letter from the Attorney General," she concluded that the "DACA program should be terminated." *Id.*, at 117a.

Duke then detailed how the program would be wound down: No new applications would be accepted, but DHS would entertain applications for two-year renewals from DACA recipients whose benefits were set to expire within six months. For all other DACA recipients, previously issued grants of deferred action and work authorization would not be revoked but would expire on their own terms, with no prospect for renewal. *Id.*, at 117a–118a.

## B

Within days of Acting Secretary Duke's rescission announcement, multiple groups of plaintiffs ranging from individual DACA recipients and States to the Regents of the University of California and the National Association for the Advancement of Colored People challenged her decision in the U. S. District Courts for the Northern District of California (*Regents*, No. 18–587), the Eastern District of New York (*Batalla Vidal*, No. 18–589), and the District of Columbia (*NAACP*, No. 18–588). The relevant claims are that the rescission was arbitrary and capricious in violation of the APA and that it infringed the equal protection guarantee of the Fifth Amendment's Due Process Clause.[1]

All three District Courts ruled for the plaintiffs, albeit at different stages of the proceedings.[2] In doing so, each court rejected the Government's threshold arguments that the

---

[1] Plaintiffs also raised notice and comment claims, which uniformly failed below, and assorted due process challenges, some of which survived motions to dismiss. Those claims are not before us.

[2] In a related challenge not at issue here, the District Court for the District of Maryland granted partial summary judgment in favor of the Government. *Casa de Maryland* v. *United States Dept. of Homeland Security*, 284 F. Supp. 3d 758 (2018). After the Government filed petitions for certiorari in the instant cases, the Fourth Circuit reversed that decision and vacated Acting Secretary Duke's rescission as arbitrary and capricious. *Casa de Maryland* v. *United States Dept. of Homeland Security*, 924 F. 3d 684 (2019), cert. pending, No. 18–1469. The Fourth Circuit has since stayed its mandate.

Opinion of the Court

claims were unreviewable under the APA and that the INA deprived the court of jurisdiction. 298 F. Supp. 3d 209, 223–224, 234–235 (DC 2018); 279 F. Supp. 3d 1011, 1029–1033 (ND Cal. 2018); 295 F. Supp. 3d 127, 150, 153–154 (EDNY 2017).

In *Regents* and *Batalla Vidal*, the District Courts held that the equal protection claims were adequately alleged. 298 F. Supp. 3d 1304, 1315 (ND Cal. 2018); 291 F. Supp. 3d 260, 279 (EDNY 2018). Those courts also entered coextensive nationwide preliminary injunctions, based on the conclusion that the plaintiffs were likely to succeed on the merits of their claims that the rescission was arbitrary and capricious. These injunctions did not require DHS to accept new applications, but did order the agency to allow DACA recipients to "renew their enrollments." 279 F. Supp. 3d, at 1048; see 279 F. Supp. 3d 401, 437 (EDNY 2018).

In *NAACP*, the D. C. District Court took a different course. In April 2018, it deferred ruling on the equal protection challenge but granted partial summary judgment to the plaintiffs on their APA claim, holding that Acting Secretary Duke's "conclusory statements were insufficient to explain the change in [the agency's] view of DACA's lawfulness." 298 F. Supp. 3d, at 243. The District Court stayed its order for 90 days to permit DHS to "reissue a memorandum rescinding DACA, this time providing a fuller explanation for the determination that the program lacks statutory and constitutional authority." *Id.*, at 245.

Two months later, Duke's successor, Secretary Kirstjen M. Nielsen, responded via memorandum. App. to Pet. for Cert. 120a–126a. She explained that, "[h]aving considered the Duke memorandum," she "decline[d] to disturb" the rescission. *Id.*, at 121a. Secretary Nielsen went on to articulate her "understanding" of Duke's memorandum, identifying three reasons why, in Nielsen's estimation, "the decision to rescind the DACA policy was, and remains, sound." *Ibid.* First, she reiterated that, "as the Attorney

General concluded, the DACA policy was contrary to law." *Id.*, at 122a.  Second, she added that, regardless, the agency had "serious doubts about [DACA's] legality" and, for law enforcement reasons, wanted to avoid "legally questionable" policies.  *Id.*, at 123a.  Third, she identified multiple policy reasons for rescinding DACA, including (1) the belief that any class-based immigration relief should come from Congress, not through executive non-enforcement; (2) DHS's preference for exercising prosecutorial discretion on "a truly individualized, case-by-case basis"; and (3) the importance of "project[ing] a message" that immigration laws would be enforced against all classes and categories of aliens.  *Id.*, at 123a–124a.  In her final paragraph, Secretary Nielsen acknowledged the "asserted reliance interests" in DACA's continuation but concluded that they did not "outweigh the questionable legality of the DACA policy and the other reasons" for the rescission discussed in her memorandum.  *Id.*, at 125a.

The Government asked the D. C. District Court to revise its prior order in light of the reasons provided by Secretary Nielsen, but the court declined.  In the court's view, the new memorandum, which "fail[ed] to elaborate meaningfully" on the agency's illegality rationale, still did not provide an adequate explanation for the September 2017 rescission. 315 F. Supp. 3d 457, 460, 473–474 (2018).

The Government appealed the various District Court decisions to the Second, Ninth, and D. C. Circuits, respectively.  In November 2018, while those appeals were pending, the Government simultaneously filed three petitions for certiorari before judgment.  After the Ninth Circuit affirmed the nationwide injunction in *Regents*, see 908 F. 3d 476 (2018), but before rulings from the other two Circuits, we granted the petitions and consolidated the cases for argument.  588 U. S. ___ (2019).  The issues raised here are (1) whether the APA claims are reviewable, (2) if so,

Opinion of the Court

whether the rescission was arbitrary and capricious in violation of the APA, and (3) whether the plaintiffs have stated an equal protection claim.

## II

The dispute before the Court is not whether DHS may rescind DACA. All parties agree that it may. The dispute is instead primarily about the procedure the agency followed in doing so.

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin* v. *Massachusetts*, 505 U. S. 788, 796 (1992). It requires agencies to engage in "reasoned decisionmaking," *Michigan* v. *EPA*, 576 U. S. 743, 750 (2015) (internal quotation marks omitted), and directs that agency actions be "set aside" if they are "arbitrary" or "capricious," 5 U. S. C. §706(2)(A). Under this "narrow standard of review, . . . a court is not to substitute its judgment for that of the agency," *FCC* v. *Fox Television Stations, Inc.*, 556 U. S. 502, 513 (2009) (internal quotation marks omitted), but instead to assess only whether the decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402, 416 (1971).

But before determining whether the rescission was arbitrary and capricious, we must first address the Government's contentions that DHS's decision is unreviewable under the APA and outside this Court's jurisdiction.

## A

The APA establishes a "basic presumption of judicial review [for] one 'suffering legal wrong because of agency action.'" *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 140 (1967) (quoting §702). That presumption can be rebutted by a showing that the relevant statute "preclude[s]" review,

10          DEPARTMENT OF HOMELAND SECURITY *v.*
                    REGENTS OF UNIV. OF CAL.

                    Opinion of the Court

§701(a)(1), or that the "agency action is committed to
agency discretion by law," §701(a)(2). The latter exception
is at issue here.

To "honor the presumption of review, we have read the
exception in §701(a)(2) quite narrowly," *Weyerhaeuser Co.*
v. *United States Fish and Wildlife Serv.*, 586 U. S. ___, ___
(2018) (slip op., at 12), confining it to those rare "adminis-
trative decision[s] traditionally left to agency discretion,"
*Lincoln* v. *Vigil*, 508 U. S. 182, 191 (1993). This limited cat-
egory of unreviewable actions includes an agency's decision
not to institute enforcement proceedings, *Heckler* v.
*Chaney*, 470 U. S. 821, 831–832 (1985), and it is on that ex-
ception that the Government primarily relies.

In *Chaney*, several death-row inmates petitioned the
Food and Drug Administration (FDA) to take enforcement
action against two States to prevent their use of certain
drugs for lethal injection. The Court held that the FDA's
denial of that petition was presumptively unreviewable in
light of the well-established "tradition" that "an agency's
decision not to prosecute or enforce" is "generally commit-
ted to an agency's absolute discretion." *Id.*, at 831. We
identified a constellation of reasons that underpin this tra-
dition. To start, a non-enforcement decision "often involves
a complicated balancing of a number of factors which
are peculiarly within [the agency's] expertise," such as
"whether the particular enforcement action requested best
fits the agency's overall policies." *Ibid.* The decision also
mirrors, "to some extent," a prosecutor's decision not to in-
dict, which has "long been regarded as the special province
of the Executive Branch." *Id.*, at 832. And, as a practical
matter, "when an agency refuses to act" there is no action
to "provide[] a focus for judicial review." *Ibid.*

The Government contends that a general non-enforcement
policy is equivalent to the individual non-enforcement
decision at issue in *Chaney*. In each case, the Government
argues, the agency must balance factors peculiarly within

Opinion of the Court

its expertise, and does so in a manner akin to a criminal prosecutor.  Building on that premise, the Government argues that the rescission of a non-enforcement policy is no different—for purposes of reviewability—from the adoption of that policy.  While the rescission may lead to increased enforcement, it does not, by itself, constitute a particular enforcement action.  Applying this logic to the facts here, the Government submits that DACA is a non-enforcement policy and that its rescission is therefore unreviewable.

But we need not test this chain of reasoning because DACA is not simply a non-enforcement policy.  For starters, the DACA Memorandum did not merely "refus[e] to institute proceedings" against a particular entity or even a particular class.  *Ibid.*  Instead, it directed USCIS to "establish a clear and efficient process" for identifying individuals who met the enumerated criteria.  App. to Pet. for Cert. 100a. Based on this directive, USCIS solicited applications from eligible aliens, instituted a standardized review process, and sent formal notices indicating whether the alien would receive the two-year forbearance.  These proceedings are effectively "adjudicat[ions]."  *Id.*, at 117a.  And the result of these adjudications—DHS's decision to "grant deferred action," Brief for Petitioners 45—is an "affirmative act of approval," the very opposite of a "refus[al] to act," *Chaney*, 470 U. S., at 831–832.  In short, the DACA Memorandum does not announce a passive non-enforcement policy; it created a program for conferring affirmative immigration relief. The creation of that program—and its rescission—is an "action [that] provides a focus for judicial review."  *Id.*, at 832.

The benefits attendant to deferred action provide further confirmation that DACA is more than simply a non-enforcement policy.  As described above, by virtue of receiving deferred action, the 700,000 DACA recipients may request work authorization and are eligible for Social Security and Medicare.  See *supra*, at 3.  Unlike an agency's refusal to take requested enforcement action, access to these

types of benefits is an interest "courts often are called upon
to protect." *Chaney*, 470 U. S., at 832. See also *Barnhart* v.
*Thomas*, 540 U. S. 20 (2003) (reviewing eligibility determi-
nation for Social Security benefits).

Because the DACA program is more than a non-enforce-
ment policy, its rescission is subject to review under the
APA.

### B

The Government also invokes two jurisdictional provi-
sions of the INA as independent bars to review. Neither
applies.

Section 1252(b)(9) bars review of claims arising from "ac-
tion[s]" or "proceeding[s] brought to remove an alien." 66
Stat. 209, as amended, 8 U. S. C. §1252(b)(9). That tar-
geted language is not aimed at this sort of case. As we have
said before, §1252(b)(9) "does not present a jurisdictional
bar" where those bringing suit "are not asking for review of
an order of removal," "the decision . . . to seek removal," or
"the process by which . . . removability will be determined."
*Jennings* v. *Rodriguez*, 583 U. S. ___, ___–___ (2018) (plu-
rality opinion) (slip op., at 10–11); *id.*, at ___ (BREYER, J.,
dissenting) (slip op., at 31). And it is certainly not a bar
where, as here, the parties are not challenging any removal
proceedings.

Section 1252(g) is similarly narrow. That provision limits
review of cases "arising from" decisions "to commence pro-
ceedings, adjudicate cases, or execute removal orders."
§1252(g). We have previously rejected as "implausible" the
Government's suggestion that §1252(g) covers "all claims
arising from deportation proceedings" or imposes "a general
jurisdictional limitation." *Reno* v. *American-Arab Anti-
Discrimination Comm.*, 525 U. S. 471, 482 (1999). The re-
scission, which revokes a deferred action program with as-
sociated benefits, is not a decision to "commence proceed-
ings," much less to "adjudicate" a case or "execute" a

Opinion of the Court

removal order.

With these preliminary arguments out of the way, we proceed to the merits.

### III

### A

Deciding whether agency action was adequately explained requires, first, knowing where to look for the agency's explanation. The natural starting point here is the explanation provided by Acting Secretary Duke when she announced the rescission in September 2017. But the Government urges us to go on and consider the June 2018 memorandum submitted by Secretary Nielsen as well. That memo was prepared after the D. C. District Court vacated the Duke rescission and gave DHS an opportunity to "reissue a memorandum rescinding DACA, this time providing a fuller explanation for the determination that the program lacks statutory and constitutional authority." 298 F. Supp. 3d, at 245. According to the Government, the Nielsen Memorandum is properly before us because it was invited by the District Court and reflects the views of the Secretary of Homeland Security—the official responsible for immigration policy. Respondents disagree, arguing that the Nielsen Memorandum, issued nine months after the rescission, impermissibly asserts prudential and policy reasons not relied upon by Duke.

It is a "foundational principle of administrative law" that judicial review of agency action is limited to "the grounds that the agency invoked when it took the action." *Michigan*, 576 U. S., at 758. If those grounds are inadequate, a court may remand for the agency to do one of two things: First, the agency can offer "a fuller explanation of the agency's reasoning *at the time of the agency action.*" *Pension Benefit Guaranty Corporation* v. *LTV Corp.*, 496 U. S. 633, 654 (1990) (emphasis added). See also *Alpharma, Inc.* v.

*Leavitt*, 460 F. 3d 1, 5–6 (CADC 2006) (Garland, J.) (permitting an agency to provide an "amplified articulation" of a prior "conclusory" observation (internal quotation marks omitted)). This route has important limitations. When an agency's initial explanation "indicate[s] the determinative reason for the final action taken," the agency may elaborate later on that reason (or reasons) but may not provide new ones. *Camp* v. *Pitts*, 411 U. S. 138, 143 (1973) (*per curiam*). Alternatively, the agency can "deal with the problem afresh" by taking *new* agency action. *SEC* v. *Chenery Corp.*, 332 U. S. 194, 201 (1947) (*Chenery II*). An agency taking this route is not limited to its prior reasons but must comply with the procedural requirements for new agency action.

The District Court's remand thus presented DHS with a choice: rest on the Duke Memorandum while elaborating on its prior reasoning, or issue a new rescission bolstered by new reasons absent from the Duke Memorandum. Secretary Nielsen took the first path. Rather than making a new decision, she "decline[d] to disturb the Duke memorandum's rescission" and instead "provide[d] further explanation" for that action. App. to Pet. for Cert. 121a. Indeed, the Government's subsequent request for reconsideration described the Nielsen Memorandum as "additional explanation for [Duke's] decision" and asked the District Court to "leave in place [Duke's] September 5, 2017 decision to rescind the DACA policy." Motion to Revise Order in No. 17–cv–1907 etc. (D DC), pp. 2, 19. Contrary to the position of the Government before this Court, and of JUSTICE KAVANAUGH in dissent, *post*, at 4 (opinion concurring in judgment in part and dissenting in part), the Nielsen Memorandum was by its own terms not a new rule implementing a new policy.

Because Secretary Nielsen chose to elaborate on the reasons for the initial rescission rather than take new administrative action, she was limited to the agency's original reasons, and her explanation "must be viewed critically" to

Opinion of the Court

ensure that the rescission is not upheld on the basis of impermissible "*post hoc* rationalization." *Overton Park*, 401 U. S., at 420. But despite purporting to explain the Duke Memorandum, Secretary Nielsen's reasoning bears little relationship to that of her predecessor. Acting Secretary Duke rested the rescission on the conclusion that DACA is unlawful. Period. See App. to Pet. for Cert. 117a. By contrast, Secretary Nielsen's new memorandum offered three "separate and independently sufficient reasons" for the rescission, *id.*, at 122a, only the first of which is the conclusion that DACA is illegal.

Her second reason is that DACA is, at minimum, legally *questionable* and should be terminated to maintain public confidence in the rule of law and avoid burdensome litigation. No such justification can be found in the Duke Memorandum. Legal uncertainty is, of course, related to illegality. But the two justifications are meaningfully distinct, especially in this context. While an agency might, for one reason or another, choose to do nothing in the face of uncertainty, illegality presumably requires remedial action of some sort.

The policy reasons that Secretary Nielsen cites as a third basis for the rescission are also nowhere to be found in the Duke Memorandum. That document makes no mention of a preference for legislative fixes, the superiority of case-by-case decisionmaking, the importance of sending a message of robust enforcement, or any other policy consideration. Nor are these points included in the legal analysis from the Fifth Circuit and the Attorney General. They can be viewed only as impermissible *post hoc* rationalizations and thus are not properly before us.

The Government, echoed by JUSTICE KAVANAUGH, protests that requiring a new decision before considering Nielsen's new justifications would be "an idle and useless formality." *NLRB* v. *Wyman-Gordon Co.*, 394 U. S. 759, 766,

n. 6 (1969) (plurality opinion). See also *post*, at 5. Procedural requirements can often seem such. But here the rule serves important values of administrative law. Requiring a new decision before considering new reasons promotes "agency accountability," *Bowen* v. *American Hospital Assn.*, 476 U. S. 610, 643 (1986), by ensuring that parties and the public can respond fully and in a timely manner to an agency's exercise of authority. Considering only contemporaneous explanations for agency action also instills confidence that the reasons given are not simply "convenient litigating position[s]." *Christopher* v. *SmithKline Beecham Corp.*, 567 U. S. 142, 155 (2012) (internal quotation marks omitted). Permitting agencies to invoke belated justifications, on the other hand, can upset "the orderly functioning of the process of review," *SEC* v. *Chenery Corp.,* 318 U. S. 80, 94 (1943), forcing both litigants and courts to chase a moving target. Each of these values would be markedly undermined were we to allow DHS to rely on reasons offered nine months after Duke announced the rescission and after three different courts had identified flaws in the original explanation.

JUSTICE KAVANAUGH asserts that this "foundational principle of administrative law," *Michigan*, 576 U. S., at 758, actually limits only what lawyers may argue, not what agencies may do. *Post*, at 5. While it is true that the Court has often rejected justifications belatedly advanced by advocates, we refer to this as a prohibition on *post hoc* rationalizations, not advocate rationalizations, because the problem is the timing, not the speaker. The functional reasons for requiring contemporaneous explanations apply with equal force regardless whether *post hoc* justifications are raised in court by those appearing on behalf of the agency or by agency officials themselves. See *American Textile Mfrs. Institute, Inc.* v. *Donovan*, 452 U. S. 490, 539 (1981) ("[T]he *post hoc* rationalizations of the agency . . . cannot serve as a sufficient predicate for agency action."); *Overton*

Opinion of the Court

*Park*, 401 U. S., at 419 (rejecting "litigation affidavits" from agency officials as "merely '*post hoc*' rationalizations").[3]

Justice Holmes famously wrote that "[m]en must turn square corners when they deal with the Government." *Rock Island, A. & L. R. Co.* v. *United States*, 254 U. S. 141, 143 (1920). But it is also true, particularly when so much is at stake, that "the Government should turn square corners in dealing with the people." *St. Regis Paper Co.* v. *United States*, 368 U. S. 208, 229 (1961) (Black, J., dissenting). The basic rule here is clear: An agency must defend its actions based on the reasons it gave when it acted. This is not the case for cutting corners to allow DHS to rely upon reasons absent from its original decision.

## B

We turn, finally, to whether DHS's decision to rescind DACA was arbitrary and capricious. As noted earlier, Acting Secretary Duke's justification for the rescission was succinct: "Taking into consideration" the Fifth Circuit's conclusion that DAPA was unlawful because it conferred benefits in violation of the INA, and the Attorney General's conclusion that DACA was unlawful for the same reason, she concluded—without elaboration—that the "DACA program should be terminated." App. to Pet. for Cert. 117a.[4]

———————

[3] JUSTICE KAVANAUGH further argues that the contemporaneous explanation requirement applies only to agency adjudications, not rulemakings. *Post*, at 5–6 (opinion concurring in judgment in part and dissenting in part). But he cites no authority limiting this basic principle—which the Court regularly articulates in the context of rulemakings—to adjudications. The Government does not even raise this unheralded argument.

[4] The Government contends that Acting Secretary Duke also focused on litigation risk. Although the background section of her memo references a letter from the Texas Attorney General threatening to challenge DACA, the memo never asserts that the rescission was intended to avert litigation. And, given the Attorney General's conclusion that the policy was unlawful—and thus presumably could not be maintained or defended in its current form—it is difficult to see how the risk of litigation

Respondents maintain that this explanation is deficient for three reasons.  Their first and second arguments work in tandem, claiming that the Duke Memorandum does not adequately explain the conclusion that DACA is unlawful, and that this conclusion is, in any event, wrong.  While those arguments carried the day in the lower courts, in our view they overlook an important constraint on Acting Secretary Duke's decisionmaking authority—she was *bound* by the Attorney General's legal determination.

The same statutory provision that establishes the Secretary of Homeland Security's authority to administer and enforce immigration laws limits that authority, specifying that, with respect to "all questions of law," the determinations of the Attorney General "shall be controlling."   8 U. S. C. §1103(a)(1).  Respondents are aware of this constraint.  Indeed they emphasized the point in the reviewability sections of their briefs.  But in their merits arguments, respondents never addressed whether or how this unique statutory provision might affect our review.  They did not discuss whether Duke was required to explain a legal conclusion that was not hers to make.  Nor did they discuss whether the current suits challenging Duke's rescission decision, which everyone agrees was within her legal authority under the INA, are proper vehicles for attacking the Attorney General's legal conclusion.

Because of these gaps in respondents' briefing, we do not evaluate the claims challenging the explanation and correctness of the illegality conclusion.  Instead we focus our attention on respondents' third argument—that Acting Secretary Duke "failed to consider . . . important aspect[s] of the problem" before her.  *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43 (1983).

———————

carried any independent weight.

Opinion of the Court

Whether DACA is illegal is, of course, a legal determination, and therefore a question for the Attorney General. But deciding how best to address a finding of illegality moving forward can involve important policy choices, especially when the finding concerns a program with the breadth of DACA. Those policy choices are for DHS.

Acting Secretary Duke plainly exercised such discretionary authority in winding down the program. See App. to Pet. for Cert. 117a–118a (listing the Acting Secretary's decisions on eight transition issues). Among other things, she specified that those DACA recipients whose benefits were set to expire within six months were eligible for two-year renewals. *Ibid.*

But Duke did not appear to appreciate the full scope of her discretion, which picked up where the Attorney General's legal reasoning left off. The Attorney General concluded that "the DACA policy has the same legal . . . defects that the courts recognized as to DAPA." App. 878. So, to understand those defects, we look to the Fifth Circuit, the highest court to offer a reasoned opinion on the legality of DAPA. That court described the "core" issue before it as the "Secretary's decision" to grant "eligibility for benefits"—including work authorization, Social Security, and Medicare—to unauthorized aliens on "a class-wide basis." *Texas*, 809 F. 3d, at 170; see *id.*, at 148, 184. The Fifth Circuit's focus on these benefits was central to every stage of its analysis. See *id.*, at 155 (standing); *id.*, at 163 (zone of interest); *id.*, at 164 (applicability of §1252(g)); *id.*, at 166 (reviewability); *id.*, at 176–177 (notice and comment); *id.*, at 184 (substantive APA). And the Court ultimately held that DAPA was "manifestly contrary to the INA" precisely because it "would make 4.3 million otherwise removable aliens" eligible for work authorization and public benefits. *Id.*, at 181–182 (internal quotation marks omitted).[5]

———————
[5]As the Fifth Circuit noted, DAPA recipients were eligible for Social

But there is more to DAPA (and DACA) than such bene-
fits. The defining feature of deferred action is the decision
to defer removal (and to notify the affected alien of that de-
cision). See App. to Pet. for Cert. 99a. And the Fifth Circuit
was careful to distinguish that forbearance component from
eligibility for benefits. As it explained, the "challenged por-
tion of DAPA's deferred-action program" was the decision
to make DAPA recipients eligible for benefits. See *Texas*,
809 F. 3d, at 168, and n. 108. The other "[p]art of DAPA,"
the court noted, "involve[d] the Secretary's decision—at
least temporarily—not to enforce the immigration laws as
to a class of what he deem[ed] to be low-priority illegal al-
iens." *Id.*, at 166. Borrowing from this Court's prior de-
scription of deferred action, the Fifth Circuit observed that
"the states do not challenge the Secretary's decision to 'de-
cline to institute proceedings, terminate proceedings, or de-
cline to execute a final order of deportation.'" *Id.*, at 168
(quoting *Reno*, 525 U. S., at 484). And the Fifth Circuit un-
derscored that nothing in its decision or the preliminary in-
junction "requires the Secretary to remove any alien or to
alter" the Secretary's class-based "enforcement priorities."
*Texas*, 809 F. 3d, at 166, 169. In other words, the Secre-
tary's forbearance authority was unimpaired.

Acting Secretary Duke recognized that the Fifth Circuit's
holding addressed the benefits associated with DAPA. In
her memorandum she explained that the Fifth Circuit con-

———————

Security and Medicare benefits because they had been designated "law-
fully present." *Texas*, 809 F. 3d, at 168. Lawful presence is a statutory
prerequisite for receipt of certain benefits. See *id.,* at 148 (citing 8
U. S. C. §1611). It is not the same as forbearance nor does it flow inexo-
rably from forbearance. Thus, while deferred action recipients have been
designated lawfully present for purposes of Social Security and Medicare
eligibility, see 8 CFR §1.3; 42 CFR §417.422(h), agencies can also exclude
them from this designation, see 45 CFR §152.2(8) (2019) (specifying that
DACA recipients are not considered lawfully present for purposes of cov-
erage under the Affordable Care Act).

Opinion of the Court

cluded that DAPA "conflicted with the discretion author-
ized by Congress" because the INA "'flatly does not permit
the reclassification of millions of illegal aliens as lawfully
present and thereby make them newly eligible for a host of
federal and state benefits, including work authorization.'"
App. to Pet. for Cert. 114a (quoting *Texas*, 809 F. 3d, at
184). Duke did not characterize the opinion as one about
forbearance.

   In short, the Attorney General neither addressed the for-
bearance policy at the heart of DACA nor compelled DHS
to abandon that policy. Thus, removing benefits eligibility
while continuing forbearance remained squarely within the
discretion of Acting Secretary Duke, who was responsible
for "[e]stablishing national immigration enforcement poli-
cies and priorities." 116 Stat. 2178, 6 U. S. C. §202(5). But
Duke's memo offers no reason for terminating forbearance.
She instead treated the Attorney General's conclusion re-
garding the illegality of benefits as sufficient to rescind both
benefits and forbearance, without explanation.

   That reasoning repeated the error we identified in one of
our leading modern administrative law cases, *Motor Vehicle
Manufacturers Association of the United States, Inc.* v. *State
Farm Mutual Automobile Insurance Co.* There, the Na-
tional Highway Traffic Safety Administration (NHTSA)
promulgated a requirement that motor vehicles produced
after 1982 be equipped with one of two passive restraints:
airbags or automatic seatbelts. 463 U. S., at 37–38, 46.
Four years later, before the requirement went into effect,
NHTSA concluded that automatic seatbelts, the restraint of
choice for most manufacturers, would not provide effective
protection. Based on that premise, NHTSA rescinded the
passive restraint requirement in full. *Id.*, at 38.

   We concluded that the total rescission was arbitrary and
capricious. As we explained, NHTSA's justification sup-
ported only "disallow[ing] compliance by means of" auto-
matic seatbelts. *Id.*, at 47. It did "not cast doubt" on the

22      DEPARTMENT OF HOMELAND SECURITY *v.*
REGENTS OF UNIV. OF CAL.

Opinion of the Court

"efficacy of airbag technology" or upon "the need for a passive restraint standard." *Ibid.* Given NHTSA's prior judgment that "airbags are an effective and cost-beneficial lifesaving technology," we held that "the mandatory passive restraint rule [could] not be abandoned without any consideration whatsoever of an airbags-only requirement." *Id.*, at 51.

While the factual setting is different here, the error is the same. Even if it is illegal for DHS to extend work authorization and other benefits to DACA recipients, that conclusion supported only "disallow[ing]" benefits. *Id.*, at 47. It did "not cast doubt" on the legality of forbearance or upon DHS's original reasons for extending forbearance to childhood arrivals. *Ibid.* Thus, given DHS's earlier judgment that forbearance is "especially justified" for "productive young people" who were brought here as children and "know only this country as home," App. to Pet. for Cert. 98a–99a, the DACA Memorandum could not be rescinded in full "without any consideration whatsoever" of a forbearance-only policy, *State Farm*, 463 U. S., at 51.[6]

The Government acknowledges that "[d]eferred action coupled with the associated benefits are the two legs upon which the DACA policy stands." Reply Brief 21. It insists, however, that "DHS was not required to consider whether DACA's illegality could be addressed by separating" the

———————

[6]The three-page memorandum that established DACA is devoted entirely to forbearance, save for one sentence directing USCIS to "determine whether [DACA recipients] qualify for work authorization." App. to Pet. for Cert. 101a. The benefits associated with DACA flow from a separate regulation. See 8 CFR §1.3(a)(4)(vi); see also 42 CFR §417.422(h) (cross-referencing 8 CFR §1.3). Thus, DHS could have addressed the Attorney General's determination that such benefits were impermissible under the INA by amending 8 CFR §1.3 to exclude DACA recipients from those benefits without rescinding the DACA Memorandum and the forbearance policy it established. But Duke's rescission memo shows no cognizance of this possibility.

Opinion of the Court

two. *Ibid.* According to the Government, "It was not arbitrary and capricious for DHS to view deferred action and its collateral benefits as importantly linked." *Ibid.* Perhaps. But that response misses the point. The fact that there may be a valid reason not to separate deferred action from benefits does not establish that DHS considered that option or that such consideration was unnecessary.

The lead dissent acknowledges that forbearance and benefits are legally distinct and can be decoupled. *Post*, at 21–22, n. 14 (opinion of THOMAS, J). It contends, however, that we should not "dissect" agency action "piece by piece." *Post,* at 21. The dissent instead rests on the Attorney General's legal determination—which considered only benefits—"to supply the 'reasoned analysis'" to support rescission of both benefits and forbearance. *Post*, at 22 (quoting *State Farm*, 463 U. S., at 42). But *State Farm* teaches that when an agency rescinds a prior policy its reasoned analysis must consider the "alternative[s]" that are "within the ambit of the existing [policy]." *Id.*, at 51. Here forbearance was not simply "within the ambit of the existing [policy]," it was the centerpiece of the policy: DACA, after all, stands for "*Deferred Action* for Childhood Arrivals." App. to Pet. for Cert. 111a (emphasis added). But the rescission memorandum contains no discussion of forbearance or the option of retaining forbearance without benefits. Duke "entirely failed to consider [that] important aspect of the problem." *State Farm*, 463 U. S., at 43.

That omission alone renders Acting Secretary Duke's decision arbitrary and capricious. But it is not the only defect. Duke also failed to address whether there was "legitimate reliance" on the DACA Memorandum. *Smiley* v. *Citibank (South Dakota), N. A.*, 517 U. S. 735, 742 (1996). When an agency changes course, as DHS did here, it must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars, LLC* v. *Navarro*, 579 U. S. ___, ___ (2016)

(slip op., at 9) (quoting *Fox Television*, 556 U. S., at 515). "It would be arbitrary and capricious to ignore such matters." *Id.*, at 515. Yet that is what the Duke Memorandum did.

For its part, the Government does not contend that Duke considered potential reliance interests; it counters that she did not need to. In the Government's view, shared by the lead dissent, DACA recipients have no "legally cognizable reliance interests" because the DACA Memorandum stated that the program "conferred no substantive rights" and provided benefits only in two-year increments. Reply Brief 16–17; App. to Pet. for Cert. 125a. See also *post*, at 23–24 (opinion of THOMAS, J). But neither the Government nor the lead dissent cites any legal authority establishing that such features automatically preclude reliance interests, and we are not aware of any. These disclaimers are surely pertinent in considering the strength of any reliance interests, but that consideration must be undertaken by the agency in the first instance, subject to normal APA review. There was no such consideration in the Duke Memorandum.

Respondents and their *amici* assert that there was much for DHS to consider. They stress that, since 2012, DACA recipients have "enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance" on the DACA program. Brief for Respondent Regents of Univ. of California et al. in No. 18–587, p. 41 (Brief for Regents). The consequences of the rescission, respondents emphasize, would "radiate outward" to DACA recipients' families, including their 200,000 U. S.-citizen children, to the schools where DACA recipients study and teach, and to the employers who have invested time and money in training them. See *id.*, at 41–42; Brief for Respondent State of New York et al. in No. 18–589, p. 42 (Brief for New York). See also Brief for 143 Businesses as *Amici Curiae* 17 (estimating that hiring and training replacements would cost employers $6.3 billion).

Opinion of the Court

In addition, excluding DACA recipients from the lawful labor force may, they tell us, result in the loss of $215 billion in economic activity and an associated $60 billion in federal tax revenue over the next ten years. Brief for Regents 6. Meanwhile, States and local governments could lose $1.25 billion in tax revenue each year. *Ibid.*

These are certainly noteworthy concerns, but they are not necessarily dispositive. To the Government and lead dissent's point, DHS could respond that reliance on forbearance and benefits was unjustified in light of the express limitations in the DACA Memorandum. Or it might conclude that reliance interests in benefits that it views as unlawful are entitled to no or diminished weight. And, even if DHS ultimately concludes that the reliance interests rank as serious, they are but one factor to consider. DHS may determine, in the particular context before it, that other interests and policy concerns outweigh any reliance interests. Making that difficult decision was the agency's job, but the agency failed to do it.

DHS has considerable flexibility in carrying out its responsibility. The wind-down here is a good example of the kind of options available. Acting Secretary Duke authorized DHS to process two-year renewals for those DACA recipients whose benefits were set to expire within six months. But Duke's consideration was solely for the purpose of assisting the agency in dealing with "administrative complexities." App. to Pet. for Cert. 116a–118a. She should have considered whether she had similar flexibility in addressing any reliance interests of DACA recipients. The lead dissent contends that accommodating such interests would be "another exercise of unlawful power," *post*, at 23 (opinion of THOMAS, J.), but the Government does not make that argument and DHS has already extended benefits for purposes other than reliance, following consultation with the Office of the Attorney General. App. to Pet. for Cert. 116a.

Had Duke considered reliance interests, she might, for example, have considered a broader renewal period based on the need for DACA recipients to reorder their affairs. Alternatively, Duke might have considered more accommodating termination dates for recipients caught in the middle of a time-bounded commitment, to allow them to, say, graduate from their course of study, complete their military service, or finish a medical treatment regimen. Or she might have instructed immigration officials to give salient weight to any reliance interests engendered by DACA when exercising individualized enforcement discretion.

To be clear, DHS was not required to do any of this or to "consider all policy alternatives in reaching [its] decision." *State Farm*, 463 U. S., at 51. Agencies are not compelled to explore "every alternative device and thought conceivable by the mind of man." *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.*, 435 U. S. 519, 551 (1978). But, because DHS was "not writing on a blank slate," *post,* at 22, n. 14 (opinion of THOMAS, J.), it *was* required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns.

The lead dissent sees all the foregoing differently. In its view, DACA is illegal, so any actions under DACA are themselves illegal. Such actions, it argues, must cease immediately and the APA should not be construed to impede that result. See *post*, at 19–23 (opinion of THOMAS, J.).

The dissent is correct that DACA was rescinded because of the Attorney General's illegality determination. See *ante*, at 20. But nothing about that determination foreclosed or even addressed the options of retaining forbearance or accommodating particular reliance interests. Acting Secretary Duke should have considered those matters but did not. That failure was arbitrary and capricious in violation of the APA.

Opinion of ROBERTS, C. J.

### IV

Lastly, we turn to respondents' claim that the rescission violates the equal protection guarantee of the Fifth Amendment.

The parties dispute the proper framing of this claim. The Government contends that the allegation that the Executive, motivated by animus, ended a program that disproportionately benefits certain ethnic groups is a selective enforcement claim. Such a claim, the Government asserts, is barred by our decision in *Reno* v. *American-Arab Anti-Discrimination Committee.* See 525 U. S., at 488 (holding that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation"). Respondents counter that their claim falls outside the scope of that precedent because they are not challenging individual enforcement proceedings. We need not resolve this debate because, even if the claim is cognizable, the allegations here are insufficient.

To plead animus, a plaintiff must raise a plausible inference that an "invidious discriminatory purpose was a motivating factor" in the relevant decision. *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 266 (1977). Possible evidence includes disparate impact on a particular group, "[d]epartures from the normal procedural sequence," and "contemporary statements by members of the decisionmaking body." *Id.*, at 266–268. Tracking these factors, respondents allege that animus is evidenced by (1) the disparate impact of the rescission on Latinos from Mexico, who represent 78% of DACA recipients; (2) the unusual history behind the rescission; and (3) pre- and post-election statements by President Trump. Brief for New York 54–55.

None of these points, either singly or in concert, establishes a plausible equal protection claim. First, because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized

share of recipients of any cross-cutting immigration relief program. See B. Baker, DHS, Office of Immigration Statistics, Population Estimates, Illegal Alien Population Residing in the United States: January 2015, Table 2 (Dec. 2018), https://www.dhs.gov/sites/default/files/publications/18_1214_PLCY_pops-est-report.pdf. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds.

Second, there is nothing irregular about the history leading up to the September 2017 rescission. The lower courts concluded that "DACA received reaffirmation by [DHS] as recently as three months before the rescission," 908 F. 3d, at 519 (quoting 298 F. Supp. 3d, at 1315), referring to the June 2017 DAPA rescission memo, which stated that DACA would "remain in effect," App. 870. But this reasoning confuses abstention with reaffirmation. The DAPA memo did not address the merits of the DACA policy or its legality. Thus, when the Attorney General later determined that DACA shared DAPA's legal defects, DHS's decision to reevaluate DACA was not a "strange about-face." 908 F. 3d, at 519. It was a natural response to a newly identified problem.

Finally, the cited statements are unilluminating. The relevant actors were most directly Acting Secretary Duke and the Attorney General. As the *Batalla Vidal* court acknowledged, respondents did not "identif[y] statements by [either] that would give rise to an inference of discriminatory motive." 291 F. Supp. 3d, at 278. Instead, respondents contend that President Trump made critical statements about Latinos that evince discriminatory intent. But, even as interpreted by respondents, these statements—remote in time and made in unrelated contexts—do not qualify as "contemporary statements" probative of the decision at issue. *Arlington Heights*, 429 U. S., at 268. Thus, like respondents' other points, the statements fail to

raise a plausible inference that the rescission was moti-
vated by animus.

\*    \*    \*

We do not decide whether DACA or its rescission are
sound policies. "The wisdom" of those decisions "is none of
our concern." *Chenery II*, 332 U. S., at 207. We address
only whether the agency complied with the procedural re-
quirement that it provide a reasoned explanation for its ac-
tion. Here the agency failed to consider the conspicuous is-
sues of whether to retain forbearance and what if anything
to do about the hardship to DACA recipients. That dual
failure raises doubts about whether the agency appreciated
the scope of its discretion or exercised that discretion in a
reasonable manner. The appropriate recourse is therefore
to remand to DHS so that it may consider the problem
anew.

The judgment in *NAACP*, No. 18–588, is affirmed.[7] The
judgment in *Regents*, No. 18–587, is vacated in part and re-
versed in part. And in *Batalla Vidal*, No. 18–589, the Feb-
ruary 13, 2018 order granting respondents' motion for a
preliminary injunction is vacated, the November 9, 2017 or-
der partially denying the Government's motion to dismiss
is affirmed in part, and the March 29, 2018 order partially
denying the balance of the Government's motion to dismiss
is reversed in part. All three cases are remanded for further
proceedings consistent with this opinion.

*It is so ordered.*

_____

  [7] Our affirmance of the *NAACP* order vacating the rescission makes it
unnecessary to examine the propriety of the nationwide scope of the in-
junctions issued by the District Courts in *Regents* and *Batalla Vidal*.

Cite as: 591 U. S. ____ (2020)          1

Opinion of SOTOMAYOR, J.

# SUPREME COURT OF THE UNITED STATES

————————

Nos. 18–587, 18–588, and 18–589

————————

### DEPARTMENT OF HOMELAND SECURITY, ET AL., PETITIONERS

18–587                    *v.*

### REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT


### DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS

18–588                    *v.*

### NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.; AND

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE
UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT


### CHAD WOLF, ACTING SECRETARY OF HOMELAND SECURITY, ET AL., PETITIONERS

18–589                    *v.*

### MARTIN JONATHAN BATALLA VIDAL, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 18, 2020]

JUSTICE SOTOMAYOR, concurring in part, concurring in
the judgment in part, and dissenting in part.

The majority rightly holds that the Department of Home-
land Security (DHS) violated the Administrative Procedure
Act in rescinding the Deferred Action for Childhood Arri-
vals (DACA) program. But the Court forecloses any chal-
lenge to the rescission under the Equal Protection Clause.
I believe that determination is unwarranted on the existing
record and premature at this stage of the litigation. I would
instead permit respondents to develop their equal protec-
tion claims on remand.

Respondents' equal protection challenges come to us in a
preliminary posture. All that respondents needed to do at
this stage of the litigation was state sufficient facts that
would "allo[w a] court to draw the reasonable inference that
[a] defendant is liable for the misconduct alleged." *Ashcroft*
v. *Iqbal*, 556 U. S. 662, 678 (2009). The three courts to eval-
uate respondents' pleadings below held that they cleared
this modest threshold. 908 F. 3d 476, 518–520 (CA9 2018)
(affirming the District Court's denial of the Government's
motion to dismiss); see also *Batalla Vidal* v. *Nielsen*, 291 F.
Supp. 3d 260, 274 (EDNY 2018).

I too would permit respondents' claims to proceed on re-
mand. The complaints each set forth particularized facts
that plausibly allege discriminatory animus. The plurality
disagrees, reasoning that "[n]one of these points, either sin-
gly or in concert, establishes a plausible equal protection
claim." *Ante*, at 27. But it reaches that conclusion by dis-
counting some allegations altogether and by narrowly view-
ing the rest.

First, the plurality dismisses the statements that Presi-
dent Trump made both before and after he assumed office.
The *Batalla Vidal* complaints catalog then-candidate
Trump's declarations that Mexican immigrants are "people
that have lots of problems," "the bad ones," and "criminals,
drug dealers, [and] rapists." 291 F. Supp. 3d, at 276 (inter-
nal quotation marks omitted). The *Regents* complaints ad-

Opinion of SOTOMAYOR, J.

ditionally quote President Trump's 2017 statement comparing undocumented immigrants to "animals" responsible for "the drugs, the gangs, the cartels, the crisis of smuggling and trafficking, [and] MS13." 298 F. Supp. 3d 1304, 1314 (ND Cal. 2018) (internal quotation marks omitted). The plurality brushes these aside as "unilluminating," "remote in time," and having been "made in unrelated contexts." *Ante*, at 28.

But "nothing in our precedent supports [the] blinkered approach" of disregarding any of the campaign statements as remote in time from later-enacted policies. *Trump* v. *Hawaii*, 585 U. S. ___, ___, n. 3 (2018) (SOTOMAYOR, J., dissenting) (slip op., at 11, n. 3). Nor did any of the statements arise in unrelated contexts. They bear on unlawful migration from Mexico—a keystone of President Trump's campaign and a policy priority of his administration—and, according to respondents, were an animating force behind the rescission of DACA. Cf. *ibid.* (noting that Presidential Proclamation No. 9645, 82 Fed. Reg. 45161 (2017), which barred entry of individuals from several Muslim-majority countries, was an outgrowth of the President's campaign statements about Muslims). Taken together, "the words of the President" help to "create the strong perception" that the rescission decision was "contaminated by impermissible discriminatory animus." 585 U. S., at ___ (opinion of SOTOMAYOR, J.) (slip op., at 13). This perception provides respondents with grounds to litigate their equal protection claims further.

Next, the plurality minimizes the disproportionate impact of the rescission decision on Latinos after considering this point in isolation. *Ante*, at 28 ("Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds"). But the impact of the policy decision must be viewed in the context of the President's public statements on and off the campaign trail. At the motion-to-dismiss

stage, I would not so readily dismiss the allegation that an executive decision disproportionately harms the same racial group that the President branded as less desirable mere months earlier.

Finally, the plurality finds nothing untoward in the "specific sequence of events leading up to the challenged decision." *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 267 (1977). I disagree. As late as June 2017, DHS insisted it remained committed to DACA, even while rescinding a related program, the Deferred Action for Parents of Americans and Lawful Permanent Residents. App. 718–720. But a mere three months later, DHS terminated DACA without, as the plurality acknowledges, considering important aspects of the termination. The abrupt change in position plausibly suggests that something other than questions about the legality of DACA motivated the rescission decision. Accordingly, it raises the possibility of a "significant mismatch between the decision . . . made and the rationale . . . provided." *Department of Commerce* v. *New York*, 588 U. S. ___, ___ (2019) (slip op., at 26). Only by bypassing context does the plurality conclude otherwise.

*     *     *

The facts in respondents' complaints create more than a "sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U. S., at 678. Whether they ultimately amount to actionable discrimination should be determined only after factual development on remand. Because the Court prematurely disposes of respondents' equal protection claims by overlooking the strength of their complaints, I join all but Part IV of the opinion and do not concur in the corresponding part of the judgment.

Opinion of THOMAS, J.

# SUPREME COURT OF THE UNITED STATES

————————

Nos. 18–587, 18–588, and 18–589

————————

### DEPARTMENT OF HOMELAND SECURITY, ET AL., PETITIONERS

18–587                      *v.*

### REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT


### DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS

18–588                      *v.*

### NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.; AND

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE
UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT


### CHAD WOLF, ACTING SECRETARY OF HOMELAND SECURITY, ET AL., PETITIONERS

18–589                      *v.*

### MARTIN JONATHAN BATALLA VIDAL, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 18, 2020]

JUSTICE THOMAS, with whom JUSTICE ALITO and
JUSTICE GORSUCH join, concurring in the judgment in part
and dissenting in part.

Opinion of THOMAS, J.

Between 2001 and 2011, Congress considered over two dozen bills that would have granted lawful status to millions of aliens who were illegally brought to this country as children. Each of those legislative efforts failed. In the wake of this impasse, the Department of Homeland Security (DHS) under President Barack Obama took matters into its own hands. Without any purported delegation of authority from Congress and without undertaking a rulemaking, DHS unilaterally created a program known as Deferred Action for Childhood Arrivals (DACA). The three-page DACA memorandum made it possible for approximately 1.7 million illegal aliens to qualify for temporary lawful presence and certain federal and state benefits. When President Donald Trump took office in 2017, his Acting Secretary of Homeland Security, acting through yet another memorandum, rescinded the DACA memorandum. To state it plainly, the Trump administration rescinded DACA the same way that the Obama administration created it: unilaterally, and through a mere memorandum.

Today the majority makes the mystifying determination that this rescission of DACA was unlawful. In reaching that conclusion, the majority acts as though it is engaging in the routine application of standard principles of administrative law. On the contrary, this is anything but a standard administrative law case.

DHS created DACA during the Obama administration without any statutory authorization and without going through the requisite rulemaking process. As a result, the program was unlawful from its inception. The majority does not even attempt to explain why a court has the authority to scrutinize an agency's policy reasons for rescinding an unlawful program under the arbitrary and capricious microscope. The decision to countermand an unlawful agency action is clearly reasonable. So long as the agency's determination of illegality is sound, our review should be at an end.

Opinion of THOMAS, J.

Today's decision must be recognized for what it is: an effort to avoid a politically controversial but legally correct decision. The Court could have made clear that the solution respondents seek must come from the Legislative Branch. Instead, the majority has decided to prolong DHS' initial overreach by providing a stopgap measure of its own. In doing so, it has given the green light for future political battles to be fought in this Court rather than where they rightfully belong—the political branches. Such timidity forsakes the Court's duty to apply the law according to neutral principles, and the ripple effects of the majority's error will be felt throughout our system of self-government.

Perhaps even more unfortunately, the majority's holding creates perverse incentives, particularly for outgoing administrations. Under the auspices of today's decision, administrations can bind their successors by unlawfully adopting significant legal changes through Executive Branch agency memoranda. Even if the agency lacked authority to effectuate the changes, the changes cannot be undone by the same agency in a successor administration unless the successor provides sufficient policy justifications to the satisfaction of this Court. In other words, the majority erroneously holds that the agency is not only permitted, but required, to continue administering unlawful programs that it inherited from a previous administration. I respectfully dissent in part.[1]

## I

### A

In 2012, after more than two dozen attempts by Congress to grant lawful status to aliens who were brought to this country as children,[2] the then-Secretary of Homeland Security Janet Napolitano announced, by memorandum, a new

---

[1] I concur in the judgment insofar as the majority rejects respondents' equal protection claim.

[2] See Immigrant Children's Educational Advancement and Dropout

4        DEPARTMENT OF HOMELAND SECURITY *v.*
REGENTS OF UNIV. OF CAL.

Opinion of THOMAS, J.

"prosecutorial discretion" policy known as DACA.  App. to
Pet. for Cert. in No. 18–587, p. 97a.  The memorandum di-
rected immigration enforcement officers not to remove "cer-
tain young people who were brought to this country as chil-
dren" that met delineated criteria.  *Id.*, at 97a–98a.  In the
Secretary's view, the program was consistent with "the
framework of the existing law."  *Id.*, at 101a.

DACA granted a renewable 2-year period of "deferred ac-
tion" that made approximately 1.7 million otherwise remov-
able aliens eligible to remain in this country temporarily.[3]
By granting deferred action, the memorandum also made
recipients eligible for certain state and federal benefits, in-
cluding Medicare and Social Security.  See 8 U. S. C.
§§1611(b)(2)–(4);  8 CFR §1.3(a)(4)(vi) (2020);  45 CFR
§152.2(4)(vi) (2019).  In addition, deferred action enabled
the recipients to seek work authorization.  8 U. S. C.

————————
Prevention Act of 2001, H. R. 1582, 107th Cong., 1st Sess.; Student Ad-
justment Act of 2001, H. R. 1918, 107th Cong., 1st Sess.; DREAM Act, S.
1291, 107th Cong., 1st Sess. (2001); DREAM Act, S. 1545, 108th Cong.,
1st Sess. (2003); Student Adjustment Act of 2003, H. R. 1684, 108th
Cong., 1st Sess.; DREAM Act, S. 2863, 108th Cong., 2d Sess., Tit. XVIII
(2003); DREAM Act of 2005, S. 2075, 109th Cong., 1st Sess.; Comprehen-
sive Immigration Reform Act of 2006, S. 2611, 109th Cong., 2d Sess., Tit.
VI, Subtitle C; American Dream Act, H. R. 5131, 109th Cong., 2d Sess.
(2006); DREAM Act of 2007, S. 774, 110th Cong., 1st Sess.; DREAM Act
of 2007, S. 2205, 110th Cong., 1st Sess.; STRIVE Act of 2007, H. R. 1645,
110th Cong., 1st Sess., Tit. VI, Subtitle B; Comprehensive Immigration
Reform Act of 2007, S. 1348, 110th Cong., 1st Sess., Tit. VI, Subtitle C;
DREAM Act of 2009, S. 729, 111th Cong., 1st Sess.; American Dream
Act, H. R. 1751, 111th Cong., 1st Sess.; Comprehensive Immigration Re-
form Act of 2010, S. 3932, 111th Cong., 2d Sess., Tit. V, Subtitle D;
DREAM Act of 2010, S. 3827, 111th Cong., 2d Sess.; DREAM Act of 2010,
S. 3962, 111th Cong., 2d Sess.; DREAM Act of 2010, S. 3963, 111th Cong.,
2d Sess.; DREAM Act of 2010, S. 3992, 111th Cong., 2d Sess.; DREAM
Act of 2010, H. R. 6497, 111th Cong., 2d Sess.; DREAM Act of 2011, S.
952, 112th Cong., 1st Sess.

[3]See J. Passel & M. Lopez, Pew Research Center, Up to 1.7 Million
Unauthorized Immigrant Youth May Benefit From New Deportation
Rules (Aug. 14, 2012).

§1324a(h)(3)(B); 8 CFR §274a.12(c)(14). Despite these changes, the memorandum contradictorily claimed that it "confer[red] no substantive right [or] immigration status," because "[o]nly the Congress, acting through its legislative authority, can confer these rights." App. to Pet. for Cert. in No. 18–587, at 101a.

In 2014, then-Secretary of Homeland Security Jeh Johnson broadened the deferred-action program in yet another brief memorandum. This 2014 memorandum expanded DACA eligibility by extending the deferred-action period to three years and by relaxing other criteria. It also implemented a related program, known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). DAPA allowed unlawfully present parents to obtain deferred action derivatively through their children who were either citizens or lawful permanent residents. Approximately 4.3 million aliens qualified for DAPA and, as with DACA, these individuals would have become eligible for certain federal and state benefits upon the approval of their DAPA applications. See *Texas* v. *United States*, 809 F. 3d 134, 181 (CA5 2015). Nevertheless, the 2014 memorandum repeated the incongruous assertion that these programs "d[id] not confer any form of legal status in this country" and added that deferred action "may be terminated at any time at the agency's discretion." App. to Pet. for Cert. in No. 18–587, at 104a.

## B

Twenty-six States filed suit to enjoin the implementation of these new programs, DAPA and "expanded DACA," maintaining that they violated the Constitution, the Administrative Procedure Act (APA), and the Immigration and Naturalization Act (INA). The States contended that, because the 2014 memorandum allowed aliens to receive deferred action and other benefits, it amounted to a legislative rule that had to comply with the APA's notice and

comment procedures. The States also argued that DHS' de-
cision to recategorize an entire class of aliens from "unlaw-
fully present" to "lawfully present" exceeded its statutory
authority under the federal immigration laws. According
to the States, these defects rendered the 2014 memoran-
dum arbitrary, capricious, or otherwise not in accordance
with law.

The District Court preliminarily enjoined DAPA and ex-
panded DACA. The Fifth Circuit affirmed, rejecting DHS'
claim that the programs were an exercise of prosecutorial
discretion. *Texas*, 809 F. 3d, at 167, 188. The court con-
cluded that the States were likely to succeed on their claim
that the 2014 memorandum was a legislative rule that had
to be adopted through notice and comment rulemaking. *Id.*,
at 171–178. The court further concluded that the 2014
memorandum was "substantively contrary to law" because
the INA did not grant DHS the statutory authority to im-
plement either program. *Id.*, at 170, 178–186.

This Court affirmed the Fifth Circuit's judgment by an
equally divided vote. *United States* v. *Texas*, 579 U. S. ___
(2016) (*per curiam*).

                        C

The 2014 memorandum was rescinded on June 15, 2017,
before taking effect. Shortly after that rescission, several
of the plaintiff States sent a letter to then-Attorney General
Jefferson Sessions III. They contended that the 2012 DACA
memorandum was also legally defective because, "just like
DAPA, DACA unilaterally confers eligibility for . . . lawful
presence without any statutory authorization from Con-
gress." App. 873. The States wrote that they would amend
their complaint to challenge DACA if the administration
did not rescind the 2012 memorandum creating DACA by
September 5, 2017.

On September 4, then-Attorney General Sessions wrote
to then-Acting Secretary of Homeland Security Elaine

Opinion of THOMAS, J.

Duke, advising her to rescind DACA.  Sessions stated that, in his legal opinion, DACA took effect "through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result.  Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch."  *Id.*, at 877.  The letter also stated that DACA was infected with the "same legal . . . defects that the courts recognized as to DAPA," *id.*, at 878, and thus DACA would likely be enjoined as well.

Then-Acting Secretary Duke rescinded DACA the next day, also through a memorandum.  Her memorandum began by noting that DACA "purported to use deferred action . . . to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law."  App. to Pet. for Cert. in No. 18–587, at 112a.  It described the history of the Fifth Circuit litigation, noting that the court had concluded that DAPA "conflicted with the discretion authorized by Congress" because "the [INA] flatly does not permit the reclassification of millions of illegal aliens as lawfully present."  *Id.*, at 114a (internal quotation marks omitted).  Finally, the memorandum accepted then-Attorney General Sessions' legal determination that DACA was unlawful for the same reasons as DAPA.  See §1103(a)(1).  In light of the legal conclusions reached by the Fifth Circuit and the Attorney General, then-Acting Secretary Duke set forth the procedures for winding down DACA.

These three cases soon followed.  In each, respondents claimed, among other things, that DACA's rescission was arbitrary and capricious under the APA.  Two District Courts granted a preliminary nationwide injunction, while the third vacated the rescission.

## II

"'[A]n agency literally has no power to act . . . unless and

until Congress confers power upon it.'" *Arlington* v. *FCC*,
569 U. S. 290, 317 (2013) (ROBERTS, C. J., dissenting) (quot-
ing *Louisiana Pub. Serv. Comm'n* v. *FCC*, 476 U. S. 355,
374 (1986)).  When an agency exercises power beyond the
bounds of its authority, it acts unlawfully.  See, *e.g.*, *SAS
Institute Inc.* v. *Iancu*, 584 U. S. ___, ___, n. (2018) (slip op.,
at 11, n.).  The 2012 memorandum creating DACA provides
a poignant illustration of ultra vires agency action.

DACA alters how the immigration laws apply to a certain
class of aliens.  "DACA [recipients] primarily entered the
country either by overstaying a visa or by entering without
inspection, and the INA instructs that aliens in both classes
are removable." *Texas* v. *United States*, 328 F. Supp. 3d
662, 713 (SD Tex. 2018) (footnote omitted).  But DACA
granted its recipients deferred action, *i.e.*, a decision to "de-
cline to institute [removal] proceedings, terminate [re-
moval] proceedings, or decline to institute a final order of
[removal]." *Reno* v. *American-Arab Anti-Discrimination
Comm.*, 525 U. S. 471, 484 (1999) (internal quotation marks
omitted).  Under other regulations, recipients of deferred
action are deemed lawfully present for purposes of certain
federal benefits.  See *supra*, at 4.  Thus, DACA in effect cre-
ated a new exception to the statutory provisions governing
removability and, in the process, conferred lawful presence
on an entire class of aliens.

To lawfully implement such changes, DHS needed a
grant of authority from Congress to either reclassify remov-
able DACA recipients as lawfully present, or to exempt the
entire class of aliens covered by DACA from statutory re-
moval procedures.  No party disputes that the immigration
statutes lack an express delegation to accomplish either re-
sult.  And, an examination of the highly reticulated immi-
gration regime makes clear that DHS has no implicit dis-
cretion to create new classes of lawful presence or to grant
relief from removal out of whole cloth.  Accordingly, DACA
is substantively unlawful.

Opinion of THOMAS, J.

This conclusion should begin and end our review. The decision to rescind an unlawful agency action is *per se* lawful. No additional policy justifications or considerations are necessary. And, the majority's contrary holding—that an agency is not only permitted, but required, to continue an ultra vires action—has no basis in law.

### A

Congress has not authorized DHS to reclassify an entire class of removable aliens as lawfully present or to categorically exempt aliens from statutory removal provisions.

### 1

I begin with lawful presence. As just stated, nothing in the federal immigration laws expressly delegates to DHS the unfettered discretion to create new categories of lawfully present aliens. And, there is no basis for concluding that Congress implicitly delegated to DHS the power to reclassify categories of aliens as lawfully present. The immigration statutes provide numerous ways to obtain lawful presence, both temporary and permanent. The highly detailed nature of these provisions indicates that Congress has exhaustively provided for all of the ways that it thought lawful presence should be obtainable, leaving no discretion to DHS to add new pathways.

For example, federal immigration laws provide over 60 temporary nonimmigrant visa options, including visas for ambassadors, full-time students and their spouses and children, those engaged to marry a United States citizen within 90 days of arrival, athletes and performers, and aliens with specialized knowledge related to their employers. See §§1101(a)(15)(A)–(V), 1184; 8 CFR §214.1; see also Congressional Research Service, J. Wilson, Nonimmigrant and Immigrant Visa Categories: Data Brief 1–6 (2019) (Table 1). In addition, the statutes permit the Attorney General to grant temporary "parole" into the United States "for urgent

humanitarian reasons or [a] significant public benefit," 8
U. S. C. §1182(d)(5)(A); provide for temporary protected
status when the Attorney General finds that removal to a
country with an ongoing armed conflict "would pose a seri-
ous threat to [an alien's] personal safety," §1254a(b)(1)(A);
and allow the Secretary of Homeland Security (in consulta-
tion with the Secretary of State) to waive visa requirements
for certain aliens for up to 90 days, §§1187(a)–(d).

The immigration laws are equally complex and detailed
when it comes to obtaining lawful permanent residence.
Congress has expressly specified numerous avenues for
obtaining an immigrant visa, which aliens may then use
to become lawful permanent residents.   §§1201, 1255(a).
Among other categories, immigrant visas are available to
specified family-sponsored aliens, aliens with advanced de-
grees or exceptional abilities, certain types of skilled and
unskilled workers, "special immigrants," and those enter-
ing the country to "engag[e] in a new commercial enter-
prise."   §§1153(a)–(b), 1154; see also Congressional Re-
search Service, Nonimmigrant and Immigrant Visa
Categories, at 6–7 (Table 2).   Refugees and asylees also may
receive lawful permanent residence under certain condi-
tions, §1159; 8 CFR §§209.1, 209.2.[4]   As with temporary
lawful presence, each avenue to lawful permanent resi-
dence status has its own set of rules and exceptions.[5]

As the Fifth Circuit held in the DAPA litigation, a conclu-
sion with which then-Attorney General Sessions agreed,
"specific and detailed provisions[ of] the INA expressly and

_____

[4] The immigration statutes also provide for conditional lawful perma-
nent residence status.   See §1186a(b)(1)(A)(i) (two years for spouses to
demonstrate that the marriage "was [not] entered into for the purpose of
procuring an alien's admission as an immigrant"); §1186b (qualifying
business entrepreneurs).

[5] For instance, Congress has carved out rules for aliens who served in
the Armed Forces, §§1438–1440, and alien spouses who have been sub-
ject to domestic abuse, §§1186a(c)(4)(C)–(D).

Opinion of THOMAS, J.

carefully provid[e] legal designations allowing defined classes of aliens to be lawfully present." *Texas*, 809 F. 3d, at 179. In light of this elaborate statutory scheme, the lack of any similar provision for DACA recipients convincingly establishes that Congress left DHS with no discretion to create an additional class of aliens eligible for lawful presence. Congress knows well how to provide broad discretion, and it has provided open-ended delegations of authority in statutes too numerous to name. But when it comes to lawful presence, Congress did something strikingly different. Instead of enacting a statute with "broad general directives" and leaving it to the agency to fill in the lion's share of the details, *Mistretta* v. *United States*, 488 U. S. 361, 372 (1989), Congress put in place intricate specifications governing eligibility for lawful presence. This comprehensive scheme indicates that DHS has no discretion to supplement or amend the statutory provisions in any manner, least of all by memorandum. See *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 125 (2000) (An agency "may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted" (internal quotation marks omitted)); see also *ETSI Pipeline Project* v. *Missouri*, 484 U. S. 495, 509–510 (1988).

2

The relief that Congress has extended to removable aliens likewise confirms that DACA exceeds DHS' delegated authority. Through deferred action, DACA grants temporary relief to removable aliens on a programmatic scale. See *Texas*, 328 F. Supp. 3d, at 714. But as with lawful presence, Congress did not expressly grant DHS the authority to create categorical exceptions to the statute's removal requirements. And again, as with lawful presence, the intricate level of detail in the federal immigration laws regarding relief from removal indicates that DHS has no discretionary authority to supplement that relief with an

12        DEPARTMENT OF HOMELAND SECURITY *v.*
REGENTS OF UNIV. OF CAL.

Opinion of THOMAS, J.

entirely new programmatic exemption.

At the outset, Congress clearly knows how to provide for classwide deferred action when it wishes to do so. On multiple occasions, Congress has used express language to make certain classes of individuals eligible for deferred action. See 8 U. S. C. §§1154(a)(1)(D)(i)(II), (IV) (certain individuals covered under the Violence Against Women Act are "eligible for deferred action"); Victims of Trafficking and Violence Protection Act of 2000, 114 Stat. 1522 ("'Any individual described in subclause (I) is eligible for deferred action'"); Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, §423(b), 115 Stat. 361 ("Such spouse, child, son, or daughter may be eligible for deferred action"); National Defense Authorization Act for Fiscal Year 2004, §§1703(c)(1)(A), (2), 117 Stat. 1694–1695 ("Such spouse or child shall be eligible for deferred action").[6]  Congress has failed to provide similar explicit provisions for DACA recipients, and the immigration laws contain no indication that DHS can, at will, create its own categorical policies for deferred action.

Other provisions pertaining to relief from removal further demonstrate that DHS lacked the delegated authority

––––––––––

[6]In the DAPA litigation, DHS noted that some deferred-action programs have been implemented by the Executive Branch without explicit legislation.  But "'past practice does not, by itself, create [executive] power.'"  *Medellín* v. *Texas*, 552 U. S. 491, 532 (2008) (quoting *Dames & Moore* v. *Regan*, 453 U. S. 654, 686 (1981)).  If any of these programs had been challenged, it would seem that they would be legally infirm for the same reasons as DACA.  Moreover, if DHS had the authority to create new categories of aliens eligible for deferred action, then all of Congress' deferred-action legislation was but a superfluous exercise.  *Duncan* v. *Walker*, 533 U. S. 167, 174 (2001).  Finally, whereas some deferred-action programs were followed by legislation, DACA has existed for eight years, and Congress is no closer to a legislative solution than it was in 2012.  See, *e.g.*, American Dream and Promise Act of 2019, H. R. 6, 116th Cong., 1st Sess.

Opinion of THOMAS, J.

to create DACA.  As with lawful presence, Congress has provided a plethora of methods by which aliens may seek relief from removal.  For instance, both permanent and temporary residents can seek cancellation of removal if they meet certain residency requirements and have not committed certain crimes.  §§1229b(a)–(b).  And certain nonpermanent residents may have their status adjusted to permanent residence during these proceedings. §1229b(b)(2).  Aliens can apply for asylum or withholding of removal during removal proceedings unless they have committed certain crimes.  §§1158, 1231(b)(3).  Applicants for certain nonimmigrant visas may be granted a stay of removal until the visa application is adjudicated.  §1227(d). And, aliens may voluntarily depart rather than be subject to an order of removal.  §1229c.

In sum, like lawful presence, Congress has provided for relief from removal in specific and complex ways.  This nuanced detail indicates that Congress has provided the full panoply of methods it thinks should be available for an alien to seek relief from removal, leaving no discretion to DHS to provide additional programmatic forms of relief.[7]

### 3

Finally, DHS could not appeal to general grants of authority, such as the Secretary's ability to "perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter," §1103(a)(3), or to "[e]stablis[h] national immigration enforcement policies and priorities," 6 U. S. C. §202(5).  See also 8 U. S. C. §1103(g)(2).  Because we must interpret the statutes "as a

───────────
[7] It is uncontested that deferred action frequently occurs on a case-by-case basis, often justified on the grounds that the agency lacks resources to remove all removable aliens.  Even assuming that these ad hoc exercises of discretion are permissible, however, we have stated that "[a]n agency confronting resource constraints may change its own conduct, but it cannot change the law."  *Utility Air Regulatory Group* v. *EPA*, 573 U. S. 302, 327 (2014).

14          DEPARTMENT OF HOMELAND SECURITY *v.*
REGENTS OF UNIV. OF CAL.

Opinion of THOMAS, J.

symmetrical and coherent regulatory scheme," *Gustafson* v.
*Alloyd Co.*, 513 U. S. 561, 569 (1995), these grants of au-
thority must be read alongside the express limits contained
within the statute.  Basing the Secretary's ability to com-
pletely overhaul immigration law on these general grants
of authority would eviscerate that deliberate statutory
scheme by "allow[ing the Secretary of DHS] to grant lawful
presence . . . to any illegal alien in the United States."
*Texas*, 809 F. 3d, at 184.  Not only is this "an untenable po-
sition in light of the INA's intricate system," *ibid.*, but it
would also render many of those provisions wholly super-
fluous due to DHS' authority to disregard them at will,
*Duncan* v. *Walker*, 533 U. S. 167, 174 (2001).  And in addi-
tion to these fatal problems, adopting a broad interpreta-
tion of these general grants of authority would run afoul of
the presumption that "Congress . . . does not alter the fun-
damental details of a regulatory scheme in vague terms or
ancillary provisions."  *Whitman* v. *American Trucking
Assns.*, *Inc.*, 531 U. S. 457, 468 (2001).  And it would also
conflict with the major questions doctrine, which is based
on the expectation that Congress speaks clearly when it del-
egates the power to make "decisions of vast economic and
political significance." *Utility Air Regulatory Group* v. *EPA*,
573 U. S. 302, 324 (2014) (*UARG*) (internal quotation
marks omitted); see also *Texas*, 787 F. 3d, at 760–761.

Read together, the detailed statutory provisions govern-
ing temporary and lawful permanent resident status, relief
from removal, and classwide deferred-action programs lead
ineluctably to the conclusion that DACA is "inconsisten[t]
with the design and structure of the statute as a whole."
*University of Tex. Southwestern Medical Center* v. *Nassar*,
570 U. S. 338, 353 (2013).  As the District Court stated in
the DAPA litigation and as then-Attorney General Sessions
agreed, "[i]nstead of merely refusing to enforce the INA's
removal laws against an individual, the DHS has enacted a
wide-reaching program that awards legal presence . . . to

Opinion of THOMAS, J.

individuals Congress has deemed deportable or removable." *Texas* v. *United States*, 86 F. Supp. 3d 591, 654 (SD Tex. 2015). The immigration statutes contain a level of granular specificity that is exceedingly rare in the modern administrative state. It defies all logic and common sense to conclude that a statutory scheme detailed enough to provide conditional lawful presence to groups as narrowly defined as "alien entrepreneurs," §1186b, is simultaneously capacious enough for DHS to grant lawful presence to almost two million illegal aliens with the stroke of a Cabinet secretary's pen.

B

Then-Attorney General Sessions concluded that the initial DACA program suffered from the "same legal . . . defects" as DAPA and expanded DACA, finding that, like those programs, DACA was implemented without statutory authority. App. 877–878. Not only was this determination correct, but it is also dispositive for purposes of our review. "It is axiomatic that an administrative agency's power . . . is limited to the authority granted by Congress." *Bowen* v. *Georgetown Univ. Hospital*, 488 U. S. 204, 208 (1988). DHS had no authority here to create DACA, and the unlawfulness of that program is a sufficient justification for its rescission.

The majority opts for a different path, all but ignoring DACA's substantive legal defect. See *ante*, at 18–19. On the majority's understanding of APA review, DHS was required to provide additional policy justifications in order to rescind an action that it had no authority to take. This rule "has no basis in our jurisprudence, and support for [it] is conspicuously absent from the Court's opinion." *Massachusetts* v. *EPA*, 549 U. S. 497, 536 (2007) (ROBERTS, C. J., dissenting).

The lack of support for the majority's position is hardly

16          DEPARTMENT OF HOMELAND SECURITY *v.*
REGENTS OF UNIV. OF CAL.

Opinion of THOMAS, J.

surprising in light of our Constitution's separation of pow-
ers. No court can compel Executive Branch officials to ex-
ceed their congressionally delegated powers by continuing
a program that was void *ab initio*. Cf. *Clinton* v. *City of New
York*, 524 U. S. 417 (1998); *INS* v. *Chadha*, 462 U. S. 919
(1983); see also *EPA* v. *EME Homer City Generation, L. P.*,
572 U. S. 489, 542, n. 5 (2014) (Scalia, J., dissenting); *Public
Citizen* v. *Department of Justice*, 491 U. S. 440, 487 (1989)
(Kennedy, J., concurring in judgment). In reviewing agency
action, our role is to ensure that Executive Branch officials
do not transgress the proper bounds of their authority, *Ar-
lington*, 569 U. S., at 327 (ROBERTS, C. J., dissenting), not
to perpetuate a decision to unlawfully wield power in direct
contravention of the enabling statute's clear limits, see
*UARG*, 573 U. S., at 327–328; *Barnhart* v. *Sigmon Coal Co.*,
534 U. S. 438, 462 (2002).

Under our precedents, DHS can only exercise the author-
ity that Congress has chosen to delegate to it. See *UARG*,
573 U. S., at 327. In implementing DACA, DHS under the
Obama administration arrogated to itself power it was not
given by Congress. Thus, every action taken by DHS under
DACA is the unlawful exercise of power. Now, under the
Trump administration, DHS has provided the most compel-
ling reason to rescind DACA: The program was unlawful
and would force DHS to continue acting unlawfully if it car-
ried the program forward.

### III

The majority's demanding review of DHS' decisionmak-
ing process is especially perverse given that the 2012 mem-
orandum flouted the APA's procedural requirements—the
very requirements designed to prevent arbitrary deci-
sionmaking. Even if DHS were authorized to create DACA,
it could not do so without undertaking an administrative
rulemaking. The fact that DHS did not engage in this pro-
cess likely provides an independent basis for rescinding

DACA. But at the very least, this procedural defect compounds the absurdity of the majority's position in these cases.

As described above, DACA fundamentally altered the immigration laws. It created a new category of aliens who, as a class, became exempt from statutory removal procedures, and it gave those aliens temporary lawful presence. Both changes contravened statutory limits. DACA is thus what is commonly called a substantive or legislative rule.[8] As the name implies, our precedents state that legislative rules are those that "have the force and effect of law." *Chrysler Corp.* v. *Brown*, 441 U. S. 281, 295 (1979) (internal quotation marks omitted).

Our precedents allow the vast majority of legislative rules to proceed through so-called "informal" notice and comment rulemaking. See *United States* v. *Florida East Coast R. Co.*, 410 U. S. 224, 237–238 (1973).[9] But under our precedents, an agency must engage in certain procedures mandated by the APA before its rule carries legal force. *Kisor* v. *Wilkie*, 588 U. S. ___, ___ (2019) (plurality opinion) (slip op., at 23) ("[A] legislative rule, . . . to be valid[,] must go through notice and comment"); *id.*, at ___ (GORSUCH, J., concurring in judgment) (slip op., at 17) (same); *Perez* v. *Mortgage Bankers Assn.*, 575 U. S. 92, 96 (2015); cf. *Azar* v. *Allina Health Services*, 587 U. S. ___, ___ (2019) (slip op., at 1) (same with respect to materially identical procedures under the Medicare Act). These procedures specify that the agency "shall" publish a notice of proposed rulemaking in

─────────

[8] The majority tacitly acknowledges as much, as it must. See *ante*, at 11–12. Otherwise, the majority would have to accept that DACA was nothing more than a policy of prosecutorial discretion, which would make its rescission unreviewable. See *Heckler* v. *Chaney*, 470 U. S. 821, 831 (1985).

[9] As I have previously pointed out, "the APA actually contemplated a much more formal process for most rulemaking." *Perez* v. *Mortgage Bankers Assn.*, 575 U. S. 92, 128, n. 5 (2015) (opinion concurring in judgment).

Case 1:15-cv-00615-TSC   Document 59-1   Filed 06/23/20   Page 57 of 75

the Federal Register, justify the rule by reference to legal
authority, describe "the subjects and issues involved" in the
rule, and allow interested parties to submit comments. 5
U. S. C. §§553(b)–(c); see also *Kisor*, 588 U. S., at ___ (opin-
ion of GORSUCH, J.) (slip op., at 17). As we have recognized
recently, use of the word "shall" indicates that these proce-
dures impose mandatory obligations on the agency before it
can adopt a valid binding regulation. See *Maine Commu-
nity Health Options* v. *United States*, 590 U. S. ___, ___
(2020) (slip op., at 12). After undergoing notice and com-
ment, the agency then publishes the final rule, which must
"articulate a satisfactory explanation for [the] action in-
cluding a rational connection between the facts found and
the choice made." *Motor Vehicle Mfrs. Assn. of United
States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463
U. S. 29, 43 (1983) (internal quotation marks omitted).
Only after completing this process is the legislative rule a
valid law. See *Kisor*, 588 U. S., at ___ (opinion of GORSUCH,
J.) (slip op., at 17).[10]

Because DACA has the force and effect of law, DHS was
required to observe the procedures set out in the APA if it
wanted to promulgate a legislative rule. It is undisputed,
however, that DHS did not do so. It provided no oppor-
tunity for interested parties to submit comments regarding
the effect that the program's dramatic and very significant
change in immigration law would have on various aspects
of society. It provided no discussion of economic considera-
tions or national security interests. Nor did it provide any
substantial policy justifications for treating young people

_____

[10]The APA also provides certain exceptions from notice and comment
rulemaking. For example, an agency may promulgate a legally binding
rule without notice and comment if good cause exists to do so. 5 U. S. C.
§553(b)(B). This text would become a nullity if the agency could achieve
the same effect by simply dispensing with notice and comment proce-
dures altogether.

brought to this country differently from other classes of al-
iens who have lived in the country without incident for
many years. And, it did not invoke any law authorizing
DHS to create such a program beyond its inexplicable as-
sertion that DACA was consistent with existing law. Be-
cause DHS failed to engage in the statutorily mandated
process, DACA never gained status as a legally binding reg-
ulation that could impose duties or obligations on third par-
ties. See *id.*, at ___ (plurality opinion) (slip op., at 23); *id.*,
at ___ (opinion of GORSUCH, J.) (slip op., at 17).

Given this state of affairs, it is unclear to me why DHS
needed to provide any explanation whatsoever when it de-
cided to rescind DACA. Nothing in the APA suggests that
DHS was required to spill *any* ink justifying the rescission
of an invalid legislative rule, let alone that it was required
to provide policy justifications beyond acknowledging that
the program was simply unlawful from the beginning. And,
it is well established that we do not remand for an agency
to correct its reasoning when it was required by law to take
or abstain from an action. See *Morgan Stanley Capital
Group Inc.* v. *Public Util. Dist. No. 1 of Snohomish Cty.*, 554
U. S. 527, 544–545 (2008). Here, remand would be futile,
because no amount of policy explanation could cure the fact
that DHS lacked statutory authority to enact DACA in the
first place.

Instead of recognizing this, the majority now requires the
rescinding Department to treat the invalid rule as though
it were legitimate. As just explained, such a requirement
is not supported by the APA.[11] It is also absurd, as evi-
denced by its application to DACA in these cases. The ma-
jority insists that DHS was obligated to discuss its choices
regarding benefits and forbearance in great detail, even

_____

[11] Thus, it is not that the APA "*should* not" be construed to support the
majority's result, *ante*, at 26 (emphasis added), it is that the APA does
not and *cannot* support that result.

20        DEPARTMENT OF HOMELAND SECURITY *v.*
                REGENTS OF UNIV. OF CAL.
                    Opinion of THOMAS, J.

though no such detailed discussion accompanied DACA's is-
suance. And, the majority also requires DHS to discuss re-
liance interests at length, even though deferred action tra-
ditionally does not take reliance interests into account and
DHS was not forced to explain its treatment of reliance in-
terests in the first instance by going through notice and
comment. See *infra*, at 23–24. The majority's demand for
such an explanation here simply makes little sense.

At bottom, of course, none of this matters, because DHS
*did* provide a sufficient explanation for its action. DHS'
statement that DACA was ultra vires was more than suffi-
cient to justify its rescission.[12] By requiring more, the ma-
jority has distorted the APA review process beyond recogni-
tion, further burdening all future attempts to rescind
unlawful programs. Plaintiffs frequently bring successful
challenges to agency actions by arguing that the agency has
impermissibly dressed up a legislative rule as a policy state-
ment and must comply with the relevant procedures before
functionally binding regulated parties. See, *e.g.*, *Mendoza*
v. *Perez*, 754 F. 3d 1002 (CADC 2014); *Natural Resources
Defense Council* v. *EPA*, 643 F. 3d 311 (CADC 2011); *Na-
tional Family Planning & Reproductive Health Assn.*, *Inc.*
v. *Sullivan*, 979 F. 2d 227 (CADC 1992). But going forward,
when a rescinding agency inherits an invalid legislative
rule that ignored virtually every rulemaking requirement
of the APA, it will be obliged to overlook that reality. In-
stead of simply terminating the program because it did not
go through the requisite process, the agency will be com-
pelled to treat an invalid legislative rule as though it were
legitimate.[13]

——————
[12] I express no view on what other reasons would justify an agency's
decision to rescind a procedurally unlawful action. I merely point out
that correctly concluding that the program was illegal is sufficient.

[13] In my view, even if DACA were permitted under the federal immi-
gration laws and had complied with the APA, it would still violate the
Constitution as an impermissible delegation of legislative power. See

Opinion of THOMAS, J.

## IV

Even if I were to accept the majority's premise that DACA's rescission required additional policy justifications, the majority's reasons for setting aside the agency's decision still fail.

### A

First, the majority claims that the Fifth Circuit discussed only the legality of the 2014 memorandum's conferral of benefits, not its "forbearance component"—*i.e.*, the decision not to place DACA recipients into removal proceedings. *Ante*, at 20. The majority, therefore, claims that, notwithstanding the then-Attorney General's legal conclusion, then-Acting Secretary Duke was required to consider revoking DACA recipients' lawful presence and other attendant benefits while continuing to defer their removal. *Ante*, at 22–23. Even assuming the majority correctly characterizes the Fifth Circuit's opinion, it cites no authority for the proposition that arbitrary and capricious review *requires* an agency to dissect an unlawful program piece by piece, scrutinizing each separate element to determine whether it would independently violate the law, rather than just to rescind the entire program.[14]

––––––––––

*Department of Transportation* v. *Association of American Railroads*, 575 U. S. 43, 77 (2015) (THOMAS, J., concurring in judgment). Putting aside this constitutional concern, however, the notice and comment process at least attempts to provide a "surrogate political process" that takes some of the sting out of the inherently undemocratic and unaccountable rulemaking process. Asimow, Interim-Final Rules: Making Haste Slowly, 51 Admin. L. Rev. 703, 708 (1999).

[14] The majority's interpretation of the Fifth Circuit's opinion is highly questionable. Because a grant of deferred action renders DACA recipients eligible for certain benefits and work authorization, it is far from clear that the Department could separate DACA's "forbearance component" from the major benefits it conferred without running into yet another APA problem. The majority points to the fact that, under the Patient Protection and Affordable Care Act of 2010, relevant regulations exclude those receiving deferred action through DACA from coverage.

The then-Attorney General reviewed the thorough deci-
sions of the District Court and the Fifth Circuit. Those
courts exhaustively examined the INA's text and structure,
the relevant provisions of other federal immigration stat-
utes, the historical practice of deferred action, and the gen-
eral grants of statutory authority to set immigration policy.
Both decisions concluded that DAPA and expanded DACA
violated the carefully crafted federal immigration scheme,
that such violations could not be justified through reference
to past exercises of deferred action, and that the general
grants of statutory authority did not give DHS the power to
enact such a sweeping nonenforcement program. Based on
the reasoning of those decisions, then-Attorney General
Sessions concluded that DACA was likewise implemented
without statutory authority. He directed DHS to restore
the rule of law. DHS followed the then-Attorney General's
legal analysis and rescinded the program. This legal con-
clusion more than suffices to supply the "reasoned analysis"
necessary to rescind an unlawful program. *State Farm*, 463
U. S., at 42.

The majority has no answer except to suggest that this
approach is inconsistent with *State Farm*. See *ante*, at 21–
22. But in doing so, the majority ignores the fact that, un-
like the typical "prior policy" contemplated by the Court in

––––––––
*Ante*, at 19, n. 5. But that misses the point. Those regulations were
promulgated before "anyone with deferred action under the DACA pro-
cess applie[d]" for those benefits. See 77 Fed. Reg. 52616 (2012). By
contrast, DACA recipients have been eligible for and have received Med-
icare, Social Security, and work authorization for years. DHS therefore
is not writing on a blank slate. Under the majority's rule, DHS would
need to amend all relevant regulations and explain why *all* recipients of
deferred action who have previously received such benefits may no longer
receive them. Alternatively and perhaps more problematically, it would
need to provide a reason why other recipients of deferred action should
continue to qualify, while DACA recipients should not. It thus seems
highly likely that the majority's proposed course of action would be sub-
ject to serious arbitrary and capricious challenges.

Opinion of THOMAS, J.

*State Farm*, DACA is unlawful.  Neither *State Farm* nor
any other decision cited by the majority addresses what an
agency must do when it has inherited an unlawful program.
It is perhaps for this reason that, rather than responding
with authority of its own, the majority simply opts to excise
the "unlawful policy" aspect from its discussion.

### B

Second, the majority claims that DHS erred by failing to
take into account the reliance interests of DACA recipients.
*Ante*, at 23–26.  But reliance interests are irrelevant when
assessing whether to rescind an action that the agency
lacked statutory authority to take.  No amount of reliance
could ever justify continuing a program that allows DHS to
wield power that neither Congress nor the Constitution
gave it.  Any such decision would be "not in accordance with
law" or "in excess of statutory . . . authority."  5 U. S. C.
§§706(2)(A), (C).  Accordingly, DHS would simply be engag-
ing in yet another exercise of unlawful power if it used reli-
ance interests to justify continuing the initially unlawful
program, and a court would be obligated to set aside that
action.[15]

Even if reliance interests were sometimes relevant when
rescinding an ultra vires action, the rescission still would
not be arbitrary and capricious here.  Rather, as the major-
ity does not dispute, the rescission is consistent with how
deferred action has always worked.  As a general matter,
deferred action creates no rights—it exists at the Govern-
ment's discretion and can be revoked at any time.  See App.

———————

[15]The majority contends that this argument does not carry force be-
cause the rescission implemented a winddown period during which re-
cipients would continue to receive benefits.  But whether DHS' decision
to wind down DACA was lawful is a separate question from whether
DHS was required to consider reliance interests before discontinuing an
unlawful program.

24        DEPARTMENT OF HOMELAND SECURITY *v.*
REGENTS OF UNIV. OF CAL.

Opinion of THOMAS, J.

to Pet. for Cert. in No. 18–587, at 104a (DACA and ex-
panded DACA); 8 CFR §214.11(j)(3) (T visas); §214.14(d)(2)
(U visas); 62 Fed. Reg. 63249, 63253 (1997) (discussing
Exec. Order No. 12711 for certain citizens of the People's
Republic of China). The Government has made clear time
and again that, because "deferred action is not an immigra-
tion status, no alien has the right to deferred action. It
is used solely in the discretion of the [Government] and con-
fers no protection or benefit upon an alien." DHS Immigra-
tion and Customs Enforcement Office of Detention and Re-
moval, Detention and Deportation Officers' Field Manual
§20.8 (Mar. 27, 2006); see also Memorandum from D. Meiss-
ner, Comm'r, INS, to Regional Directors et al., pp. 11–12
(Nov. 17, 2000); Memorandum from W. Yates, Assoc. Direc-
tor of Operations, DHS, Citizenship and Immigration
Servs., to Director, Vt. Serv. Center, p. 5 (2003). Thus, con-
trary to the majority's unsupported assertion, *ante,* at 23,
this longstanding administrative treatment of deferred ac-
tion provides strong evidence and authority for the proposi-
tion that an agency need not consider reliance interests in
this context.[16]

Finally, it is inconceivable to require DHS to study reli-
ance interests before rescinding DACA considering how the
program was previously defended. DHS has made clear
since DACA's inception that it would not consider such re-
liance interests. Contemporaneous with the DACA memo,
DHS stated that "DHS can terminate or renew deferred ac-
tion at any time at the agency's discretion." Consideration

─────────

[16]The majority's approach will make it far more difficult to change
deferred-action programs going forward, which is hardly in keeping with
this Court's own understanding that deferred action is an "exercise in
administrative discretion" used for administrative "convenience." *Reno*
v. *American-Arab Anti-Discrimination Comm.,* 525 U. S. 471, 484 (1999).
Agencies will likely be less willing to grant deferred action knowing that
any attempts to undo it will require years of litigation and time-consuming
rulemakings.

Opinion of THOMAS, J.

of Deferred Action for Childhood Arrivals Process, 89 Interpreter Releases 1557, App. 4, p. 2 (Aug. 20, 2012). In fact, DHS repeatedly argued in court that the 2014 memorandum was a valid exercise of prosecutorial discretion in part *because* deferred action created no rights on which recipients could rely. Before the Fifth Circuit, DHS stated that "DHS may revoke or terminate deferred action and begin removal proceedings at any time at its discretion." Brief for Appellants in *Texas* v. *United States*, No. 15–40238, p. 7; see also *id.*, at 45–46. And before this Court, in that same litigation, DHS reiterated that "DHS has absolute discretion to revoke deferred action unilaterally, without notice or process." Brief for United States in *United States* v. *Texas*, O. T. 2015, No. 15–674, p. 5; see also *id.*, at 37. If that treatment of reliance interests was incorrect, it provides yet one more example of a deficiency in DACA's issuance, not its rescission.

\*   \*   \*

President Trump's Acting Secretary of Homeland Security inherited a program created by President Obama's Secretary that was implemented without statutory authority and without following the APA's required procedures. Then-Attorney General Sessions correctly concluded that this ultra vires program should be rescinded. These cases could—and should—have ended with a determination that his legal conclusion was correct.

Instead, the majority today concludes that DHS was required to do far more. Without grounding its position in either the APA or precedent, the majority declares that DHS was required to overlook DACA's obvious legal deficiencies and provide additional policy reasons and justifications before restoring the rule of law. This holding is incorrect, and it will hamstring all future agency attempts to undo actions that exceed statutory authority. I would

therefore reverse the judgments below and remand with in-
structions to dissolve the nationwide injunctions.

Opinion of ALITO, J.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 18–587, 18–588, and 18–589

————

DEPARTMENT OF HOMELAND SECURITY,
ET AL., PETITIONERS

18–587        *v.*

REGENTS OF THE UNIVERSITY OF
CALIFORNIA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT


DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES, ET AL., PETITIONERS

18–588                    *v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, ET AL.; AND

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE
UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT


CHAD WOLF, ACTING SECRETARY OF HOMELAND
SECURITY, ET AL., PETITIONERS

18–589             *v.*

MARTIN JONATHAN BATALLA VIDAL, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 18, 2020]

JUSTICE ALITO, concurring in the judgment in part and
dissenting in part.

Anyone interested in the role that the Federal Judiciary

now plays in our constitutional system should consider
what has happened in these cases. Early in the term of the
current President, his administration took the controver-
sial step of attempting to rescind the Deferred Action for
Childhood Arrivals (DACA) program. Shortly thereafter,
one of the nearly 700 federal district court judges blocked
this rescission, and since then, this issue has been mired in
litigation. In November 2018, the Solicitor General filed
petitions for certiorari, and today, the Court still does not
resolve the question of DACA's rescission. Instead, it tells
the Department of Homeland Security to go back and try
again. What this means is that the Federal Judiciary, with-
out holding that DACA cannot be rescinded, has prevented
that from occurring during an entire Presidential term.
Our constitutional system is not supposed to work that way.

I join JUSTICE THOMAS's opinion. DACA presents a deli-
cate political issue, but that is not our business. As JUSTICE
THOMAS explains, DACA was unlawful from the start, and
that alone is sufficient to justify its termination. But even
if DACA were lawful, we would still have no basis for over-
turning its rescission. First, to the extent DACA repre-
sented a lawful exercise of prosecutorial discretion, its re-
scission represented an exercise of that same discretion,
and it would therefore be unreviewable under the Adminis-
trative Procedure Act. 5 U. S. C. §701(a)(2); see *Heckler* v.
*Chaney*, 470 U. S. 821, 831–832 (1985). Second, to the ex-
tent we could review the rescission, it was not arbitrary and
capricious for essentially the reasons explained by JUSTICE
KAVANAUGH. See *post*, at 4–6 (opinion concurring in the
judgment in part and dissenting in part).

Cite as: 591 U. S. ____ (2020)          1

Opinion of KAVANAUGH, J.

# SUPREME COURT OF THE UNITED STATES

————————

Nos. 18–587, 18–588, and 18–589

————————

DEPARTMENT OF HOMELAND SECURITY,
ET AL., PETITIONERS

18–587                    *v.*

REGENTS OF THE UNIVERSITY OF
CALIFORNIA, ET AL.

*ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT*


DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES, ET AL., PETITIONERS

18–588                    *v.*

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, ET AL.; AND

*ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE
UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT*


CHAD WOLF, ACTING SECRETARY OF HOMELAND
SECURITY, ET AL., PETITIONERS

18–589                    *v.*

MARTIN JONATHAN BATALLA VIDAL, ET AL.

*ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE SECOND CIRCUIT*

[June 18, 2020]

JUSTICE KAVANAUGH, concurring in the judgment in part
and dissenting in part.

For the last 20 years, the country has engaged in conse-
quential policy, religious, and moral debates about the legal
status of millions of young immigrants who, as children,
were brought to the United States and have lived here ever
since.  Those young immigrants do not have legal status in
the United States under current statutory law.  They live,
go to school, and work here with uncertainty about their
futures.  Despite many attempts over the last two decades,
Congress has not yet enacted legislation to afford legal sta-
tus to those immigrants.

In 2012, exercising its view of the Executive's prosecuto-
rial discretion under Article II and the immigration laws,
President Obama's administration unilaterally instituted a
program known as Deferred Action for Childhood Arrivals,
or DACA.  Under DACA, eligible young immigrants may
apply for and receive deferred action.  They must renew
their DACA status every two years.  Under the program,
the Executive Branch broadly forbears from enforcing cer-
tain immigration removal laws against DACA recipients.
And by virtue of the forbearance, DACA recipients also be-
come eligible for work authorization and other benefits.

Since 2017, President Trump's administration has
sought to rescind DACA based on its different and narrower
understanding of the Executive's prosecutorial discretion
under Article II and the immigration laws.  In its view, the
Executive Branch legally may not, and as a policy matter
should not, *unilaterally* forbear from enforcing the immi-
gration laws against such a large class of individuals.  The
current administration has stated that it instead wants to
work with Congress to enact comprehensive legislation that
would address the legal status of those immigrants together
with other significant immigration issues.

The question before the Court is whether the Executive
Branch acted lawfully in ordering rescission of the ongoing
DACA program.  To begin with, all nine Members of the
Court accept, as do the DACA plaintiffs themselves, that

Cite as: 591 U. S. ____ (2020)          3

Opinion of KAVANAUGH, J.

the Executive Branch possesses the legal authority to re-
scind DACA and to resume pre-DACA enforcement of the
immigration laws enacted by Congress. Having previously
adopted a policy of prosecutorial discretion and nonenforce-
ment with respect to a particular class of offenses or indi-
viduals, the Executive Branch has the legal authority to re-
scind such a policy and resume enforcing the law enacted
by Congress. The Executive Branch's exercise of that re-
scission authority is subject to constitutional constraints
and may also be subject to statutory constraints. The nar-
row legal dispute here concerns a statutory constraint—
namely, whether the Executive Branch's action to rescind
DACA satisfied the general arbitrary-and-capricious stand-
ard of the Administrative Procedure Act, or APA.

The APA's arbitrary-and-capricious standard requires
that agency action be reasonable and reasonably explained.
As the Court has long stated, judicial review under that
standard is deferential to the agency. The Court may not
substitute its policy judgment for that of the agency. The
Court simply ensures that the agency has acted within a
broad zone of reasonableness and, in particular, has reason-
ably considered the relevant issues and reasonably ex-
plained the decision. See *FCC* v. *Fox Television Stations,
Inc.*, 556 U. S. 502 (2009); *Motor Vehicle Mfrs. Assn. of
United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*,
463 U. S. 29 (1983).

The Executive Branch explained its decision to rescind
DACA in two sequential memorandums by successive Sec-
retaries of Homeland Security: the 2017 Duke Memoran-
dum and the 2018 Nielsen Memorandum. The Duke Mem-
orandum focused on DACA's perceived legal flaws. The
Court today finds the Duke Memorandum insufficient un-
der the APA's arbitrary-and-capricious standard.

But regardless of whether the Court is correct about the
Duke Memorandum, the Nielsen Memorandum more fully
explained the Department's legal reasons for rescinding

DACA, and clarified that even if DACA were lawful, the De-
partment would still rescind DACA for a variety of policy
reasons.  The Nielsen Memorandum also expressly ad-
dressed the reliance interests of DACA recipients.  The
question under the APA's deferential arbitrary-and-capri-
cious standard is not whether we agree with the Depart-
ment's decision to rescind DACA.  The question is whether
the Nielsen Memorandum reasonably explained the deci-
sion to rescind DACA.  Under ordinary application of the
arbitrary-and-capricious standard, the Nielsen Memoran-
dum—with its alternative and independent rationales and
its discussion of reliance—would pass muster as an expla-
nation for the Executive Branch's action.

The Nielsen Memorandum was issued nine months after
the Duke Memorandum.  Under the Administrative Proce-
dure Act, the Nielsen Memorandum is itself a "rule" setting
forth "an agency statement of general . . . applicability and
future effect designed to implement . . . policy." 5 U. S. C.
§551(4).  Because it is a rule, the Nielsen Memorandum con-
stitutes "agency action." §551(13).  As the Secretary of
Homeland Security, Secretary Nielsen had the authority to
decide whether to stick with Secretary Duke's decision to
rescind DACA, or to make a different decision.  Like Secre-
tary Duke, Secretary Nielsen chose to rescind DACA, and
she provided additional explanation.  Her memorandum
was akin to common forms of agency action that follow ear-
lier agency action on the same subject—for example, a sup-
plemental or new agency statement of policy, or an agency
order with respect to a motion for rehearing or reconsider-
ation.  Courts often consider an agency's additional expla-
nations of policy or additional explanations made, for exam-
ple, on agency rehearing or reconsideration, or on remand
from a court, even if the agency's bottom-line decision itself
does not change.

Yet the Court today jettisons the Nielsen Memorandum
by classifying it as a *post hoc* justification for rescinding

Opinion of KAVANAUGH, J.

DACA. *Ante*, at 14–16.  Under our precedents, however, the *post hoc* justification doctrine merely requires that courts assess agency action based on the official explanations of the agency decisionmakers, and not based on after-the-fact explanations advanced *by agency lawyers during litigation* (or by judges).  See, *e.g., State Farm*, 463 U. S., at 50 ("courts may not accept appellate counsel's *post hoc* rationalizations for agency action"); *FPC* v. *Texaco Inc.*, 417 U. S. 380, 397 (1974) (same); *NLRB* v. *Metropolitan Life Ins. Co.*, 380 U. S. 438, 443–444 (1965) (same); *Burlington Truck Lines, Inc.* v. *United States*, 371 U. S. 156, 168–169 (1962) (same).  As the D. C. Circuit has explained, the *post hoc* justification doctrine "is not a time barrier which freezes an agency's exercise of its judgment after an initial decision has been made and bars it from further articulation of its reasoning.  It is a rule directed at reviewing courts which forbids judges to uphold agency action on the basis of rationales offered by anyone other than the proper decisionmakers."  *Alpharma, Inc.* v. *Leavitt*, 460 F. 3d 1, 6 (2006) (Garland, J.) (internal quotation marks omitted).

Indeed, the ordinary judicial remedy for an agency's insufficient explanation is to remand for further explanation by the relevant agency personnel.  It would make little sense for a court to exclude official explanations by agency personnel such as a Cabinet Secretary simply because the explanations are purportedly *post hoc*, and then to turn around and remand for further explanation by those same agency personnel.  Yet that is the upshot of the Court's application of the *post hoc* justification doctrine today.  The Court's refusal to look at the Nielsen Memorandum seems particularly mistaken, moreover, because the Nielsen Memorandum shows that the Department, back in 2018, considered the policy issues that the Court today says the Department did not consider.  *Ante,* at 20–26.

To be sure, cases such as *Overton Park* and *Camp* v. *Pitts* suggest that courts reviewing certain agency *adjudications*

may in some circumstances decline to examine an after-the-fact agency explanation. See *Camp* v. *Pitts*, 411 U. S. 138, 142–143 (1973) (*per curiam*); *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402, 419–421 (1971). But agency adjudications are "concerned with the determination of past and present rights and liabilities," Attorney General's Manual on the Administrative Procedure Act 14 (1947), and implicate the due process interests of the individual parties to the adjudication. Judicial review of an adjudication therefore ordinarily focuses on what happened during the agency's adjudication process of deciding that individual case.

Even if certain agency adjudications have a slightly more stringent restriction on *post hoc* explanations, the APA is "based upon a dichotomy between rule making and adjudication," *ibid.*, and this case involves an ongoing agency rule that has future effect—the rescission of DACA. The Nielsen Memorandum implements and explains the rescission of DACA. I am aware of no case from this Court, and the Court today cites none, that has employed the *post hoc* justification doctrine to exclude an agency's official explanation of an agency rule. For purposes of arbitrary-and-capricious review, it does not matter whether the latest official explanation was two years ago or three years ago. What matters is whether the explanation was reasonable and followed the requisite procedures. In my view, the Court should consider the Nielsen Memorandum in deciding whether the Department's rescission of DACA satisfies the APA's arbitrary-and-capricious standard.

Because the Court excludes the Nielsen Memorandum, the Court sends the case back to the Department of Homeland Security for further explanation. Although I disagree with the Court's decision to remand, the only practical consequence of the Court's decision to remand appears to be some delay. The Court's decision seems to allow the Department on remand to relabel and reiterate the substance

Opinion of KAVANAUGH, J.

of the Nielsen Memorandum, perhaps with some elaboration as suggested in the Court's opinion. *Ante,* at 23–26.*

\*        \*        \*

The Court's resolution of this narrow APA issue of course cannot eliminate the broader uncertainty over the status of the DACA recipients. That uncertainty is a result of Congress's inability thus far to agree on legislation, which in turn has forced successive administrations to improvise, thereby triggering many rounds of relentless litigation with the prospect of more litigation to come. In contrast to those necessarily short-lived and stopgap administrative measures, the Article I legislative process could produce a sturdy and enduring solution to this issue, one way or the other, and thereby remove the uncertainty that has persisted for years for these young immigrants and the Na-

––––––––

  *Because I conclude that the Executive Branch satisfied the APA's arbitrary-and-capricious standard, I need not consider whether its prosecutorial enforcement policy was "committed to agency discretion by law" and therefore not subject to APA arbitrary-and-capricious review in the first place. 5 U. S. C. §701(a)(2). Several judges have advanced arguments suggesting that DACA—at least to the extent it was simply an exercise of forbearance authority—and the repeal of DACA are decisions about whether and to what extent to exercise prosecutorial discretion against a class of offenses or individuals, and are therefore unreviewable under the APA as "committed to agency discretion by law." *Ibid.*; see *Casa De Maryland* v. *United States Dept. of Homeland Security*, 924 F. 3d 684, 709–715 (CA4 2019) (Richardson, J., concurring in part and dissenting in part); *Regents of Univ. Cal.* v. *United States Dept. of Homeland Security*, 908 F. 3d 476, 521–523 (CA9 2018) (Owens, J., concurring in judgment); see also *Texas* v. *United States*, 809 F. 3d 134, 196–202 (CA5 2015) (King, J., dissenting); *Texas* v. *United States*, 787 F. 3d 733, 770–776 (CA5 2015) (Higginson, J., dissenting); cf. *Heckler* v. *Chaney*, 470 U. S. 821, 831–835 (1985); *ICC* v. *Locomotive Engineers*, 482 U. S. 270, 277–284 (1987); *United States* v. *Nixon*, 418 U. S. 683, 693 (1974) ("the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case"); *In re Aiken County*, 725 F. 3d 255, 262–264 (CADC 2013).

8          DEPARTMENT OF HOMELAND SECURITY *v.*
              REGENTS OF UNIV. OF CAL.
                Opinion of KAVANAUGH, J.

tion's immigration system.  In the meantime, as to the narrow APA question presented here, I appreciate the Court's careful analysis, but I ultimately disagree with its treatment of the Nielsen Memorandum.  I therefore respectfully dissent from the Court's judgment on plaintiffs' APA claim, and I concur in the judgment insofar as the Court rejects plaintiffs' equal protection claim.