# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Save Jobs USA,<br><br>    *Plaintiff*,<br><br>  v.<br><br>U.S. Department of Homeland Security,<br><br>    *Defendant,*<br><br>  and<br><br>Anujkumar Dhamija, *et al.*<br><br>    *Intervenors-<br>Defendants*. | Civil Action No. 15-cv-615<br><br>Hon. Tanya S. Chutkan |

### BRIEF OF LEADING COMPANIES AND BUSINESS ASSOCIATIONS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT

Paul W. Hughes (D.C. Bar No. 997235)
 phughes@mwe.com
Andrew A. Lyons-Berg (D.C. Bar No. 230182)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, D.C. 20001
(202) 756-8000 (office)
(202) 756-8087 (facsimile)

# TABLE OF CONTENTS

Table of Authorities ................................................................................................. ii

Glossary ............................................................................................................... viii

Introduction and Interest of the *Amici Curiae* ........................................................1

Argument ..................................................................................................................3

I.   H-4 employment authorization is critically important to the affected individuals, employers like *amici*, and the health of the overall economy. ...............................3

    A.   Eliminating H-4 employment authorization would be devastating to the affected employees and their families. ...........................................................4

    B.   Leading companies, including *amici* and their members, rely daily on this highly accomplished cohort of employees. ...................................................7

    C.   Setting aside the H-4 Rule would lose the contributions of these high-skilled workers and innovators to other nations. ...........................................8

II.   The H-4 Rule is lawful.........................................................................................11

    A.   The INA empowers DHS to authorize the employment of lawfully admitted noncitizens. ...................................................................................11

    B.   DHS's choice to authorize certain H-4 employment is eminently reasonable. .....................................................................................................22

Conclusion .............................................................................................................25

i

# TABLE OF AUTHORITIES

**Cases**

*Action on Smoking & Health v. C.A.B.*,
   713 F.2d 795 (D.C. Cir. 1983) .................................................................................24

*AFL-CIO v. NLRB*,
   471 F. Supp. 3d 228 (D.D.C. 2020) ..........................................................................24

*Airmotive Eng'g Corp. v. FAA*,
   882 F.3d 1157 (D.C. Cir. 2018) ...........................................................................24, 25

*Altman v. SEC*,
   666 F.3d 1322 (D.C. Cir. 2011) ...........................................................................14, 16

*Ariz. DREAM Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) ..................................................................................18

*Barnhart v. Peabody Coal Co.*,
   537 U.S. 149 (2003)...................................................................................................21

*Butte Cty. v. Chaudhuri*,
   887 F.3d 501 (D.C. Cir. 2018) ...................................................................................23

*Camp v. Pitts*,
   411 U.S. 138 (1973)...................................................................................................24

*Cape Cod Hosp. v. Sebelius*,
   630 F.3d 203 (D.C. Cir. 2011) ...................................................................................18

*Catawba Cty. v. EPA*,
   571 F.3d 20 (D.C. Cir. 2009) .....................................................................................21

*Cheney R.R. Co. v. ICC*,
   902 F.2d 66 (D.C. Cir. 1990) .....................................................................................21

*Cmtys. Against Runway Expansion, Inc. v. FAA*,
   355 F.3d 678 (D.C. Cir. 2004) ...................................................................................23

*\*Commodity Futures Trading Comm'n v. Schor*,
   478 U.S. 883 (1986)...............................................................................14, 15, 16, 18

*CTS Corp. v. EPA*,
   759 F.3d 52 (D.C. Cir. 2014) .....................................................................................23

*DHS v. Regents of Univ. of Cal.*,
   140 S. Ct. 1891 (2020).............................................................................................5, 24

*Diaz v. INS*,
   648 F. Supp. 638 (E.D. Cal. 1986)............................................................................13

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016)................................................................................................5

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502, 515 (2009)............................................................................................5

**Cases—continued**

*FBME Bank Ltd. v. Mnuchin*,
249 F. Supp. 3d 215 (D.D.C. 2017) ...................................................24

*Hoffman Plastic Compounds, Inc. v. NLRB*,
535 U.S. 137 (2002) ........................................................................15

*Home Box Office, Inc. v. FCC*,
587 F.2d 1248 (D.C. Cir. 1978) .......................................................25

*Hsuan Wei v. Robinson*,
246 F.2d 739 (7th Cir. 1957) ...........................................................13

*Jenkins v. Haubert*,
179 F.3d 19 (2d Cir. 1999) ..............................................................12

*Koi Nation of N. Cal. v. U.S. Dep't of Interior*,
361 F. Supp. 3d 14 (D.D.C. 2019) ...................................................19

*Matter of Lieu*,
15 I. & N. Dec. 786 (Acting Dist. Dir., INS 1976) ..........................13

*Nat'l Ass'n of Mfrs. v. Dep't of Defense*,
138 S. Ct. 617 (2018) ......................................................................12

*Nat'l Black Police Ass'n v. District of Columbia*,
108 F.3d 346 (D.C. Cir. 1997) .........................................................19

*Pub. Citizen, Inc. v. FAA*,
988 F.2d 186 (D.C. Cir. 1993) .........................................................24

*Pub. Citizen, Inc. v. U.S. Dep't of Health & Human Servs.*,
332 F.3d 654 (D.C. Cir. 2003) .........................................................18

*Red Lion Broad. Co. v. FCC*,
395 U.S. 367 (1969) ....................................................................15, 16

*Regents of Univ. of Cal. v. DHS*,
908 F.3d 476 (9th Cir. 2018) ...........................................................22

*Reytblatt v. Nuclear Regulatory Comm'n*,
105 F.3d 715 (D.C. Cir. 1997) .........................................................24

*Rhea Lana, Inc. v. United States*,
925 F.3d 521 (D.C. Cir. 2019) .........................................................23

*Matter of S-*,
8 I. & N. Dec. 574 (B.I.A. 1960) ......................................................13

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ...........................................................................24

*Sec'y of Labor, Mine Safety & Health Admin. v. Excel Mining, LLC*,
334 F.3d 1 (D.C. Cir. 2003) .............................................................14

*Sierra Club v. FERC*,
867 F.3d 1357 (D.C. Cir. 2017) .......................................................23

**Cases—continued**

*Matter of T-*,
  7 I. & N. Dec. 682 (B.I.A. 1958) ........................................................................12

*Tanzin v. Tanvir*,
  141 S. Ct. 486 (2020) ........................................................................................11

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) .............................................................................22

*\*Wash. All. of Tech. Workers v. DHS*,
  __ F. Supp. 3d ___, 2021 WL 329847 (D.D.C. Jan. 28, 2021) (*Washtech III*) ................19, 22

*\*Wash. All. of Tech. Workers v. DHS*,
  156 F. Supp. 3d 123 (D.D.C. 2015) (*Washtech I*) ............................................19

*Wash. All. of Tech. Workers v. DHS*,
  892 F.3d 332 (D.C. Cir. 2018) (*Washtech II*) ..................................................12

**Statutes**

6 U.S.C.
  § 202................................................................................................................12
  § 557................................................................................................................12
8 U.S.C.
  § 1101(a)(15)(H)................................................................................................2
  § 1101(a)(15)(H)(i)(b)........................................................................................1
  § 1103........................................................................................................*passim*
  § 1103(a)..........................................................................................................14
  § 1103(a)(3)................................................................................................12, 20
  § 1158(a)..........................................................................................................13
  § 1184(a)(1)................................................................................................12, 20
  § 1184(i)(1).........................................................................................................1
  § 1324a.....................................................................................................*passim*
  § 1324a(a)(1)(A)..............................................................................................15
  § 1324a(h)(3)...................................................................................................15

Pub. L. No. 100-525, 102 Stat. 2609 (1988)................................................................18

Pub. L. No. 101-649, 104 Stat. 4978 (1990)................................................................18

Pub. L. No. 102-232, 105 Stat. 1733 (1991)................................................................18

Pub. L. No. 103-416, 108 Stat. 4305 (1994)................................................................18

Pub. L. No. 104-208, 110 Stat. 3009 (1996)................................................................18

Pub. L. No. 108-390, 118 Stat. 2242 (2004)................................................................18

**Rules and Regulations**

8 C.F.R.
§ 109.1(b) ......................................................................................................14
§ 214.1(a)(1)(iii) ...............................................................................................2
§ 214.2(c) (1957) ............................................................................................12
§ 274a.12 ...............................................................................................14, 17
§ 274a.12(c)(14) ..............................................................................................22

12 Fed. Reg. 5,355 (Aug. 7, 1947) .....................................................................12

38 Fed. Reg. 35,425 (Dec. 28, 1973) .................................................................13

43 Fed. Reg. 33,229 (July 31, 1978) ..................................................................13

44 Fed. Reg. 43,480 (July 25, 1979) ............................................................13, 14

48 Fed. Reg. 14,575 (Apr. 5, 1983) ...................................................................13

52 Fed. Reg. 8,762 (Mar. 19, 1987) ..................................................................13

52 Fed. Reg. 16,216 (May 1, 1987) ...................................................................17

53 Fed. Reg. 46,850 (Nov. 21, 1988) .................................................................17

55 Fed. Reg. 25,928 (June 25, 1990) .................................................................17

56 Fed. Reg. 55,608 (Oct. 29, 1991) ..................................................................17

57 Fed. Reg. 31,954 (July 20, 1992) ..................................................................17

60 Fed. Reg. 44,260 (Aug. 25, 1995) .................................................................17

60 Fed. Reg. 66,062 (Dec. 21, 1995) .................................................................17

63 Fed. Reg. 27,823 (May 21, 1998) ..................................................................17

64 Fed. Reg. 25,756 (May 12, 1999) ..................................................................17

67 Fed. Reg. 4,784 (Jan. 31, 2002) ...................................................................17

67 Fed. Reg. 76,256 (Dec. 11. 2002) .................................................................17

69 Fed. Reg. 45,555 (July 30, 2004) ..................................................................17

73 Fed. Reg. 18,944 (Apr. 8, 2008) ...................................................................17

74 Fed. Reg. 26,514 (June 3, 2009) ...................................................................17

74 Fed. Reg. 46,938 (Sept. 14, 2009) ................................................................17

75 Fed. Reg. 47,699 (Aug. 9, 2010) ...................................................................17

75 Fed. Reg. 79,264 (Dec. 20, 2010) .................................................................17

79 Fed. Reg. 26,886 (May 12, 2014) ..................................................................17

80 Fed. Reg. 63,376 (Oct. 19, 2015) ..................................................................17

*Employment Authorization,*
51 Fed. Reg. 39,385 (Oct. 28, 1986) ............................................................13, 16

*Employment Authorization; Classes of Aliens Eligible,*
52 Fed. Reg. 46,092 (Dec. 4, 1987) ...................................................................17

*Employment Authorization for Certain H-4 Dependent Spouses,*
80 Fed. Reg. 10,284 (Feb. 25, 2015) ..........................................................*passim*

**Rules and Regulations—continued**

*Employment Authorization to Aliens in the United States*,
46 Fed. Reg. 25,079 (May 5, 1981) ..............................................................14

*Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students
with STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students*,
81 Fed. Reg. 13,040 (Mar. 11, 2016)...............................................................2

*Proposed Rules for Employment Authorization for Certain Aliens*,
44 Fed. Reg. 43,480 (July 25, 1979)................................................................13

*Strengthening the H-1B Nonimmigrant Visa Classification Program*, 85 Fed. Reg.
63,918 (Oct. 8, 2020) ......................................................................................3

**Other Authorities**

Alex Nowrasteh, *Don't Ban H-1B Workers: They Are Worth Their Weight in Innovation*,
Cato at Liberty (May 14, 2020) ......................................................................9

Andrew Edgecliffe-Johnson, *US Companies Say Visa Rules Are Jobs Boon for Canada*,
Financial Times (June 26, 2020) ...................................................................10

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012) ......................................16

Border Security, Economic Opportunity, and Immigration Modernization Act,
S. 744, 113th Cong. § 4102 (2013)..................................................................20

1 Charles Gordon et al., *Immigration Law & Procedure* (2019)..................................19

Condition, Merriam-Webster Dictionary.................................................................12

*COVID-19 and Gender Equality: Countering the Regressive Effects*,
McKinsey & Co. (July 15, 2020).......................................................................9

David J. Bier, *Backlog for Skilled Immigrants Tops 1 Million: Over 200,000 Indians Could
Die of Old Age While Awaiting Green Cards*, Cato Institute (Mar. 30, 2020)..........2

David J. Bier, *The Facts About H-4 Visas for Spouses of H-1B Workers*,
Cato at Liberty (June 16, 2020) .......................................................................3

Ethan Baron, *H-1B: Bay Area Spouses of Visa Holders Thrown out of Work by Government
Delays; Feds Demand Fingerprinting That Feds Can't Provide*,
San Jose Mercury News (Feb. 25, 2021) .......................................................4, 6

Ethan Baron, *H-1B: Google Urges Feds to Fix 'Logjam' Costing Foreign
Workers' Jobs*, San Jose Mercury News (Apr. 12, 2021)............................6, 8, 11

Federal Reserve Bank of St. Louis, *Real Median Personal Income in the United States*
(Sep. 16, 2020)..............................................................................................7

Giovanni Peri & Chad Sparber, *Presidential Executive Actions Halting High
Skilled Immigration Hurt the US Economy* (July 2020) .....................................9

I-Squared Act of 2013, S. 169, 113th Cong. § 103.................................................20

I-Squared Act of 2015, S. 153, 114th Cong. § 102.................................................20

Ike Brannon & M. Kevin McGee, *Hurting Americans in Order to Hurt Foreigners*,
Regulation (Spring 2019).......................................................................... *passim*

Other Authorities—continued

Ike Brannon & M. Kevin McGee, *Repealing H-4 Visa Work Authorization: A Cost-Benefit Analysis* (Apr. 2, 2019)................................................................5, 6, 7

INS Operating Instructions
    214.1 (Jan. 26, 1966).................................................................................12
    214.2(a) (June 15, 1963) ...........................................................................12
    214.2(e) (Feb. 28, 1968) ...........................................................................12
    214.2(e) (Nov. 10, 1971)...........................................................................12
    214.2(f) (Jan. 15, 1962).............................................................................12
    214.2(j)(1) (Nov. 15, 1963)........................................................................12
    214.2(j)(5) (Jan. 17, 1973) ........................................................................13
    214.2(j)(5) (Apr. 14, 1965) ........................................................................12
    214.2(j)(5) (July 5, 1978)..........................................................................13

48 Interpreter Releases (1971) ..........................................................................13

55 Interpreter Releases (1978) ..........................................................................13

Letter from Rep. Bonnie Watson Coleman to President-elect Joe Biden (Dec. 16, 2020).............6

Michelle Hackman, *Work-Permit Backlog for Immigrant Spouses Takes Toll on Professional Women*, Wall Street Journal (Apr. 17, 2021)....................................4, 5

National Academies of Sciences, Engineering, and Medicine, *The Economic and Fiscal Consequences of Immigration* (2017) ..........................................................8

New American Economy Research Fund, *Sizing Up the Gap in our Supply of STEM Workers: Data & Analysis* (Mar. 29, 2017)....................................................................7

Nirmita Panchal et al., *The Implications of COVID-19 for Mental Health and Substance Use*, Kaiser Family Foundation (Feb. 10, 2021) ........................................................6

Sam Bensen, Assistant Commissioner, Adjudications, Immigration and Naturalization Service, *Lawful Work for Nonimmigrants* ................................................................13

Stuart Anderson, *Evidence Mounts that Reducing Immigration Harms America's Economy*, Forbes (Apr. 1, 2021)............................................................................9

Stuart Anderson*, Indians Immigrating to Canada at An Astonishing Rate*, Forbes (Feb. 3, 2020) .............................................................................10

2B *Sutherland Statutes & Statutory Construction* (7th ed.) ........................................18

U.S. Dep't of State, *Visa Bulletin* (May 2021) ..................................................2

# GLOSSARY

DHS................Department of Homeland Security

EAD ..............Employment Authorization Document

H-4 Rule.........*Employment Authorization for Certain H-4 Dependent Spouses*,
　　　　　　　　80 Fed. Reg. 10,284 (Feb. 25, 2015)

INA ................Immigration and Nationality Act

INS .................Immigration and Naturalization Service

IRCA ..............Immigration Reform and Control Act

LPR ................Lawful Permanent Residence

STEM.............Science, Technology, Engineering, and Mathematics

**INTRODUCTION AND INTEREST OF THE *AMICI CURIAE***

This is a case of enormous practical consequence: The regulation at issue here—the H-4 Rule, U.S. Dep't of Homeland Security, *Employment Authorization for Certain H-4 Dependent Spouses*, 80 Fed. Reg. 10,284 (Feb. 25, 2015)—provides work authorization to more than 90,000 H-4 visa-holders (spouses of certain H-1B visa-holders), more than 90% of whom are women. Invalidation of this rule would result in these talented individuals being barred from the workplace, forcibly severing tens of thousands of employment relationships across the country. The results would be utterly destructive for the families impacted; by just one measure, about 87% of these families have made crucial life decisions on the promise of H-4 employment, including whether to have a child and whether to buy a house.

*Amici* are a group of leading companies and organizations that employ H-1B or H-4 visa-holders as critical colleagues and team members, as well as national business associations representing such companies.[1] They respectfully submit this brief to aid the Court's consideration of Plaintiff's legal challenges, in particular by drawing attention to the substantial impact of the H-4 Rule on employees, employers, and the economy as a whole. Further, *amici* provide additional argument demonstrating why Plaintiff's legal theories lack merit.

**1.** The regulation challenged in this case—the H-4 Rule—affects, directly and indirectly, some of the most important visa categories in this country's immigration system. The H-1B visa is issued to highly skilled workers "who [are] coming temporarily to the United States to perform services . . . in a specialty occupation"—that is, "an occupation that requires . . . theoretical and practical application of a body of highly specialized knowledge, and . . . attainment of a bachelor's or higher degree in the specific specialty (or its equivalent)." 8 U.S.C. §§ 1101(a)(15)(H)(i)(b); 1184(i)(1). These highly sought-after workers boost innovation in the United States—as measured

---

[1]   A full listing of the *amici* is provided in Appendix A.

No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money towards this brief; nor did any person other than the *amici curiae*, their members, or their counsel.

by proxies such as patenting activity—driving the economy and helping to ensure American competitiveness on the global stage. *See, e.g.*, U.S. Dep't of Homeland Security, *Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students with STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students*, 81 Fed. Reg. 13,040, 13,048 (Mar. 11, 2016) (collecting authorities); H-4 Rule, 80 Fed. Reg. at 10,284 (explaining that H-1B visa-holders "contribute to advances in entrepreneurship and research and development, which are highly correlated with overall economic growth and job creation").

H-4 visas are issued to the spouses and minor children of H-1B nonimmigrants. *See* 8 U.S.C. § 1101(a)(15)(H); 8 C.F.R. § 214.1(a)(1)(iii). In 2015, the Department of Homeland Security (DHS) promulgated a regulation permitting certain H-4 spouses—those whose H-1B spouses have been approved for permanent residency but are waiting for a green card to become available—to work in the United States. *See generally* H-4 Rule, 80 Fed. Reg. 10,284. This work authorization is critically important in part because of the lengthy period of time it currently takes for certain H-1B visa-holders to obtain a green card.[2] Once the green card is issued (and the spouse's derivative permanent resident status follows), both spouses will be able to work to support their family—but in the meantime, the family would be limited to a single income, absent the H-4 Rule. As DHS explained, allowing H-4 spouses to work during this years-long transitional period thus "ameliorate[s] certain disincentives that currently lead H-1B nonimmigrants to abandon efforts to remain in the United States while seeking [lawful permanent resident (LPR)] status,

---

[2]     The Immigration and Nationality Act's geographical quota system restricts the number of permanent resident visas (colloquially, green cards) available to nationals of any given country each year, with the result that certain countries—particularly India—are oversubscribed, leading to extremely long wait times for visa availability. *See* U.S. Dep't of State, *Visa Bulletin* 3-4 (May 2021) (State Department is currently only issuing employment-based immigrant visas to Indian nationals whose petitions were approved prior to February 2011), perma.cc/V7D4-73BB. Indeed, one commentator has calculated that this significant backlog, unless reformed, could lead to a wait time of *89 years* for a green card. David J. Bier, *Backlog for Skilled Immigrants Tops 1 Million: Over 200,000 Indians Could Die of Old Age While Awaiting Green Cards*, Cato Institute (Mar. 30, 2020), perma.cc/F97Q-RCQX.

thereby minimizing disruptions to U.S. businesses employing such workers" and "assist[ing] over-all economic growth and job creation." *Id.* at 10,285.

There are over 580,000 noncitizens working in the United States on H-1B visas, and the population of H-4 spouses with work authorization is estimated at approximately 90,000, with an additional 180,000 H-4 spouses eligible to be authorized. *See* U.S. Dep't of Homeland Security, *Strengthening the H-1B Nonimmigrant Visa Classification Program*, 85 Fed. Reg. 63,918, 63,921 (Oct. 8, 2020) (H-1B authorized-to-work population); David J. Bier, *The Facts About H-4 Visas for Spouses of H-1B Workers*, Cato at Liberty (June 16, 2020) (estimates of H-4 spouses with, and eligible for, employment authorization), perma.cc/Z6QL-WKSW.

**2.** *Amici* include leading U.S. companies (and associations of companies) that count H-4 visa-holders as integral parts of their teams, helping to power critical projects and deliver value to their customers and clients. *Amici* also employ many team members on H-1B visas—a great num-ber of whom have relied on their spouses' ability to pursue careers in the United States on H-4 visas as an essential component of their families' decision to bring their talents to this country. *Amici* are committed to ensuring these valued colleagues are not forced to forgo employment or leave the United States.

## ARGUMENT

I.   **H-4 employment authorization is critically important to the affected individuals, employers like *amici*, and the health of the overall economy.**

The provision of employment authorization to certain H-4 visa-holders has become, by necessity, a vital component of the immigration system: Not only is this employment authorization immensely significant to the tens of thousands of families that have organized their lives around the availability of H-4 employment, but it also brings critical benefits to the companies, including *amici* and their members, that employ these skilled, motivated, and vibrant individuals as valued colleagues. In all, these individuals contribute immediately to America's overall economy and the nation's continued global economic competitiveness.

**A.      Eliminating H-4 employment authorization would be devastating to the affected employees and their families.**

A judicial invalidation of work authorization for H-4 spouses would inflict severe harm on tens of thousands of H-4 spouses, along with their families. *Cf.* H-4 Rule, 80 Fed. Reg. at 10,284-10,285 (one purpose of H-4 work authorization is "to reduce the economic burdens and personal stresses that H-1B nonimmigrants and their families may experience during the transition from nonimmigrant to LPR status while, at the same time, facilitating their integration into American society."). The loss of employment authorization would result in lost income, leaving some families unable to pay their bills—a result that is already occurring at an alarming rate due to government delays in processing employment authorization paperwork.

As one H-4 spouse put it after losing her work authorization—and therefore her skilled job diagnosing cancer samples—due to government processing delays: "I am not sure how we are going to meet our monthly expenses. . . . I haven't been sleeping from the stress." Michelle Hackman, *Work-Permit Backlog for Immigrant Spouses Takes Toll on Professional Women*, Wall Street Journal (Apr. 17, 2021), perma.cc/6SZC-DRUJ; *see also id.* (discussing another affected individual who lost her job as a technology-consulting manager at the accounting and consulting firm Ernst & Young because of processing delays; she and her husband have had to "put off making an offer on a home, and have been dipping into savings to make ends meet"); Ethan Baron, *H-1B: Bay Area Spouses of Visa Holders Thrown out of Work by Government Delays; Feds Demand Fingerprinting That Feds Can't Provide*, San Jose Mercury News (Feb. 25, 2021) (quoting an affected H-4 software engineer: "We are draining our savings. I don't know how long that will go."), perma.cc/83W6-UQU6; *id.* (another affected H-4 employee: "It's a constant tension. . . . We have to cut short on many things."). Indeed, for a family with two professional breadwinners making roughly equal salaries, an unexpected halving of household income may be catastrophic.

Such unexpected job losses are especially harmful in this context because the vast majority of families with H-4 work authorization have made major, and frequently irreversible, life decisions in explicit reliance on the economic security provided by H-4 employment. A study conducted in 2018 found that over 40% of families with a working H-4 spouse decided to have a

child—and to incur the major, unavoidable expenses that having a child entails—based on the dual income enabled by H-4 employment authorization. Ike Brannon & M. Kevin McGee, *Repealing H-4 Visa Work Authorization: A Cost-Benefit Analysis* 14-15 & tbl. 4 (Apr. 2, 2019), perma.cc/HQ9X-78WA. Extrapolated to the current H-4 employment-authorized population of roughly 90,000 (*see* page 3, *supra*), this study suggests that roughly 36,000 couples have chosen the size of their families, at least in part, through reliance on H-4 employment authorization.

Similarly, 77% of H-4 families bought a house in reliance on the availability of two incomes, and 29% have invested in additional education. Brannon & McGee, *Repealing H-4 Visa Work Authorization*, *supra*, at 14-15 & tbl. 4, 30. All told, 87% of working H-4 families—over 78,000 families in total—took at least one of these major life decisions in express reliance on the government's approval of their H-4 employment authorization applications. Success by Plaintiff in this lawsuit would pull the rug out from under these tens of thousands of working families. *Cf., e.g.*, *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) ("When an agency changes course, as DHS did here, it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.' . . . 'It would be arbitrary and capricious to ignore such matters.'") (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016), and *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

Apart from the immediate economic impacts on families, Plaintiff's position also threatens the progress achieved by the H-4 Rule in addressing gender disparities, thereby imposing dignitary harms on those—overwhelmingly women—who, absent the Rule, would be prevented from pursuing their careers. Indeed, a full 90% of H-4 visa-holders are women. Ike Brannon & M. Kevin McGee, *Hurting Americans in Order to Hurt Foreigners*, Regulation 9 (Spring 2019), perma.cc/QV8H-2QBJ. And the implications of shutting these individuals out of the workplace are staggering. As one affected individual—a biochemical engineer, who worked on developing coronavirus diagnostic tests in California until her employment authorization expired in March due to government processing delays—put it: "It's affecting me financially, but more than that, career wise. . . . I want to achieve higher and higher but these are the kinds of thing that come on

your way and stop you. It's really hard. It's depressing." Ethan Baron, *H-1B: Google Urges Feds to Fix 'Logjam' Costing Foreign Workers' Jobs*, San Jose Mercury News (Apr. 12, 2021), perma.cc/N795-DW6X. Another female H-4 EAD holder: "I'm used to working. . . . It's so traumatic to just sit at home and be dependent on someone else." Hackman, *Work-Permit Backlog*, *supra*. Another: "I'm highly qualified. . . . A right to work is a basic right." Baron, *Google Urges Feds to Fix 'Logjam,' supra.* Yet another: "Every time I speak about it I literally end up crying. . . . I worked really hard to get that position." Baron, *Bay Area Spouses*, *supra*.

Indeed, H-4 spouses affected by government processing delays have reported developing depression and anxiety from being prevented from working—just as was commonplace before H-4 work authorization was first promulgated in 2015. *See* Baron, *Google Urges Feds to Fix 'Logjam,' supra*. As a group of sixty Members of Congress wrote to President-elect Biden in urging him to extend expiring H-4 employment authorizations, "[b]efore the rule was granted, many women on H-4 visas described depression and isolation in moving to a new country and not being allowed to work outside of the home." Letter from Rep. Bonnie Watson Coleman to President-elect Joe Biden (Dec. 16, 2020), perma.cc/XD6A-CRBQ; *see also, e.g.*, Brannon & McGee, *Repealing H-4 Visa Work Authorization*, *supra*, at 15 ("the depression associated with not being able to work" "arose repeatedly" as a theme in survey responses from H-4 visa-holders); *id.* at 15-18 (collecting representative examples of responses); H-4 Rule, 80 Fed. Reg. at 10,288 (acknowledging comments that authorizing H-4 employment "assuage[s] negative health effects (such as depression).").

Such mental health concerns are particularly acute now, in the midst of an isolating pandemic that is already causing symptoms of depression and anxiety to skyrocket. *See* Nirmita Panchal et al., *The Implications of COVID-19 for Mental Health and Substance Use*, Kaiser Family Foundation (Feb. 10, 2021) ("During the pandemic, about 4 in 10 adults in the U.S. have reported symptoms of anxiety or depressive disorder,  . . .  up from one in ten adults" prior to the pandemic.), perma.cc/449Q-QUQL.

In short, the H-4 EAD Rule is vitally important to the roughly 90,000 families who depend upon H-4 work authorization. Setting aside the H-4 Rule—the relief Plaintiff seeks—would inflict severe financial harm and emotional trauma on tens of thousands of individuals across the country.

**B.  Leading companies, including *amici* and their members, rely daily on this highly accomplished cohort of employees.**

Just as talented H-4 employees rely on the work authorization provided by the H-4 Rule, so too do their employers. *Amici* and the associational *amici*'s members collectively employ tens of thousands of highly skilled, high-performing H-4 employees. Invalidation of the H-4 EAD Rule would forcibly sever all of those relationships.

As noted above, H-4 visa-holders—like their H-1B spouses—are a highly educated, highly skilled group. Nearly 60% of H-4 visa-holders have attained a master's degree or higher, and 99% hold at least a college degree. Brannon & McGee, *Hurting Americans*, *supra*, at 9; *see also* Brannon & McGee, *Repealing H-4 Visa Work Authorization*, *supra*, at 5 tbl. 1. Moreover, their training is overwhelmingly in highly sought-after fields such as science, technology, engineering, and mathematics (STEM): Two thirds of employed H-4 visa-holders work in a STEM occupation, with an additional 16% employed in business, finance, and management, and 8% in health care, working as doctors, nurses, pharmacists, and the like. *Id.* at 5-6 & tbl. 2. Separately, over two thirds of H-4 employees work in fields that, prior to the pandemic in 2018, had unemployment rates below 2%, indicating that their skills are in high demand. Brannon & McGee, *Hurting Americans*, *supra*, at 11; *see also, e.g.*, New American Economy Research Fund, *Sizing Up the Gap in our Supply of STEM Workers: Data & Analysis* (Mar. 29, 2017) (noting that in 2016, "13 STEM jobs were posted online for each unemployed worker that year—or roughly 3 million more jobs than the number of available, trained professionals who could potentially fill them."), perma.cc/4BZR-ED9S. And H-4 workers' average salary is more than double the median annual income in the U.S., pointing to the same conclusion. *Compare* Brannon & McGee, *Hurting Americans*, *supra*, at 9 (average salary of $77,000 for H-4 visa-holders), *with* Federal Reserve Bank of St. Louis, *Real Median Personal Income in the United States* (Sep. 16, 2020) (median income of roughly $36,000 in 2019),

perma.cc/6WB2-FN2R. As the same study reported, "[s]ome common self-reported job titles in our survey include systems engineers, software developers, automation engineers, quality assurance analysts, and data analysts—all jobs that U.S. employers have trouble filling." Brannon & McGee, *Hurting Americans*, *supra*, at 9-10.

These statistics capture what *amici* already know: H-4 visa-holders are important contributors and valued teammates, with skills and experience that make them irreplaceable. Setting aside the H-4 Rule would thus directly harm employers. Not only would the tens of thousands of forced terminations end important professional and personal relationships and destroy institutional knowledge within companies, they would require employers to expend significant resources on searching for, hiring, and training replacements. The costs—economic, institutional, and cultural—of replacing these valued co-workers are by no means minor. As one *amicus* put it, H-4 employment authorization "has been important to the business community to attract and retain skilled workers." Baron, *Google Urges Feds to Fix 'Logjam,' supra*. And the loss of this productivity further harms the users of products and services, the delivery of which depends on the talents of H-4 employees. In all, invalidation of the H-4 EAD Rule would sever tens of thousands of employment relationships, drastically harming employees and employers alike.

**C.    Setting aside the H-4 Rule would lose the contributions of these high-skilled workers and innovators to other nations.**

Finally, there is a strong consensus that high-skilled noncitizens, like H-4 visa-holders and their H-1B spouses, make enormous positive contributions to American productivity, innovation, and competitiveness. For example, a recent comprehensive literature review by the National Academies of Sciences, Engineering, and Medicine concludes that "immigration is integral to the nation's economic growth. . . . [T]he infusion by high-skilled immigration of human capital . . . has boosted the nation's capacity for innovation and technological change. The contribution of immigrants to human and physical capital formation, entrepreneurship, and innovation are *essential* to long-run sustained economic growth." National Academies of Sciences, Engineering, and Medicine, *The Economic and Fiscal Consequences of Immigration*, 6, 317 (2017) (emphasis added),

perma.cc/JU7U-LVJ2; *see also, e.g.*, Giovanni Peri & Chad Sparber, *Presidential Executive Actions Halting High Skilled Immigration Hurt the US Economy* 2 (July 2020) (identifying three independent mechanisms through which immigrants drive economic growth), perma.cc/3B6B-25YU; Alex Nowrasteh, *Don't Ban H-1B Workers: They Are Worth Their Weight in Innovation*, Cato at Liberty (May 14, 2020) (summarizing and linking to several leading studies), perma.cc/SMW4-UUJT; Stuart Anderson, *Evidence Mounts that Reducing Immigration Harms America's Economy*, Forbes (Apr. 1, 2021) (similar), perma.cc/UJ5Z-TQEL; H-4 Rule, 80 Fed. Reg. at 10,309 ("[M]uch research has been done to show the positive impacts on economic growth and job creation from highly skilled immigrants.").

In fact, the need to attract and retain highly qualified foreign employees was the central premise of DHS's 2015 decision to allow H-4 spouses to work in the first place. As the agency then explained, the change was made "to support the retention of highly skilled workers who are on the path to lawful permanent residence" by "ameliorat[ing] certain disincentives that currently lead H-1B nonimmigrants to abandon efforts to remain in the United States while seeking LPR status, thereby minimizing disruptions to U.S. businesses employing such workers." H-4 Rule, 80 Fed. Reg. at 10,284-10,285. In other words, families cannot be expected to put one spouse's career on hold indefinitely, just so the other spouse can pursue employment in the United States—particularly when other countries competing for the same global talent freely permit spousal employment for work-based immigrants. *Id.* at 10,309.[3] And indeed, 28% of families with H-4 employment authorization indicate that this employment authorization is important in their decision to remain in the United States. Brannon & McGee, *Hurting Americans*, *supra*, at 10.

Economic analysis thus indicates that ending the H-4 employment program would reduce U.S. gross domestic product by around $7.5 billion per year, accounting for the lost productivity of the H-4 employees themselves and that of the H-1B employees who would choose to leave the

---

[3]    Again, women are disproportionately affected in such scenarios—and the global pandemic has already had significant regressive effects on gender equality and employment. *See COVID-19 and Gender Equality: Countering the Regressive Effects*, McKinsey & Co. (July 15, 2020), perma.cc/K32K-U2DK.

country if their H-4 spouses were unable to work. Brannon & McGee, *Hurting Americans*, *supra*, at 10. The federal government would also lose at least $1.9 billion in tax revenue annually, with States and municipalities forgoing an additional $530 million in taxes per year. *Id.* at 10-11. And the same analysis indicates—contrary to Plaintiff's position—that the harm to American workers from the H-4 program is minimal. Indeed, the estimated job losses to domestic workers from the program are almost exactly canceled out by the 6,800 jobs *created* by the H-4 entrepreneurs who have founded companies and employ American workers. *Id.* at 11.

What is more, the economic contributions and critical innovations currently produced by these highly skilled and motivated workers would not simply vanish in the absence of a functioning H-4 employment program. Rather, those workers would take their talents to other nations—the United States' competitors on the global stage—whose policies and attitudes toward high-skilled foreign workers are more welcoming. As DHS recognized in promulgating the H-4 Rule, for example, Canada and Australia both "seek to attract skilled foreign workers" by providing work permits to the spouses of temporary work-based visa-holders. H-4 Rule, 80 Fed. Reg. at 10,309. And it is no surprise that talented foreign workers respond to the incentives created by more welcoming immigration systems elsewhere. *See, e.g.*, Stuart Anderson*, Indians Immigrating to Canada at An Astonishing Rate*, Forbes (Feb. 3, 2020) (quoting one expert: "Canada is benefiting from a diversion of young Indian tech workers from U.S. destinations, largely because of the challenges of obtaining and renewing H-1B visas and finding a reliable route to U.S. permanent residence."), perma.cc/YV8Z-JLWM; Andrew Edgecliffe-Johnson, *US Companies Say Visa Rules Are Jobs Boon for Canada*, Financial Times (June 26, 2020) (quoting one Fortune 100 CEO's opinion that the Trump Administration's restrictions on high-skilled immigration would be "a Canadian Jobs Creation Act"), perma.cc/MP7G-ZSKB.

By frustrating the efforts of skilled professionals to remain in the United States, vacatur of the H-4 Rule thus would not only siphon off U.S. gross domestic product, but gift that productivity—and the innovation that comes with it—to other nations, harming America's global economic competitiveness into the future. Indeed, the effects are already starting, with families affected by

H-4 processing delays implementing plans to emigrate to Canada: "Instead of going through this trauma every three years, we would rather move." Baron, *Google Urges Feds to Fix 'Logjam,'* *supra* (quoting a Silicon Valley software engineer who, together with her daughter and engineer husband, are moving to Canada); *see also id.* (reporting on another H-4 software engineer in Silicon Valley, whose company offered to relocate her position to Canada or Ireland after her work authorization expired without government action). In sum, invalidation of H-4 work authorization would resonate throughout the greater economy both now and for years to come, diverting some of the world's best and brightest to innovate in other nations, in addition to harming employers and devastating the affected families themselves.

## II.     The H-4 Rule is lawful.

On the merits, Plaintiff has presented no basis to invalidate this enormously consequential rule. To the contrary, it has been uncontroversial for decades that DHS is empowered to authorize the employment of lawfully admitted noncitizens, and—particularly in view of the important interests just described—it exercised that power in an eminently reasonable manner here.

### A.     The INA empowers DHS to authorize the employment of lawfully admitted noncitizens.

Plaintiff's case is premised on a sweeping assertion that would undercut decades of settled executive practice: that the Executive Branch is powerless to authorize lawfully admitted noncitizens to work in this country unless Congress has expressly spoken to the precise group of noncitizens in question. That is wrong. DHS enjoys ample statutory authority—confirmed by longstanding congressional acquiescence and active ratification of the government's practice—to permit categories of lawfully admitted noncitizens to work.

**1.**   "As usual, we start with the statutory text." *E.g. Tanzin v. Tanvir*, 141 S. Ct. 486, 489 (2020). Section 1103 of Title 8, originally enacted as part of the 1952 Immigration and Nationality Act (INA), provides the Secretary of Homeland Security with authority to "establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority under

the provisions of [the INA]." 8 U.S.C. § 1103(a)(3).[4] More specifically with regard to nonimmi-

grants like the H-4 spouses at issue here, Section 1184(a)(1) additionally provides that "[t]he ad-

mission to the United States of any alien as a nonimmigrant shall be for such time and under such

conditions as the Attorney General may by regulations prescribe." *Id*. § 1184(a)(1).

Section 1184(a) thus explicitly empowers DHS to promulgate regulations that establish the

"conditions" of a lawfully admitted nonimmigrant's admission to the country—including whether

he or she will be permitted to work. *See, e.g.* Condition, Merriam-Webster Dictionary ("*plural*:

attendant circumstances"), perma.cc/Y78N-5BQ2; *cf., e.g. Jenkins v. Haubert*, 179 F.3d 19, 28 (2d

Cir. 1999) ("'Conditions of confinement' is not a term of art; it has a plain meaning. It quite simply

encompasses all conditions under which a prisoner is confined for his term of imprisonment."').

This unambiguous and unrestricted grant of power to "prescribe" the "conditions" of a nonimmi-

grant's admission establishes legal authority for the H-4 Rule. *See, e.g.*, *Nat'l Ass'n of Mfrs. v.*

*Dep't of Defense*, 138 S. Ct. 617, 631 (2018) ("Because the plain language of [the statute] is un-

ambiguous, our inquiry begins with the statutory text, and ends there as well.") (quotation marks

omitted).

**2.** Moreover, the federal immigration agencies have understood from the start that these

statutory provisions empower them to permit noncitizens to work. Indeed, in dozens of separate

actions, starting even before the 1952 enactment of the INA, the Executive has issued regulations

or other regulatory statements exercising its Section 1103 authority to issue work authorization.[5]

---

[4]    The statute refers to the Attorney General, rather than the Secretary of Homeland Security, but
that statutory reference is now "deemed to refer to the Secretary." 6 U.S.C. §§ 557, 202; *see Wash.*
*All. of Tech. Workers v. DHS*, 892 F.3d 332, 337 n.1 (D.C. Cir. 2018) (*Washtech II*).

[5]    *See*, *e.g.*., 12 Fed. Reg. 5,355, 5,357 (Aug. 7, 1947) (before the INA, F-1 students); 8 C.F.R.
§ 214.2(c) (1957); *Matter of T-*, 7 I. & N. Dec. 682 (B.I.A. 1958) (discussing employment of F-1
students); INS Operating Instructions 214.2(f) at 1124 (Jan. 15, 1962) (F-1 students); INS Operat-
ing Instructions 214.2(j)(1) at 1129-1130 (Nov. 15, 1963) (spouses of J-1 students); INS Operating
Instructions 214.2(a) at 1121-1122 (June 15, 1963) (non-enforcement of A-1, A-2, and A-3
spouses); *id.* at 1129 (spouses of J-1 students); INS Operating Instructions 214.2(j)(5) at 1135-
1136 (Apr. 14, 1965) (J-1 students and J-2 spouses); INS Operating Instructions 214.1 at 1122.5
(Jan. 26, 1966) (F-1 students); INS Operating Instructions 214.2(e) at 1122.7 (Feb. 28, 1968); INS
Operating Instructions 214.2(e) at 1122.9 (Nov. 10, 1971) (non-enforcement of E visa-holders);

Meanwhile, the courts and the immigration agencies' adjudicative bodies repeatedly acknowledged this power. *See, e.g.*, *Hsuan Wei v. Robinson*, 246 F.2d 739, 743 (7th Cir. 1957) (noting regulations prohibiting nonimmigrants from working "unless such employment . . . has first been authorized by the district director or the officer in charge"); *Diaz v. INS*, 648 F. Supp. 638, 646 (E.D. Cal. 1986) ("The Refugee Act does not address the question of whether political asylum applicants may work in the United States while their applications are in process," but "pursuant to 8 U.S.C. § 1158(a) and 8 U.S.C. § 1103, the Attorney General, through the Commissioner of the INS, has published two regulations permitting the district director of the INS to grant work authorization to those aliens awaiting the determination of their political asylum applications."); *Matter of S-*, 8 I. & N. Dec. 574, 575 (B.I.A. 1960) (noting that "the Immigration Service has issued printed material putting nonimmigrant aliens on notice that they may not engage in employment without permission of the Immigration Service.").

In 1979, the legacy Immigration and Naturalization Service (INS) explicitly confirmed its understanding that Section 1103 empowered it to authorize noncitizen employment. At that time, the INS published a notice of proposed rulemaking to codify in a single location its previously internal employment-authorization procedures. *Proposed Rules for Employment Authorization for Certain Aliens*, 44 Fed. Reg. 43,480 (July 25, 1979). In the preamble to the proposed rule, the

---

INS Operating Instructions 214.2(j)(5) at 1161-1162 (Jan. 17, 1973) (spouses and children of J-1 nonimmigrants); 38 Fed. Reg. 35,425 (Dec. 28, 1973) (F-1 students); *Matter of Lieu*, 15 I. & N. Dec. 786 (Acting Dist. Dir., INS 1976) (certain refugees, before Refugee Act of 1980); INS Operating Instructions 214.2(j)(5) at 1162.1 (July 5, 1978) (spouses and children of J-1 nonimmigrants); 43 Fed. Reg. 33,229 (July 31, 1978) (G-4 spouses and dependent children); 44 Fed. Reg. 43,480 (July 25, 1979) (deferred action recipients); 48 Fed. Reg. 14,575 (Apr. 5, 1983) (F-1 Students); 51 Fed. Reg. 39,385 (Oct. 28, 1986) (deferred action recipients); 52 Fed. Reg. 8,762 (Mar. 19, 1987) (deferred action recipients); *see also* 48 Interpreter Releases (1971) at 168-174, Sam Bensen, Assistant Commissioner, Adjudications, Immigration and Naturalization Service, *Lawful Work for Nonimmigrants* (discussing A, B, D, E, G, H, I, K, L, F and J nonimmigrants and in some instances, their spouses and noting "that there is authorization for some kind of employment for all nonimmigrant classes except . . . B-2 visitors for pleasure . . . [and] 29-day transits and 10-day transits without visas"); 55 Interpreter Releases (1978) at 267-269 (describing INS procedure for J-1 and J-2 nonimmigrants to secure work authorization); *id.* at 495 (describing work authorization for A-3 or G-5 domestic servants).

agency explained that "[t]he Attorney General's authority to grant employment authorization stems from section 103(a) of the [INA] [8 U.S.C. § 1103(a),] which authorizes him to establish regulations, issue instructions, and perform any actions necessary for the implementation and administration of the Act." *Id.* at 43,480. More generally, "[t]he authority of the Attorney General to authorize employment of aliens in the United States [is] a necessary incident of his authority to administer the Act." *Id.* That was—and remains—a correct statement of the law.

The final rule was promulgated in 1981. *Employment Authorization to Aliens in the United States*, 46 Fed. Reg. 25,079 (May 5, 1981). Notably, the regulations that emerged were not limited to the employment of noncitizens specifically authorized to work by the INA. Rather, the 1981 rule authorized the employment of several categories of noncitizens outside of those expressly authorized by the statutory scheme. *Id.* at 25,081 (codifying these regulations at 8 C.F.R. § 109.1(b)).[6]

The immigration agencies have thus interpreted the INA as providing the authority for the government to permit employment for categories of noncitizens since the statute's enactment in 1952, and published that understanding in the Federal Register as early as 1979. Given the numerous times the INA has been amended since 1952 (and even since 1979), this history confirms the Rule's validity: "It is well established that when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *Altman v. SEC*, 666 F.3d 1322, 1326 (D.C. Cir. 2011) (quoting *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 883, 846 (1986)); *see also Sec'y of Labor, Mine Safety & Health Admin. v. Excel Mining, LLC*, 334 F.3d 1, 7 (D.C. Cir. 2003) ("[W]e give weight to the fact that the agency that administers the statute . . . has interpreted [it] the same way for more than 25 years."). *See* pages 17-18, *infra* (cataloging subsequent statutory alterations to employment authorization).

---

[6] Currently, the regulation unifying those classes of noncitizens eligible for federal work authorization is located at 8 C.F.R. § 274a.12.

**3.**   Although the text of Sections 1103 and 1184—along with the longstanding interpretations of those provisions—affords ample authority for the H-4 Rule, those provisions do not stand alone. Indeed, directly after the INS formalized its employment authorization regulations in 1981, Congress expressly ratified the Executive's power to grant work authorization beyond the classes of noncitizens already authorized to work by statute, putting to rest any doubt about the scope of executive authority in this area. And "[w]here, as here, 'Congress has not just kept its silence by refusing to overturn [an] administrative construction, but has *ratified it with positive legislation*,' [the Court] cannot but deem that construction virtually conclusive." *Schor*, 478 U.S. at 846 (quoting *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 381-382 (1969)) (emphasis added).

The 1986 Immigration Control and Reform Act (IRCA) created a "comprehensive scheme" regulating the intersection of employment and immigration (including the employment of unauthorized individuals in the United States). *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002). IRCA rendered it a federal offense for an employer to knowingly hire "an unauthorized alien (as defined in subsection (h)(3))." 8 U.S.C. § 1324a(a)(1)(A). The definition of an "unauthorized alien" is thus crucial: Employers may not hire "*unauthorized* alien[s]," meaning that they may hire any *authorized* noncitizen.

Subsection (h)(3) in turn provides that, "[a]s used in this section, the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter *or by the Attorney General*." 8 U.S.C. § 1324a(h)(3) (emphasis added). Thus, under IRCA, there are three ways that a noncitizen may be authorized for employment and thus eligible to work: *First*, the noncitizen may be lawfully admitted for permanent residence; *second*, a statute may authorize the noncitizen's employment; *or third*, the noncitizen may be "authorized to be so employed . . . *by the* [*Secretary of Homeland Security*]." *Id.* (emphasis added). Section 1324a(h)(3) thus recognizes that the Secretary of Homeland Security has the power to authorize employment beyond the categories of noncitizens "authorized to be so employed by [the

INA]"—otherwise, this final clause would be meaningless. That is the necessary result of the statute's use of the disjunctive "or." *See, e.g.*, Antonin Scalia & Bryan A. Garner, *Reading Law* 116 (2012) ("*[A]nd* combines items while *or* creates alternatives.").

In Section 1324a, Congress thus "ratified . . . with positive legislation" the Executive's longtime understanding that the INA empowers the immigration agencies to authorize the employment of noncitizens other than those explicitly authorized to work by statute. *Schor*, 478 U.S. at 846 (quoting *Red Lion*, 395 U.S. at 381-382). Faced with such explicit ratification, the Court "cannot but deem that construction virtually conclusive." *Id.*

Moreover, the immigration agencies themselves adopted that exact interpretation of Section 1324a immediately after it was enacted in 1986—and Congress has acquiesced in this interpretation. *See Altman*, 666 F.3d at 1326 ("[W]hen Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.'") (quoting *Schor*, 478 U.S. at 846).

Prior to Section 1324a's enactment, an anti-immigration interest group challenged the INS's 1981 employment authorization regulations, described above, on precisely the grounds invoked by Plaintiff here: that the Executive Branch is without authority under Section 1103 to authorize work for noncitizens beyond those classes explicitly provided by Congress. *See Employment Authorization*, 51 Fed. Reg. 39,385, 39,388-39,389 (Oct. 28, 1986) (petition for rulemaking). After inviting further comment regarding the effect of Section 1324a on this analysis, the Reagan administration rejected this argument in no uncertain terms:

> Assuming for the sake of argument that [Section 1103] did not vest in the Attorney General the necessary authority to promulgate [noncitizen-employment regulations], such authority is apparent in the new [Section 1324a,] which was created by the Immigration Reform and Control Act of 1986.
>
> . . .

> *[T]he only logical way to interpret* [Section 1324a] is that Congress, being fully
> aware of the Attorney General's authority to promulgate regulations, and approving
> of the manner in which he has exercised that authority in this matter, defined "un-
> authorized alien" in such fashion as to exclude aliens who have been authorized
> employment by the Attorney General through the regulatory process, *in addition to
> those who are authorized employment by statute.*

*Employment Authorization; Classes of Aliens Eligible*, 52 Fed. Reg. 46,092, 46,093 (Dec. 4, 1987)

(emphases added).

Since IRCA's adoption, the immigration agencies across multiple administrations of both

political parties have time and again relied on Section 1324a as authority for allowing the employ-

ment of noncitizens not statutorily authorized to work. As the United States has cataloged in pre-

vious briefs defending this authority, immigration agencies have cited this provision at least twenty

times when identifying classes of noncitizens authorized to work in the United States.[7] Plaintiff's

argument would render each of these substantial programs unlawful. Plaintiff is simply mistaken

in its suggestion that the immigration agencies have been acting lawlessly for decades.

What is more, Congress has frequently amended Section 1324a's unauthorized-employ-

ment scheme since the INS announced its interpretation of that provision, and it has never objected

---

[7]   *See, e.g.*, 52 Fed. Reg. 16,216, 16,221 (May 1, 1987) ("Control of Employment of Aliens");
53 Fed. Reg. 46,850, 46,850 (Nov. 21, 1988) (authorization "for dependents of certain foreign
government and international organization officials classified as A-1, A-2 and G-4 nonimmi-
grants"); 55 Fed. Reg. 25,928, 25,931 (June 25, 1990) (technical and substantive amendments to
Section 274a.12); 56 Fed. Reg. 55,608, 55,616 (Oct. 29, 1991) (F-1 students); 57 Fed. Reg. 31,954,
31,956 (July 20, 1992) (same); 60 Fed. Reg. 44,260, 44,271 (Aug. 25, 1995) (Witnesses and In-
formants; Nonimmigrant S Classification); 60 Fed. Reg. 66,062, 66,069 (Dec. 21, 1995) (EADs
under "family unity program" and voluntary departure); 63 Fed. Reg. 27,823, 27,833 (May 21,
1998) (EADs under Nicaragua Adjustment and Central American Relief Act); 64 Fed. Reg.
25,756, 25,773 (May 12, 1999) (Haitian adjustment of status); 67 Fed. Reg. 4,784, 4,803 (Jan. 31,
2002) (immediate family members of T-1 nonimmigrants); 67 Fed. Reg. 76,256, 76,280 (Dec. 11.
2002) (work authorization for F, J, and M nonimmigrants); 69 Fed. Reg. 45,555, 45,557 (July 30,
2004) (general EAD revisions); 73 Fed. Reg. 18,944, 18,956 (Apr. 8, 2008) (F-1 students); 74 Fed.
Reg. 26,514, 26,515 (June 3, 2009) (same); 74 Fed. Reg. 46,938, 46,951 (Sept. 14, 2009) (E-2
investors in CNMI); 75 Fed. Reg. 47,699, 47,701 (Aug. 9, 2010) (spouses and dependents of for-
eign officials classified as A-1, A-2, G-1, G-3, and G-4 nonimmigrants); 75 Fed. Reg. 79,264,
79,277-79,278 (Dec. 20, 2010) (CNMI E-2 investors' spouses); 79 Fed. Reg. 26,886, 26,900-
26,901 (May 12, 2014) (H-4 spouses); 80 Fed. Reg. 10,284, 10,294, 10,311-10,312 (Feb. 25, 2015)
(same); 80 Fed. Reg. 63,376, 63,404 (Oct. 19, 2015) (F-1 students).

to the Executive Branch's claim of authority.[8] That is, Congress has continually "revisit[ed]" the precise statutory provisions giving rise to DHS's "longstanding administrative interpretation" that it is broadly empowered to authorize employment, and the "congressional failure to revise or repeal" that interpretation is thus "persuasive evidence that the interpretation is the one intended by Congress." *Schor*, 478 U.S. at 846; *accord, e.g.*, 2B *Sutherland Statutes & Statutory Construction* § 49:9 (7th ed.).

Importantly, this is not a case in which there is any lack of "evidence of (or reason to assume) congressional familiarity with the administrative interpretation at issue." *Pub. Citizen, Inc. v. U.S. Dep't of Health & Human Servs.*, 332 F.3d 654, 669 (D.C. Cir. 2003) (declining to rely on congressional acquiescence in such a case). The longstanding interpretation here arises from repeated assertions by the top law enforcement officer in the cabinet (and, later, another cabinet officer) of authority to take action that—if Plaintiff is to be believed—is not only *ultra vires* but actually contrary to the central purpose of one of our Nation's most frequently amended statutes. *See* Pl. Mem. 10-12 (Dkt. 42). It is simply not plausible that Congress would have been unaware of the Executive Branch's consistent interpretation concerning such a high-profile subject: the ability of noncitizens to work in the United States. *Cf. Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 214 (D.C. Cir. 2011) (declining to find congressional ratification where the agency's position "came to light only recently," and was thus "of too recent vintage to presume that Congress has tacitly ratified" it).

Taking all this together, the Ninth Circuit has observed that "Congress has given the Executive Branch broad discretion to determine when noncitizens may work in the United States." *Ariz. DREAM Act Coal. v. Brewer*, 757 F.3d 1053, 1062 (9th Cir. 2014) (citing, *inter alia*, 8 U.S.C. §§ 1103 and 1324a). And two courts in this District have rejected Plaintiff's counsel's efforts to

---

[8]   *See*, *e.g.*, Pub. L. No. 100-525, § 2, 102 Stat. 2609, 2609-2610 (1988); Pub. L. No. 101-649, §§ 521(a), 538(a), 104 Stat. 4978, 5053, 5056 (1990); Pub. L. No. 102-232, §§ 306(b)(2), 309(b)(11), 105 Stat. 1733, 1752, 1759 (1991); Pub. L. No. 103-416, §§ 213, 219(z)(4), 108 Stat. 4305, 4314, 4318 (1994); Pub. L. No. 104-208, §§ 379, 411-412, 110 Stat. 3009, 3009-649 to -650, 3009-666 to -668 (1996); Pub. L. No. 108-390, 118 Stat. 2242 (2004).

invalidate another regulatory noncitizen employment scheme on precisely the same lack-of-authority grounds pressed here. *See Wash. All. of Tech. Workers v. DHS*, __ F. Supp. 3d ___, 2021 WL 329847 (D.D.C. Jan. 28, 2021) (*Washtech III*) (Walton, J.) (rejecting arguments that DHS lacked power to authorize post-graduation practical training for international students in F-1 status); *Wash. All. of Tech. Workers v. DHS*, 156 F. Supp. 3d 123 (D.D.C. 2015) (*Washtech I*) (Huvelle, J.) (same), *vacated on mootness grounds*, 650 F. App'x 13 (D.C. Cir. 2016).[9]

In short, as the leading immigration law treatise puts it, "[w]hether or not the immigration agency earlier had the implied authority to issue such work authorization, [Section 1324a], in its definition of 'unauthorized alien,' has now implicitly granted such authority to the Attorney General." 1 Charles Gordon et al., *Immigration Law & Procedure* § 7.03[2][c] (2019). That principle resolves this case.

**4.** Plaintiff makes a variety of arguments in an attempt to resist this commonsense conclusion, but none persuades.

First, much of Plaintiff's brief is taken up with variations on the theme that "Congress does not . . . hide elephants in mouseholes" (Pl. Mem. 11 (quoting *Verizon v. FCC*, 740 F.3d 623, 639 (D.C. Cir. 2014)), with the accompanying suggestion that even more explicit statutory authorization should be required for the H-4 Rule. *See also, e.g., id.* at 7, 8. But the authority claimed by DHS here is much less of an elephant than Plaintiff lets on. That is, contrary to Plaintiff's hyperbolic assertion, the power to promulgate the H-4 Rule does not somehow give the Executive "the authority to supplant" the "comprehensive scheme governing the employment of aliens in the INA." *Id.* at 11. Rather, DHS claims only the authority to permit employment for individuals who are *already lawfully admitted* for reasons unrelated to employment—here, because of their mar-

---

[9]   Decisions vacated on mootness grounds "remain 'on the books'" so that "future courts will be able to consult [their] reasoning" as persuasive authority. *Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 353-354 (D.C. Cir. 1997); *see also, e.g., Koi Nation of N. Cal. v. U.S. Dep't of Interior*, 361 F. Supp. 3d 14, 52 n.17 (D.D.C. 2019) (decision vacated on mootness grounds "remains both appropriate for consideration and citation").

riages to noncitizens in H-1B status—as an exercise of its statutory powers to "establish such regulations . . . as [it] deems necessary for carrying out [DHS's] authority" (8 U.S.C. § 1103(a)(3)), and in particular to "prescribe" the "conditions" of nonimmigrants' "admission to the United States" (*id.* § 1184(a)(1)). The government does not, for example, assert the authority to define new classes of noncitizens that may be admitted to the country *for the purpose of pursuing employment*. *Cf.* Pl. Mem. 10-12 (discussing protections for American labor embedded in statutes dealing with noncitizens whose admission to the country is premised on employment).

Indeed, the specific noncitizens authorized to work by the H-4 Rule—spouses of H-1B visa-holders approved for lawful permanent resident status who are waiting for green cards to become available—will eventually be able to work by virtue of permanent residency anyway; the Rule merely speeds up that process. *See* H-4 Rule, 80 Fed. Reg. at 10,285 ("[T]he changes made in this rule simply alleviate the long wait for employment authorization that these H-4 dependent spouses endure through the green card process, and accelerate the timeframe within which they generally will become eligible to apply for employment authorization."). This is simply not the sea change that Plaintiff makes it out to be.

Next, Plaintiff repeatedly points to floor statements by legislators and unenacted legislation that would have expressly granted work-authorization to H-4 spouses; Plaintiff claims that these unenacted bills "show that Congress is well aware that it has not granted H-4 visaholders the ability to work." Pl. Mem. 10, 15-16. But this argument fails to appreciate that when these bills were introduced (and when the floor statements were made), the H-4 Rule had not yet been promulgated. *See* Border Security, Economic Opportunity, and Immigration Modernization Act, S. 744, 113th Cong. § 4102 (2013); I-Squared Act of 2013, S. 169, 113th Cong. § 103; I-Squared Act of 2015, S. 153, 114th Cong. § 102 (introduced Jan. 13, 2015). Those bills thus are simply a recognition that, at the time they were introduced, *no one* (neither Congress nor DHS) had addressed the H-4 employment issue and it was therefore necessary for *someone* to do so. They certainly do not suggest an understanding by Congress that DHS lacked authority to act on the same subject—only that it had not yet acted at that time.

20

Plaintiff also engages in interpretive gymnastics in an attempt to avoid the straightforward reading of Section 1324a discussed above: that DHS may authorize the employment of lawfully admitted noncitizens in addition to those already authorized to work by statute. Pl. Mem. 7-9; *see* pages 15-19, *supra*. It first asserts that "[t]he obvious problem" with this reading "is that subsection [(h)(3)] *refers* to power that the Secretary may possess through other provisions but it does not *grant* any power at all." Pl. Mem. 7-8. But that is not a problem, obvious or otherwise; to the contrary, it is fully consistent with the authority for the H-4 Rule. As discussed above, Section 1324a ratifies and makes explicit the authority that was already inherent in Section 1103's grant of rulemaking power. *See* pages 15-17, *supra*.

Plaintiff next points to other legislation explicitly authorizing and directing DHS to permit the employment of certain categories of noncitizens (Pl. Mem. 8-9)—but Congress's specification that particular noncitizens may be employed is not at all "otiose" (*id.* at 9) when DHS had not previously chosen to permit those noncitizens' employment. And it certainly does not mean, by negative implication, that DHS may not authorize employment for *other* visa categories. *See, e.g.*, *Catawba Cty. v. EPA*, 571 F.3d 20, 36 (D.C. Cir. 2009) ("When interpreting statutes that govern agency action, we have consistently recognized that a congressional mandate in one section and silence in another often 'suggests not a prohibition but simply a decision not to mandate any solution in the second context, i.e., to leave the question to agency discretion.'") (quoting *Cheney R.R. Co. v. ICC*, 902 F.2d 66, 69 (D.C. Cir. 1990)) (emphasis omitted); *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (more generally, courts "do not read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it."). Plaintiff offers nothing suggesting that Congress "meant to say no" to H-4 employment by expressly authorizing other noncitizens to work.

Finally, Plaintiff asserts—incorrectly—that the government "has since disavowed" the position that Section 1324a provides authority to grant work authorization. Pl. Mem. 9. The brief cited by Plaintiff dealt with the legality of a government program called Deferred Action for Childhood Arrivals, or DACA, which granted deferred action to hundreds of thousands of individuals,

known as "Dreamers," who had been brought to the United States unlawfully as children. Petr's Reply 19, *DHS v. Regents of Univ. of Cal.*, No. 18-587 (U.S. Oct. 28, 2019); *see generally Regents of Univ. of Cal. v. DHS*, 908 F.3d 476, 486 (9th Cir. 2018) (deferred action is "a revocable decision by the government not to deport an otherwise removable person from the country."). Work authorization was at issue only because preexisting regulations granted work authorization to all deferred action recipients in need of employment. *See* 8 C.F.R. § 274a.12(c)(14). As Judge Walton recently explained, statements that Section 1324a does not authorize widespread deferred action programs like DACA or the related Deferred Action for Parents of Americans program (DAPA) "sa[y] nothing about the question implicated by this case: whether DHS has authority to provide work authorization to individuals *already lawfully present in the United States*." *Washtech III*, 2021 WL 329847, at *12 (discussing *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015)). Indeed, the government's recent brief in *this* case makes plain that it has certainly not "disavowed" the conclusion that Section 1324a provides authority to designate categories of noncitizens as eligible for work authorization.

### B. DHS's choice to authorize certain H-4 employment is eminently reasonable.

Plaintiff also asserts that, separate from DHS's authority to permit noncitizen employment, the H-4 Rule is arbitrary and capricious. Pl. Mem. 15-19. These arguments do not withstand scrutiny—particularly in light of the compelling interests served by permitting limited H-4 spousal employment. *See* pages 3-11, *supra*.

Plaintiff's first contention is that the H-4 Rule supposedly "reverse[s] a policy adopted by Congress" that H-4 visa-holders are precluded from employment. Pl. Mem. 15. But as discussed above (*see* page 20, *supra*), there simply is no such policy, and Plaintiff's attempt to invent one falls flat. The same is true for the argument that the H-4 Rule is arbitrary and capricious because it "reverses longstanding policy without acknowledging or explaining the reasons for the reversal." Pl. Mem. 16. If Plaintiff means to suggest that the H-4 Rule reverses a policy that noncitizens on H-4 visas *cannot* be authorized to work, there is simply no indication that any such policy ever existed, as we have explained. And if Plaintiff's position is instead just that H-4 individuals had

not *previously* been authorized to work, the H-4 Rule extensively acknowledges the fact that H-4 spouses had not been authorized to work under pre-existing regulations, and explains the reasons why changing the existing approach to allow such employment is beneficial from a policy perspective. *See, e.g.*, H-4 Rule, 80 Fed. Reg. at 10,284 ("DHS does not currently extend eligibility for employment authorization to H-4 dependents . . . of H-1B nonimmigrants. The lack of employment authorization for H-4 dependent spouses often gives rise to personal and economic hardships for the families of H-1B nonimmigrants[,] . . . increas[ing] the disincentives for H-1B nonimmigrants to pursue LPR status and thus increas[ing] the difficulties that U.S. employers have in retaining highly educated and highly skilled nonimmigrant workers.") (citation omitted). Either way, Plaintiff's argument has no teeth.

Finally, Plaintiff contends that DHS "entirely failed to consider an important aspect of the problem" because the agency used a different methodology to evaluate the labor-market effects of permitting H-4 employment than Plaintiff would have preferred. Pl. Mem. 17-19. But where, as here, an agency makes a "choice among reasonable analytical methodologies," that choice "is entitled to deference." *Sierra Club v. FERC*, 867 F.3d 1357, 1368 (D.C. Cir. 2017) (quoting *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004)).

Nor can Plaintiff fault the agency for failing to consider particular studies or evidence if that evidence was not submitted for the agency's consideration at the time of the rulemaking. *Cf.* Pl. Mem. 18-19. As the D.C. Circuit has explained, "[w]hen reviewing agency action, we generally consider only 'information that the agency had when it made its decision.' Thus, even if a party seeks to rely on evidence conflicting directly with an agency decision, we will not invalidate the decision as arbitrary and capricious based on the evidence if it 'was not in the record at the time' of the decision." *Butte Cty. v. Chaudhuri*, 887 F.3d 501, 506 (D.C. Cir. 2018) (quoting *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014)) (alterations incorporated); *see also, e.g.*, *Rhea Lana, Inc. v. United States*, 925 F.3d 521, 524 (D.C. Cir. 2019) ("Ordinarily, we review an agency action based solely on the record compiled by the agency when issuing its decision, not on 'some new record made initially in the reviewing court.'") (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)

23

(per curiam)); *Action on Smoking & Health v. C.A.B.*, 713 F.2d 795, 800 (D.C. Cir. 1983) (the "'whole record' in a rulemaking case is 'comprised of comments received, hearings held, if any, and the basis and purpose statement'" of the challenged rule).

Here, DHS "carefully considered the potential for negative labor market impacts throughout this rulemaking," and responded meaningfully to commenters who "believed that the proposed rule would increase competition for jobs; exacerbate the nation's unemployment rate; drive down wages; and otherwise negatively impact native U.S. workers." H-4 Rule, 80 Fed. Reg. at 10,295. The APA requires nothing more. *See, e.g.*, *FBME Bank Ltd. v. Mnuchin*, 249 F. Supp. 3d 215, 222 (D.D.C. 2017) ("There is no requirement . . . that an agency respond to significant comments in a manner that satisfies the commenter. Instead, to respond adequately, the agency must only address significant comments 'in a reasoned manner,' that allows a court 'to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did.'") (quoting *Reytblatt v. Nuclear Regulatory Comm'n*, 105 F.3d 715, 722 (D.C. Cir. 1997), and *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993)).

In the end, under the APA, an agency must "examine[] the relevant data and articulate[] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Airmotive Eng'g Corp. v. FAA*, 882 F.3d 1157, 1159 (D.C. Cir. 2018) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (alterations incorporated). If it has done so, a reasonable "weigh[ing] . . . [of] competing policy concerns" is "'the *agency's* job,' not the court's." *AFL-CIO v. NLRB*, 471 F. Supp. 3d 228, 240 (D.D.C. 2020) (quoting *Regents*, 140 S. Ct. at 1915). Here, DHS undoubtedly considered the "competing policy concerns" involved in authorizing a limited population of H-4 spouses for employment, and reached a reasoned decision, as an exercise of its policymaking discretion, that the benefits outweighed the costs. *See, e.g.*, H-4 Rule, 80 Fed. Reg. at 10,284, 10,295.

As laid out above, those benefits are substantial. *See generally* pages 3-11, *supra*. H-4 work authorization enables tens of thousands of mutually beneficially employment relationships between these talented employees and leading employers like *amici* and their members. Moreover,

it enables U.S. employers to attract additional top international talent on H-1B visas in the first place, with the knowledge that their spouses will not have to put their own careers indefinitely on hold. The H-4 Rule thus accounts for $7.5 billion dollars of economic productivity annually, along with additional billions in federal, state, and local tax revenue—all of which will be lost to other, competing nations if the H-4 Rule is set aside. *See* pages 9-10, *supra*. And this is to say nothing of the devastation it would cause to the tens of thousands of affected families who have come to rely on the economic security provided by H-4 spousal employment, particularly given the uncertainty of the COVID-19 pandemic. *See* pages 4-7, *supra*.

In all, the H-4 Rule easily survives arbitrary-and-capricious review. *See, e.g.*, *Airmotive Eng'g Corp.*, 882 F.3d at 1159; *Home Box Office, Inc. v. FCC*, 587 F.2d 1248, 1252 (D.C. Cir. 1978). Plaintiff has provided no compelling basis for setting it aside—an action that would sever tens of thousands of employment relationships relied upon by the affected individuals, employers like *amici*, and the economy as a whole—and Plaintiff's claims must therefore be soundly rejected.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion for summary judgment, and enter summary judgment for Defendant.

25

Dated: May 14, 2021                    Respectfully submitted,

                                       /s/ *Paul W. Hughes*

                                       Paul W. Hughes (D.C. Bar No. 997235)
                                           phughes@mwe.com
                                       Andrew A. Lyons-Berg (D.C. Bar No. 230182)
                                       MCDERMOTT WILL & EMERY LLP
                                       500 North Capitol Street, NW
                                       Washington, D.C. 20001
                                       (202) 756-8000 (office)
                                       (202) 756-8087 (facsimile)

**Appendix A: List of *Amicus Curiae***

- Accenture
- Adobe Inc.
- Amazon.com, Inc.
- Apple Inc.
- Argo AI LLC
- BSA | The Software Alliance
- Business Roundtable
- CGI Inc.
- Chamber of Commerce of the United States of America
- Cisco Systems, Inc.
- Citrix Systems, Inc.
- CollectiveHealth, Inc.
- Compete America Coalition
- Consumer Technology Association
- Cummins Inc.
- eBay Inc.
- Electronic Arts Inc.
- FWD.us
- Google LLC
- Hewlett Packard Enterprise
- Howard Hughes Medical Institute
- HP Inc.
- IBM Corporation
- Information Technology Industry Council (ITI)
- Intel Corporation
- Lenovo (United States) Inc.

- Microsoft Corporation

- National Association of Manufacturers

- Partnership for a New American Economy Action Fund

- PayPal

- Pinterest Inc.

- Reddit, Inc.

- salesforce.com, inc.

- SAP

- Society for Human Resource Management (SHRM)

- Square, Inc.

- StubHub, Inc.

- TechNet

- Twitter, Inc.

- Waymo LLC

- Worldwide ERC®