# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAVE JOBS USA, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | )   Civil Action No. 15-615 (TSC) |
| | ) |
| UNITES STATES DEPARTMENT | ) |
| OF HOMELAND SECURITY, | ) |
| | ) |
| *Defendant*, | ) |
| | ) |
| *and* | ) |
| | ) |
| ANUJKUMAR DHAMIJA, *et al.*, | ) |
| | ) |
| *Intervenors*. | ) |
| | ) |

## INTERVENOR'S MEMORANDUM IN SUPPORT OF DHS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO SAVE JOBS USA'S MOTION FOR SUMMARY JUDGMENT

Carl E. Goldfarb
BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd.
Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

Lauren Goldman
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards, 20th Floor
New York, NY 10001

Lisa Lehner
AMERICANS FOR IMMIGRANT JUSTICE
6355 NW 36th Street
Miami, FL  33166
(305) 573-1106

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................ ii

INTRODUCTION ......................................................................1

ARGUMENT ...........................................................................3

I.    THE SECRETARY HAS AUTHORITY TO ISSUE THE H-4 RULE .........4

    A.    The Text of the INA Provides the Secretary with Authority to Issue Work Authorizations ..........................................................4

    B.    The History of the INA Confirms That the Secretary Has Authority to Issue Work Authorizations ...............................................9

    C.    Save Jobs' Statutory Arguments Lack Merit ......................................17

    D.    To the Extent the INA is Ambiguous, Deference Supports the H-4 Program ...............................................................20

    E.    Save Jobs' Remaining Extra-Textual Arguments Lack Merit ...........24

II.   THE H-4 RULE IS PERFECTLY REASONABLE, AND DHS DID NOT ACT ARBITRARILY OR CAPRICIOUSLY IN PROMULGATING IT. ..27

CONCLUSION ........................................................................28

CERTIFICATE OF SERVICE ...............................................................30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFL-CIO v. NLRB,*
471 F. Supp. 3d 228 (D.D.C. 2020) .................................................................28

*Arizona Dream Act Coal. v. Brewer,*
757 F.3d 1053 (9th Cir. 2014) .............................................................................5

*Arizona v. United States,*
567 U.S. 387 (2012)................................................................................ 7, 8, 26

*Barnhart v. Peabody Coal Co.,*
537 U.S. 149, (2003)..........................................................................................21

*Barnhart v. Walton,*
535 U.S. 212 (2002)............................................................................................9

*Batalla Vidal,*
279 F. Supp. 3d ..................................................................................................25

*Bennett v. Spear,*
520 U.S. 154 (1997)............................................................................................5

*Catawba County v. EPA,*
571 F.3d 20 (D.C. Cir. 2009) ............................................................................21

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
511 U.S. 164 (1994)..........................................................................................22

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
467 U.S. 837 (1984)..........................................................................................20

*Commodity Futures Trading Comm'n v. Schor,*
478 U.S. 833 (1986)..........................................................................................15

*Counterman v. U.S. Dept. of Labor,*
607 F. Supp. 286 (W.D. Tex. 1985) ..................................................................11

*Creekstone Farms Premium Beef, L.L.C. v. Dep't of Agric.,*
539 F.3d 492 (D.C. Cir. 2008).......................................................................9, 21

*De Canas v. Bica*,
424 U.S. 351 (1976)..................................................................................10

*DHS v. Regents of Univ. of Cal.*,
140 S. Ct. 1891 (2020)..............................................................................25

*Diaz v. INS*,
648 F. Supp. 638 (E.D. Cal. 1986) ...........................................................13

*FCC v. Prometheus Radio Project*,
141 S. Ct. 1150 (2021)..............................................................................28

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952)....................................................................................7

*Hoffman Plastic Compounds, Inc. v. NLRB*,
535 U.S. 137 (2002)..................................................................................12

*Home Care Ass'n of Am. v. Weil*,
799 F.3d 1084 (D.C. Cir. 2015)................................................................22

*Marx v. Gen. Revenue Corp.*,
568 U.S. 371 (2013)..................................................................................21

*Mathews v. Diaz*,
426 U.S. 67 (1976)......................................................................................7

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................................................................................28

*Mourning v. Family Publ'ns Serv.*,
411 U.S. 356 (1973)....................................................................................8

*Narenji v. Civiletti*,
617 F.2d 745 (D.C. Cir. 1979)..................................................................19

*Pension Benefit Guaranty Corp. v. LTV Corp.*,
496 U.S. 633, (1990)................................................................................23

*Perales v. Casillas*,
903 F.2d 1043 (5th Cir. 1990) ...................................................................5

*Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*,
    908 F.3d 476 (9th Cir. 2018) ......................................................... 22, 25

*Rodriguez v. United States*,
    480 U.S. 522 (1987) .........................................................................25

*Sebelius v. Auburn Reg'l Med. Ctr.*,
    568 U.S. 145 (2013) .........................................................................16

*Takahashi v. Fish & Game Comm'n*,
    334 U.S. 410 (1948) ...........................................................................8

*Texas Dept. of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*,
    135 S. Ct. 2507 (2015) ....................................................................14

*Truax v. Raich*,
    239 U.S. 33 (1915)..............................................................................8

*United States Telecomms. Ass'n v. Fed. Commc'ns Comm'n*,
    855 F.3d 381 (2017).........................................................................23

*United States v. Chen*,
    2 F.3d 330 (9th Cir. 1993) ................................................................5

*United States v. Mead Corp.*,
    533 U.S. 218 (2001).........................................................................20

*United States v. Menasche*,
    348 U.S. 528 (1955)...........................................................................6

*United States v. Vonn*,
    535 U.S. 55 (2002)...........................................................................21

*Washington All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*,
    156 F. Supp. 3d 123 (D.D.C. 2015) ...................................................5

## <u>Statutes</u>

6 U.S.C. 112....................................................................................24

6 U.S.C. 202(5) ..................................................................................4

7 U.S.C. 2045(f) (Supp. IV 1974)....................................................10

8 U.S.C. 1101(a)(15)(H)(i)(b) ...............................................................19

8 U.S.C. 1103(a) .................................................................... *passim*

8 U.S.C. 1103(a)(3) ................................................................ *passim*

8 U.S.C. 1226(a)(3) ......................................................................6

8 U.S.C. 1231(a)(7) ......................................................................6

8 U.S.C. 1255a(a) and (b) .............................................................15

8 U.S.C. 1324a ........................................................................5, 6

8 U.S.C. 1324a(h) ................................................................ *passim*

8 U.S.C. 1324a(h)(3) ....................................................................2

8 U.S.C. 1324(a)(h)(3) ..................................................................5

8 U.S.C. 1324a(a)(1) ...................................................................12

8 U.S.C. 1427(a) ........................................................................15

8 U.S.C. § 1324a(h)(3) ........................................................... *passim*

Immigration Act of 1990 (IMMACT),
    Pub. L. No. 101-649, Tit. III, 301, 104 Stat. 4978.....................15, 16

Pub. Law 93-518, December 7, 1974, 88 Stat 1652 ...............................10

Pub. L. No. 99-603, 100 Stat. 3359 ................................................12

Pub. L. No. 107-296, 116 Stat. 2135, 2273–74 ....................................20

## **Regulations**

8 C.F.R. 214.2(c) .........................................................................9

12 Fed. Reg. 357 (Aug. 7, 1947)......................................................10

17 Fed. Reg. 11,489 (Dec. 19, 1952)...............................................9, 14

44 Fed. Reg. 480 .........................................................................11

45 Fed. Reg. 19,563 ...............................................................................................11

46 Fed. Reg. 25,079, 25,080 (May 5, 1981) ........................................................11

51 Fed. Reg. 39,385 (Oct. 28, 1986)....................................................................12

51 Fed. Reg. 45,338 (Dec. 18, 1986) ...................................................................14

52 Fed. Reg. 16,221 ....................................................................................... 15, 24

52 Fed. Reg. 16,228 ....................................................................................... 15, 25

52 Fed. Reg. 46092 ...............................................................................................26

52 Fed. Reg. 46,093 (Dec. 4, 1987) .......................................................... 14, 25, 26

61 Fed. Reg. 13,061 (Mar. 26, 1996) ...................................................................28

80 Fed. Reg. 10284 ...............................................................................................19

80 Fed. Reg. 10285 ......................................................................................... 17, 24

80 Fed. Reg. 10286 ...............................................................................................19

80 Fed. Reg. 10294 ...............................................................................................17

## Other Authorities

*Immigration Reform and Control Act of 1983, Hearings before the Subcomm. On Immigration, Refugees and Int'l Law of the H. Comm. on the Judiciary*, 98th Cong. 1450 (1983) ......................................................................................13

*Leave to Labor*, 52 No. 35 Interpreter Releases ...............................................................16

*Recent Developments*, 64 No. 41 Interpreter Releases 1190, App. I, at 1201 (Oct. 26, 1987)...............26

*Recent Developments*, 67 No. 6 Interpreter Releases 153 (Feb. 5, 1990) ................................15

*Sam Bernsen, INS Assistant Comm'r, Lawful Work for Nonimmigrants*, 48 No. 21 Interpreter Releases 168 (June 21, 1971)...........................................16

*Sam Bernsen, INS Gen. Counsel, Leave to Labor*,
   52 No. 35 Interpreter Releases 291 (Sept. 2, 1975)..............................................15

USCIS,   Press   Release,   *USCIS   Announces   Interim   Relief   for   Foreign Students Adversely Impacted by Hurricane Katrina* (Nov. 25, 2005)    16

## INTRODUCTION

Intervenors Immigration Voice and Anujkumar Dhamija join in the motion by the Department of Homeland Security ("DHS") for summary judgment and also join in DHS's opposition to the cross motion for summary judgment by Save Jobs USA ("Save Jobs"), and state in support thereof as follows:

In its principal argument, Save Jobs contends that DHS lacked statutory authority to promulgate the H-4 Rule allowing certain spouses of H-1B workers to apply for work authorization while their H-1B spouse is seeking to become a Legal Permanent Resident ("LPR"), a process that often entails long delays. In the interim period that can last decades, the spouses of H-1B visa holders are legally entitled to live, but not work, in the United States. The rule at issue (the "H-4 Rule") allows the spouses of H-1B workers to apply for employment authorization documentation during the period between when the H-1B worker applies for LPR status and when the H-1B visa holder actually receives LPR status (at which point, the spouse has always been able to work legally).

In its argument, Save Jobs misrepresents DHS's position on the source of its authority, erroneously claims DHS has recently changed its position regarding its authority, turns a willful blind eye to decades of consistent practice supporting the Rule, and fails as a matter of basic statutory interpretation. The language of the statutes at issue shows that the Secretary has authority to issue the H-4 Rule, a

conclusion reinforced by the unbroken practice by DHS and its predecessor agency over the last 50 plus years. Section 1103 of the Immigration and Nationality Act gives the Secretary broad discretion to promulgate "such regulations," and to "perform such other acts as he deems necessary for carrying out his authority" to "administ[er] and enforce[]" immigration laws. This has long been interpreted to give the Executive Branch the authority to issue work authorization. Indeed, the Executive has repeatedly allowed certain classes of aliens to lawfully work in this country for over a half century under both Republican and Democratic administrations.  Additionally, Section 1184(a)(1) provides that "[t]he admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General may by regulations prescribe." Save Jobs' contrary argument that DHS lacked the authority to promulgate the H-4 Rule largely depends on falsely claiming DHS is relying primarily on 8 U.S.C. § 1324a(h)(3), a provision in which Congress expressly recognizing the Executive's authority to issue work authorization but did not first confer such authorization. Save Jobs also pretends DHS has recently shifted its position because it did not previously promulgate a regulation extending work authorization to spouses of H-1B workers, even though Save Jobs presents no evidence that DHS considered and rejected such a regulation and even though there is an unbroken practice stretching back to the early 1950s by DHS and its predecessor agency granting work authorization to

numerous groups of nonimmigrants, as well as Congress's acquiescence to and acceptance of that practice.

At the very most, the statutory framework that serves as the source of DHS's authority to promulgate the H-4 Rule is ambiguous, and DHS' longstanding interpretation is deserving of deference under the *Chevron* doctrine. And while Save Jobs USA would have preferred DHS come to a different conclusion when it analyzed the arguments for and against the Rule it was considering promulgating, DHS considered the salient factors and comments, and its decision fits comfortably within the broad discretion granted agencies under the Administrative Procedure Act ("APA") to weigh competing factors and considerations.

## ARGUMENT

The Intervenors, Immigration Voice, Anujkumar Dhamija, and Sudarshana Sengupta intervened in this action when it was pending before the United States Court of Appeals for the District of Columbia Circuit because Mr. Dhamiija, Ms. Sengupta, and the other members of Immigration Voice who had obtained work authorization through the H-4 Rule would be injured and in many cases suffer severe prejudice if the H-4 Rule were invalidated or repealed.[1] The same is true for countless other members of Immigration Voice. *See*, *e.g.*, D.E. 55 Exs. A to D

---

[1] Ms. Sengupta subsequently obtained work authorization when her husband received a green card and dropped out of this action.

(declarations by members of Immigrant Voice in opposition to Plaintiff's motion for a preliminary injunction).

## I.   THE SECRETARY HAS AUTHORITY TO ISSUE THE H-4 RULE

The text, structure, and history of the INA demonstrate DHS has the authority to issue the H-4 Rule.

### A.   *The Text of the INA Provides the Secretary with Authority to Issue Work Authorizations*

H-4 work authorization is a lawful exercise of the Secretary's broad statutory authority to carry out the immigration law. Congress has tasked the Secretary of Homeland Security with "[e]stablishing national immigration enforcement policies and priorities," and it has "charged" the Secretary with "the administration and enforcement of" the INA, "and all other laws relating to the immigration and naturalization of aliens." 6 U.S.C. 202(5); 8 U.S.C. 1103(a). Congress has also directed the Secretary to "establish such regulations," to "issue such instructions," and to "perform such other acts as he deems necessary for carrying out his authority" to "administ[er] and enforce[]" immigration laws, 8 U.S.C. 1103(a)(3), including by authorizing aliens to be lawfully employed, 8 U.S.C. 1324a(h)(3). With respect to nonimmigrants, Section 1184(a)(1) additionally provides that "[t]he admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General may by regulations prescribe." *Id.* § 1184(a)(1). Thus, Section 1184(a) expressly authorizes DHS to promulgate regulations that

4

establish the "conditions" of lawfully admitted nonimmigrants' admission to the country—including whether they will be permitted to work. In enacting these provisions, "Congress has given the Executive Branch broad discretion to determine when noncitizens may work in the United States." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1062 (9th Cir. 2014); *accord Washington All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 156 F. Supp. 3d 123, 144 (D.D.C. 2015) ("DHS has been broadly delegated the authority to regulate the terms and conditions of a nonimmigrant's stay…."), *judgment vacated, appeal dismissed on other ground*s, 650 F. App'x 13 (D.C. Cir. 2016); *see also United States v. Chen*, 2 F.3d 330, 333 (9th Cir. 1993) ("Congress has provided extremely broad powers to the Attorney General for the enforcement of the immigration laws.").

That broad statutory authority is confirmed in Section 1324a, which recognizes that both Congress and the Secretary have the authority to issue work authorization. *See Perales v. Casillas*, 903 F.2d 1043, 1049 (5th Cir. 1990) (noting that beyond one statutory reference "[e]mployment authorization is regulated" in the CFR). Section 1324a reads: "the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time ... authorized to be so employed by this chapter *or by the Attorney General*." 8 U.S.C. 1324(a)(h)(3) (emphasis added). Of course, if—as Save Jobs contends—all work authorizations flowed directly from a pronouncement in the INA, there would have

been no need for Congress to add "or by the Attorney General." *See Bennett v. Spear*, 520 U.S. 154, 173 (1997) (courts should give effect to "'every clause and word of a statute'" (quoting *United States v. Menasche*, 348 U.S. 528, 538 (1955))). That is not what Congress did. Instead, the language of Section 1324a confirms that the prior broad grants in Section 1103 and in Section 1184(a)(1) authorize the Secretary to issue work authorizations.

It is not just Section 1324a that confirms the commonsense reading of Section 1103—the statute as a whole makes sense only if Section 1103 is read to confer the authority to issue work authorizations on the Secretary. Specifically, the INA provides specific limits on the Secretary's authority to issue work authorization to specific classes of aliens, but these limits are nonsensical if the Secretary has no authority to issue work authorizations without an express grant. For example, 8 U.S.C. 1226(a)(3) provides that the Secretary "may not provide [an] alien [who has been arrested, detained, and released on bond pending a removal determination] with work authorization … unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization." Similarly, 8 U.S.C. 1231(a)(7) provides that "[n]o alien ordered removed shall be eligible to receive authorization to be employed in the United States unless the Attorney General makes a specific finding that … the alien cannot be removed" or "the removal of the alien is otherwise impracticable or contrary to

6

the public interest." The very fact that Congress recognized the need to limit the Secretary's work authorizations in such cases indicates that, absent a limitation, the Secretary has broad authority to issue work authorization as he or she deems fit. Indeed, if the Secretary's work-authorization authority is limited—as Save Jobs contends—to granting employment authorizations when a statute expressly grants the alien work eligibility, then the limited prohibitions would be surplusage.

Congress had good reason to grant the Secretary dual authority to issue work authorization in cases when Congress has not acted. Congress has long-recognized that the ever-changing requirements of the immigration system often necessitate nimble Executive Branch decision making. As the Supreme Court explained, immigration decisions "implicate our relations with foreign powers" and depend on a wide variety of "changing political and economic circumstances." *Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *see also Harisiades* v. *Shaughnessy*, 342 U.S. 580, 588-589 (1952). Therefore, in forming immigration policy, the federal government must have the "flexibility ... to respond to changing world conditions." *Diaz*, 426 U.S. at 81. This "dynamic nature" of immigration policy "requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy[]" and with the "immediate human concerns" inherent in immigration decision making. *Arizona v. United States*, 567 U.S. 387, 396–97 (2012). Dual authority furthers these ends: allowing Congress to authorize (or preclude) work

authorizations when exercising its considered judgment and allowing the Secretary the flexibility to respond to immediate policy needs in cases when Congress has not acted.

Authorizing H-4 aliens to work is consistent with this statutory framework. To begin, "[w]here" as here "the empowering provision of a statute states simply that the agency may 'make … such rules and regulations as may be necessary to carry out the provisions of this Act, … the validity of a regulation promulgated thereunder will be sustained so long as it is reasonably related to the purposes of the enabling legislation." *Mourning v. Family Publ'ns Serv.*, 411 U.S. 356, 369 (1973). That test is easily met here. The INA "framework reflects a considered judgment that making criminals out of aliens engaged in unauthorized work—aliens who already face the possibility of employer exploitation because of their removable status—would be inconsistent with federal policy and objectives." *Arizona v. United States*, 567 U.S. at 405. This is especially true in the case of individuals who are lawfully present in the United States and who will become LPRs at the same time as their H-1B spouses. *See Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 416 (1948) ("The assertion of an authority to deny to aliens the opportunity of earning a livelihood when lawfully admitted to the state would be tantamount to the assertion of the right to deny them entrance and abode, for in ordinary cases they cannot live where they cannot work." (quoting *Truax v. Raich*, 239 U.S. 33, 42 (1915))).

8

B.    *The History of the INA Confirms That the Secretary Has Authority to Issue Work Authorizations*

The history of the INA makes clear that the Secretary has the authority to issue work authorizations. This history matters for two independent, but related reasons. *First*, the history is important in its own right because courts "will normally accord particular deference" when the agency interpretation in question is "of 'longstanding' duration." *Barnhart v. Walton*, 535 U.S. 212, 220 (2002) (citation omitted). *Second*, the history matters because, despite making numerous, other significant changes to the INA, Congress has never repudiated DHS's authority to issue work authorizations. "[W]hen Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *Creekstone Farms Premium Beef, L.L.C. v. Dep't of Agric.*, 539 F.3d 492, 500 (D.C. Cir. 2008).

For more than 50 years, across multiple Democratic and Republican administrations, the Attorney General and later the Secretary of DHS have interpreted their authority under Section 1103 to include the authority to issue work authorizations. *See, e.g.*, 17 Fed. Reg. 11,489 (Dec. 19, 1952) (8 C.F.R. 214.2(c)) (authorizing nonimmigrants to engage in employment if "authorized by the district director or the officer in charge having administrative jurisdiction over the alien's

9

place of temporary residence"). Indeed, even before the 1952 enactment of the INA, the Attorney General understood his or her authority to include the ability to issue work authorization. 12 Fed. Reg. at 5357 (Aug. 7, 1947).

This authority has been consistently invoked, and by the 1970's, INS's ordinary practice was to authorize aliens to work when it decided not to pursue immediate deportation. Sam Bernsen, INS Gen. Counsel, *Leave to Labor*, 52 No. 35 Interpreter Releases 291, 294 (Sept. 2, 1975); *see* Sam Bernsen, INS Assistant Comm'r, *Lawful Work for Nonimmigrants*, 48 No. 21 Interpreter Releases 168, 315 (June 21, 1971). True enough, at the time there was no prohibition on hiring unauthorized immigrants. *See generally De Canas v. Bica*, 424 U.S. 351, 360-361 (1976). But "[s]ome employers [would] not hire an alien" without "some evidence of authorization to work." *Leave to Labor* 52 No. 35 Interpreter Releases at 294. The INS granted authority to work in those cases, reasoning that "gainful employment should not be prevented and that it is reasonable to give the alien something that he can present to a prospective employer to show that he can work." *Id.*; *see also De Canas*, 424 U.S. at 364.

Congress ratified this work-authorization authority in the 1974 Farm Labor Contractor Registration Act. *See* Pub. Law 93-518, December 7, 1974, 88 Stat 1652. That enactment barred farm labor contractors from knowingly employing any "alien not lawfully admitted for permanent residence or *who has not been authorized by*

10

*the Attorney General to accept employment*." 7 U.S.C. 2045(f) (Supp. IV 1974); *Counterman v. U.S. Dept. of Labor*, 607 F. Supp. 286, 288 (W.D. Tex. 1985). The necessary premise of the law was that the "Attorney General" already had the authority to "authorize[]" aliens "to accept employment." *Id.*

In 1979, INS sought "for the first time" to "codify [its] existing employment authorization procedures." 44 Fed. Reg. at 43,480. The proposed rule provided several categories of aliens who could receive work authorization. *Id.* As authority for this proposed rule, the INS cited Section 1103. *Id.*

The next year, after "careful consideration" of substantial public comment, a "significantly modified" rule was proposed. 45 Fed. Reg. 19,563. The new version of the rule still set out "classes of aliens who may apply for discretionary work authorization." *Id.* Again, the modified rule cited Section 1103 as its source of authority. *Id.* This modified proposal was met with "concern" that it "did not adequately cover all categories [of] nonimmigrants who are permitted to work while in the United States." 46 Fed. Reg. 25,079, 25,080 (May 5, 1981).

In 1981, the INS published its final rule. *See id.* at 25,079-083. The final rule recognized that the INS had significant discretion to issue work authorization. *Id.* at 25,080 (providing for "discretionary work authorization based upon … financial need"). Again, the final rule recognized that the general authority under Section 1103(a) allowed the INS to issue work authorizations. *Id.*

11

Five years later, in 1986, the final rule was challenged by the Federation for American Immigration Reform ("FAIR"). 51 Fed. Reg. 39,385 (Oct. 28, 1986). FAIR, like Save Jobs here, claimed that the INS had "acted beyond its statutory authority and contrary to the purpose of the Immigration and Nationality Act." *Id.* at 39,386; *see also id.* at 39,387.

Before the INS could act on FAIR's petition, Congress settled the dispute by ratifying the INS's longstanding view that it had authority to issue work authorizations in the Immigration Reform and Control Act of 1986 ("IRCA"), Pub. L. No. 99-603, 100 Stat. 3359. In IRCA, Congress adopted a "comprehensive scheme prohibiting the employment of illegal aliens in the United States." *Hoffman Plastic Compounds, Inc.* v. *NLRB*, 535 U.S. 137, 147 (2002). To do this, IRCA extended to all employers the sanctions regime that previously applied only to farm-labor contractors. *See id.* 101, 100 Stat. 3372. The critical provision of IRCA makes it unlawful for an employer to hire "*an unauthorized alien (as defined in subsection (h)(3) of this section)* with respect to such employment." 8 U.S.C. 1324a(a)(1) (emphasis added). Subsection (h)(3) in turn defines "unauthorized alien" as an alien who is not a lawful permanent resident and not "authorized to be so employed by th[e INA] *or by the Attorney General.*" 8 U.S.C. 1324a(h)(3) (emphasis added). This language reaffirmed the Attorney General's authority to issue work authorization— a practice that Congress declined to limit in IRCA.

12

Indeed, Congress was well-aware of the INS's claim of work-authorization authority when IRCA was passed because, in addition to the trio of publicly-noticed regulations in the 1980s and the FAIR petition, the INS's claim of authority was specifically highlighted to Congress while IRCA was being debated. *See* Letter from Robert McConnell, DOJ, to Romano Mazzoli (Apr. 4, 1983), *included in Immigration Reform and Control Act of 1983, Hearings before the Subcomm. On Immigration, Refugees and Int'l Law of the H. Comm. on the Judiciary*, 98th Cong. 1450 (1983) ("INS currently has authority to define classes of aliens who may be employed in the U.S."); Letter from Alan Nelson, Comm'r, INS, to Romano Mazzoli (May 14, 1984), *included in INS Oversight and Budget Authorization for Fiscal Year 1985: Hearings Before the Subcomm. On Immigration, Refugees, and Int'l Law of the H. Comm. on the Judiciary*, 98th Cong. 357 (1984) (explaining that INS regulations "set forth eligibility and criteria for employment authorization"). More than that, INS's work-authorization authority was subject to litigation by the time Congress considered IRCA. *E.g.*, *Diaz v. INS*, 648 F. Supp. 638 (E.D. Cal. 1986) (litigating work authorization for asylum applicants). Congress's decision to recognize the Attorney General's authority to issue work authorizations, when measured "[a]gainst this background understanding in the legal and regulatory system," including the history of work authorizations dating back to the 1940s, Congress's experience with the agriculture-specific work-authorization regime of

13

the 1970s, and Congress's understanding of the INS's claim of authority in the lead up to IRCA "is convincing support for the conclusion that Congress accepted and ratified" the INS's interpretation of Section 1103. *Texas Dept. of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2520 (2015).

Following enactment of IRCA, FAIR's petition claiming that the INS lacked authority to issue work authorizations remained pending. In light of IRCA, INS extended the comment period on the FAIR petition, noting that IRCA's recognition of the Attorney General's power to grant work authorization "appears to have a direct bearing on the issues to be resolved." 51 Fed. Reg. 45,338 (Dec. 18, 1986). FAIR then submitted a supplemental comment, arguing that Section 1324a(h)(3) meant that the Attorney General lacked authority "to grant work authorization except to those aliens who have already been granted specific authorization by the [INA]." 52 Fed. Reg. 46,093 (Dec. 4, 1987). The INS squarely rejected this view, reasoning, "the only logical way to interpret" Section 1324a(h)'s reference to authorization by the Attorney General, "is that Congress, being fully aware of the Attorney General's authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined 'unauthorized alien' in such fashion as to exclude aliens who have been authorized employment by the Attorney General through the regulatory process, in addition to those who are authorized employment by statute." *Id.* In light of that view, INS recodified its work-authorization regime,

14

identifying Sections 1103(a) and 1324a as authority. *See* 52 Fed. Reg. at 16,221, 16,228; *see also Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 844 (1986) (stating that "considerable weight must be accorded" an agency's "contemporaneous interpretation of the statute it is entrusted to administer").

In the years following IRCA, INS and later DHS have continued to issue work authorizations, including to aliens who are not specifically granted work authorization under the INA. In IRCA, Congress granted lawful status to millions of undocumented aliens who applied and satisfied certain residency and other requirements. *See, e.g.*, 8 U.S.C. 1255a(a) and (b). This enabled them to obtain temporary resident status with work authorization. *Id.*; *see* 8 U.S.C. 1427(a). But Congress did not extend legal protection to some of those aliens' spouses and children. *See Recent Developments*, 64 No. 41 Interpreter Releases 1190, App. I, at 1201 (Oct. 26, 1987). Nonetheless, in 1987, the INS established a "Family Fairness" policy to provide some relief to those family members. *Id.* at 1203-1204. That relief included work authorization. *Recent Developments*, 67 No. 6 Interpreter Releases 153, 152 (Feb. 5, 1990). In 1990, the INS expanded the "Family Fairness" policy, providing upwards of 100,000 people with work authorization. *Id.* at 154.

Congress responded not by repudiating the "Family Fairness" program, but by ratifying it. *See* Immigration Act of 1990 (IMMACT), Pub. L. No. 101-649, Tit. III, 301, 104 Stat. 4978. The IMMACT simultaneously made a number of

15

amendments to IRCA's work authorization provision. Tit. V, 521(a), 538, 104 Stat. 5053, 5056. But pointedly, Congress did not modify the language recognizing that "the Attorney General" could "authorize[]" aliens to be lawfully employed—even in response to the INS's "Family Fairness" policy that would have extended work authorization to a large number of people. It is black-letter administrative law that "when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 159 (2013) (citation omitted). Since then, INS has consistently used its authority to issue work authorizations. *See*, *e.g.*, 61 Fed. Reg. 13,061 (Mar. 26, 1996) (inviting Violence Against Women Act self-petitioners to apply for work authorization, notwithstanding the fact that the original VAWA statute did "not direct the Service to provide employment authorization based solely on the filing or approval of a self-petition"); USCIS, Press Release, *USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina* (Nov. 25, 2005) ("Katrina-impacted foreign academic students ... may ... apply for employment authorization based on economic necessity.").

In sum, the H-4 Rule is no different from the informal work authorization programs in the 1940s and 50s, the agricultural work authorizations presaged by

16

Congress in the 1970s, and the numerous work authorization issued after the express recognition of the Attorney General's authority in the 1980s. This unbroken history confirms what the plain text of Section 1103 makes clear: the Secretary has authority to issue work authorization.[2]

C.     *Save Jobs' Statutory Arguments Lack Merit*

Unsurprisingly, Save Jobs says little about this text or history. Rather, Save Jobs presents an atextual, ahistorical, and flawed reading of the INA.

Save Jobs begins by arguing that Section 1324a(h) is merely definitional. (Br. at 7.) But that argument misses the point. As DHS made clear when it promulgated the H-4 Rule, Section 1324a(h) is not the source of its authority; instead, it simply "recognizes the Secretary's" preexisting "authority to extend employment to noncitizens in the United States." 80 Fed. Reg. at 10285. Rather, DHS specifically invoked Section 1103(a)(3) and Section 1184(a), 80 Fed. Reg. 10294, in responding to comments and explaining its "Legal Authority To Extend Employment Authorization to Certain H-4 Dependent Spouses."

Save Jobs is equally wrong that Section 1324's reference to "by the [Secretary]" refers only to categories of aliens for whom the INA itself already directs that the Executive either must or may separately grant work authorization.

---

[2] Because DHS clearly had authority to promulgate the H-4 Rule, Save Jobs' constitutional avoidance argument (Br. at 12-14) has no traction because DHS' interpretation of its authority does not raise constitutional concerns.

(Br. at 12-13.) *First*, Save Jobs' reading ignores the nearly 40 years of pre-IRCA work authorizations. Perplexingly, on Save Jobs' reading, Congress repudiated that 40-year history of Executive work authorizations opaquely and in a statutory provision—Section 1324a(h)—which expressly recognized the Executive's authority to issue work authorization. *Second*, Save Jobs' reading leaves nothing for the "by the [Secretary]" clause to do. If a class of aliens has been granted work authorization—or has been permitted to hold work authorization—by a provision of the INA, then those aliens were authorized "to be so employed by this chapter." 8 U.S.C. 1324a(h)(3). The second clause of Section 1324a(h) does nothing on that view. True enough, Save Jobs argues that there are times when the INA provides that DHS "may" grant work authorization. But in those cases, the authority for work authorization still comes from the INA, and therefore, is encapsulated in the "by this chapter" language. Indeed, on Save Jobs' view, Section 1324a(h) would have been written conjunctively, not disjunctively. Only if Executive discretion to issue work authorizations without a specific statutory grant is assumed does the "or by the [Secretary]" clause have independent meaning.[3]

---

[3] The provision of the INA indicating that the Secretary "may" grant work authorizations is not surplusage. That provision offers a means of channeling the Secretary's discretions under Section 1103, alerting the Secretary that Congress wants him or her to consider authorizations.

Save Jobs also argues that Section 1103 does not grant DHS the authority to issue work authorizations. (Br. at 11.) That ahistorical argument was rejected in *Narenji v. Civiletti*, when this Court interpreted Section 1103 to mean that "[t]he [INA] need not specifically authorize each and every action taken by the Attorney General, so long as his action is reasonably related to the duties imposed upon him." 617 F.2d 745, 747 (D.C. Cir. 1979). In any event, the argument is wrong because work authorization has been deemed necessary to the proper functioning of the immigration system for over half a century.

Moreover, to the extent a specific statutory hook beyond Section 1103 is needed, the H-1B program is statutorily authorized, 8 U.S.C. 1101(a)(15)(H)(i)(b), and the Secretary was fully justified in concluding that H-4 work authorizations were "necessary" to support the H-1B program. 8 U.S.C. 1103(a). Indeed, the Secretary made these findings, noting that the H-4 Rule would ameliorate problems in the H-1B program. 80 Fed. Reg. at 10284. Thus, even under Save Jobs' crabbed reading of DHS' authority, the H-4 Rule should be upheld.

This case does not present the question of whether the Secretary may grant work authorization to aliens without lawful status because the H-4 Rule applies only to aliens with lawful status. 80 Fed. Reg. at 10286. DHS, through the H-4 Rule, is not claiming unfettered authority to provide work authorizations. One, on its face Section 1103 requires the Secretary to find the regulations are "necessary for

19

carrying out his authority" to "administ[er] and enforce[]" immigration laws. 8 U.S.C. 1103(a)(3). As explained, the H-4 program is necessary to administering the immigration laws, and no other provision of the INA forbids the H-4 Rule.

D.    *To the Extent the INA is Ambiguous, Deference Supports the H-4 Program*

Given the text and history of the INA, deference is not needed to resolve this dispute. But to the extent the Court finds any ambiguity, deference ices the already-baked cake under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).

*Chevron* fully applies here. First, there is no doubt that DHS is charged with implementing the INA. *See* Pub. L. No. 107-296, 116 Stat. 2135, 2273–74 (transferring INS's authority to the Secretary). Second, the H-4 Rule was passed following full notice-and-comment rulemaking. *See United States v. Mead Corp.*, 533 U.S. 218, 227 (2001). Third, Congress has not directly spoken to the question of whether H-4 aliens should be entitled to work authorization.

In search of a contrary Congressional command, Save Jobs notes that Congress has authorized the spouses of two other categories of visa holders to work. (Br. at 10.) But this *expressio unius* argument fails for multiple, independent reasons. *First*, it has little, if any, force in interpreting the INA. "[T]he *expressio unius* canon does not apply 'unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it,' and that the canon can be overcome by

20

'contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion.'" *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013) (quoting *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168, (2003), *United States v. Vonn*, 535 U.S. 55, 65 (2002)). That has particular force in the agency context because "a congressional mandate in one section and silence in another often suggests not a prohibition but simply a decision not to mandate any solution in the second context, i.e., to leave the question to agency discretion." *Catawba County v. EPA*, 571 F.3d 20, 36 (D.C. Cir. 2009). The INA is exactly the type of statute where the *expressio unius* cannon carries little force. *See Creekstone Farms Premium Beef, L.L.C. v. Dep't of Agric.*, 539 F.3d 492, 500 (D.C. Cir. 2008) (when a statute "contains broad language authorizing the agency to promulgate regulations necessary to 'carry out' the statute, we believe the [*expressio unius*] doctrine has minimal, if any, application"). *Second*, the express grants cited by Save Jobs "were not passed together as part of the original INA; rather, they were added piecemeal over time by Congress." *Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 508 (9th Cir. 2018). "Given this context," it is "improbable that Congress 'considered the … possibility' of all other potential uses for [work authorization] 'and meant to say no' to any other application of that tool by the immigration agency." *Id.* at 509 (quoting *Barnhart*, 537 U.S. at 168). *Third*, Save Jobs' *expressio unius* argument is contrary to the structure of the INA. Indeed,

21

Congress has long recognized the Executive's authority in this area. (*See supra* pp. 9-16.) Against this backdrop, the fact that Congress chose to exercise its authority to grant some groups work authorization says nothing about Congress's desire for other groups to have (or not to have) work authorization. After all, Congress legislated with the understanding that the Executive could provide work authorizations as needed unless Congress took contrary action.

Save Jobs next argues that Congress has occasionally considered, and failed to pass, laws that would have extended work authorization to H-4 visa holders. (Br. at 10.) The failed legislation says nothing about Congress's view of the Secretary's authority, especially since when those failed bills were introduced, and the quoted statements were made, the H-4 Rule had not yet been promulgated. Amicus Brief of Leading Companies and Business Associations ("Amicus Br.") at 20. Indeed, there is little reason to credit Save Jobs' historical interpretation because "failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute." *Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084, 1093 (D.C. Cir. 2015) (quoting *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994)). "Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." *Cent. Bank of Denver*, 511 U.S. at 187 (quoting *Pension Benefit Guaranty*

*Corp. v. LTV Corp.*, 496 U.S. 633, 650, (1990)). Indeed, reliance on failed legislation is especially inapt here because "Congress was aware" that the Executive claimed work authorization authority when it considered extending work authorization to H-4 visa holders, and therefore, Congress' inaction could simply mean that Congress did not act because it assumed the Executive would resolve the issue. *LTV Corp.*, 496 U.S. at 650.

The H-4 program does not grant work authorization to "unlawful aliens." Rather, all H-4 visas are given to lawfully admitted noncitizens, and all the H-4 program does is expedite the date when these lawfully admitted noncitizens will be entitled to work in the United States.[4] The H-4 program is interstitial, providing temporary work authorization to H-4 spouses as a bridge to either their receipt of Legal Permanent Resident status or their voluntary departure. *See* Memorandum of Law in Support of Plaintiff's Second Renewed Motion for Summary Judgment at 9-10 (recognizing implicit delegation of authority is sufficient for "interstitial matter[s]") (quoting *United States Telecomms. Ass'n v. Fed. Commc'ns Comm'n*, 855 F.3d 381, 403 (2017)).

---

[4] As noted, Intervenor Ms. Sengupta, who originally obtained work authorization under the H-4 Rule, subsequently obtained work authorization when her husband received a green card during the course of this litigation and dropped out of this action.

23

E.      *Save Jobs' Remaining Extra-Textual Arguments Lack Merit*

Save Jobs makes a number of additional, non-textual arguments; each is without merit.

*First*, Save Jobs contends that DHS's claim of work-authorization authority is recent. (Br. at 15.) Insofar as Save Jobs is referring to the date when the H-4 Rule was promulgated, that is irrelevant because the relevant issue is DHS's authority to grant work authorization for lawfully admitted noncitizens, and INS and later DHS have not only claimed such authority but have also exercised it, for decades. Since Section 1103 was enacted in 1952, INS, and later DHS, have interpreted that provision to allow for work authorizations. Nor is Save Jobs correct that the H-4 Rule relies exclusively on power derived from Section 1324a(h). To the contrary, the H-4 Rule was clear that "[t]he authority of the [Secretary] for this regulatory amendment can be found in ... 6 U.S.C. 112, and ... 8 U.S.C. 1103(a), which authorize the Secretary to administer and enforce the immigration and nationality laws." 80 Fed. Reg. at 10285. Indeed, in the legal authority section of the final H-4 Rule, DHS made plain that "[i]n addition" to the power granted in Section 1103, Section 1324a(h), "recognizes the Secretary's authority to extend employment to noncitizens in the United States." *Id.* There is nothing novel about that approach. Rather, the Executive has properly taken the view that Section 1324 recognizes the power conferred in Section 1103 from the beginning. 52 Fed. Reg. 46,093; 52 Fed.

24

Reg. at 16,221, 16,228. DHS also relied on its authority under Section 1184(a) in promulgating the final Rule. *See* 80 Fed. Reg. 10294 (invoking authority under Section 1103(a)(3) and Section 1184(a), in responding to comments and explaining its "Legal Authority To Extend Employment Authorization to Certain H-4 Dependent Spouses".)

*Second*, Save Jobs argues that DHS's interpretation of Section 1103 is inconsistent with prior judicial interpretations. (Br. at 11.) That is not true, as a number of courts have found Executive authority to issue work authorization. *See, e.g.*, *Regents of the Univ. of California*, 908 F.3d at 508-09; *Batalla Vidal*, 279 F. Supp. 3d at 426.

*Third*, Save Jobs contends that in light of the INA's legislative history, it is "implausible" that Section 1103 gives DHS the authority to issue work authorizations. (Br. at 11.) On Save Jobs' reading, the only purpose of the INA was to "provide[] strong safeguards for American labor." (*Id.* at 11.) Save Jobs misreads the legislative intent. True enough, one purpose of the INA is to ensure jobs for American workers, but "no legislation pursues its purposes at all costs," and therefore, "it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987). Consistent with the multifaceted nature of immigration policy, the INA "is a very complex statute which

has many different purposes, some of which may appear at time to be in conflict with others." 52 Fed. Reg. at 46092-01, *see also id.* at 46093 ("It requires a simplistic view of the purposes of the Act ... to contend that regulations should be promulgated solely for the purpose of preventing any aliens without labor certification from being authorized to accept employment."). Consistent with these broad and varied circumstances, the 1952 Congress, rather than attempting to answer the work-authorization question for all future scenarios, instead delegated broad work authorization authority to the more "dynamic" Executive Branch. *Arizona v. United States*, 567 U.S. 387, 396–97 (2012).

*Fourth*, Save Jobs contends that if the H-4 program is upheld, administrative power in this area will be limitless. (Br. at 6.) Hardly so. There are internal, external, and structural limits on DHS's authority to issue work authorizations. Internally, Section 1103 requires regulations to be "necessary for carrying out his authority" to "administ[er] and enforce[]" immigration laws. 8 U.S.C. 1103(a)(3). The decision that any regulation is necessary can be tested through the normal process of administrative review. Beyond that, DHS's power is externally limited by the remainder of the INA—DHS cannot grant work authorization when doing so is inconsistent with the INA. Congress always maintains the authority to require or forbid work authorization as it sees fit.

26

## II.   THE H-4 RULE IS PERFECTLY REASONABLE, AND DHS DID NOT ACT ARBITRARILY OR CAPRICIOUSLY IN PROMULGATING IT.

Save Jobs' contention that the H-4 Rule is arbitrary and capricious fails for multiple reasons. First, contrary to Save Jobs' claim (Br. at 15), the Rule does not reverse a policy in place for 45 years. Rather, as demonstrated above, the Rule is fully consistent with INS' and DHS' longstanding conduct under both Republican and Democratic administrations in granting work authorization to various classes of nonimmigrants, even when there was not a specific statutory provision directing the executive branch to do so.

Second, Save Jobs maintains (Br. at 16) that DHS fails to explain why it was reversing a long-standing policy. However, as explained, DHS was not reversing a longstanding policy, but rather was acting in conformity with INS' and DHS' decades-long practice. Moreover, DHS articulated the reasons for its decision to promulgate the H-4 Rule. *See*, *e.g.*, 80 Fed. Reg. at 10,285 (stating rule will "simply alleviate the long wait for employment authorization these H-4 dependent spouses endure though the green card process, and accelerate the timeframe within which they generally will become eligible to apply for employment authorization (such as when they apply for adjustment of status").

Finally, Save Jobs challenges the Rule because it contends (Br. at 17) that DHS failed to give serious consideration to the impact of "the H-4 Rule on

Americans." The record refutes that contention, (*see* DHS Br. at 26-27 and Amcius Br. at 23-25.) The fact that Save Jobs would have weighed the competing considerations differently than did the agency does not render the agency's decision arbitrary or capricious. *AFL-CIO v. NLRB*, 471 F. Supp. 3d 228, 240 (D.D.C. 2020) ("weigh[ing] . . . [of] competing policy concerns" is "'the agency's job,' not the court's" (quoting *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020)). The Rule falls well within the "zone of reasonableness for purposes of the APA" required by *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1160 (2021), because here, DHS met its obligation to "examine the relevant data and articulate a satisfactory explanation for its actions including a reasonable connection between the facts found and the choice made." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citation omitted). The APA requires no more.

## <u>CONCLUSION</u>

For these reasons, this Court should grant summary judgment to DHS and deny Save Jobs' motion for summary judgment.

Respectfully submitted,

By: */s/ Carl E. Goldfarb*                Lisa Lehner
    Carl E. Goldfarb                      AMERICANS FOR IMMIGRANT
    BOIES SCHILLER FLEXNER LLP       JUSTICE
    401 E. Las Olas Blvd., Suite 1200     6355 NW 36th Street, Suite 2201
    Ft. Lauderdale, FL 33301           Miami, FL  33166
    (954) 356-0011                     (305) 573-1106

Lauren Goldman
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
20th Floor
New York, NY 10001

## <u>CERTIFICATE OF SERVICEb</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court for the District of Columbia by using the Court's CM/ECF system on May 17, 2021.

/s/ Carl E. Goldfarb
Carl E. Goldfarb, Esq.