In the
# United States District Court
for the
# District of Columbia

| | |
|---|---|
| Save Jobs USA<br><br>*Plaintiff,*<br><br>*v.*<br>U.S. Dep't of Homeland Security<br><br>*Defendant,*<br><br>*and*<br><br>Anujkumar Dhamija, *et al.*<br><br>*Intervenors.* | Civil Action No. 1:15-cv-00615 (TSC) |

**Reply in Support of**
**Plaintiff's Second Renewed Motion for Summary Judgment**

# TABLE OF CONTENTS

Table of Authorities.................................................................................ii

Argument ..................................................................................................1

    I. DHS does not have "dual authority" with Congress to
       legislate in the area of work authorization. ................................2

   II. No legislative history supports DHS's position. .......................7

  III. The fact that the agency has been independently
      authorizing alien employment for a long time reflects
      long-term agency abuse that the courts have restrained in the past. .......9

  IV. DHS ignores the limitations on section 1103. .........................11

   V. DHS escalates the constitutional issues of the H-4 Rule
      in its response. ...........................................................................13

Conclusion ..............................................................................................15

Letter from Robert McConnell, DOJ, to Romano Mazzoli (Apr. 4, 1983) ....17

ii

## TABLE OF AUTHORITIES

Case Law:

*Chevron, U.S.A., Inc. v. NRDC, Inc.,*
467 U.S. 837 (1984)..................................................................10–11, 14–15

*Chicanos Por La Causa, Inc. v. Napolitano,*
544 F.3d 976 (9th Cir. 2008) ....................................................................3

*Clinton v. City of N.Y.,* 524 U.S. 417 (1998) ....................................................13

*Consumer Energy Council v. Fed. Energy Regulatory*
*Comm'n.,* 673 F.2d 425 (D.C. Cir. 1982) .................................................14

*Fed. Election Comm'n v. NRA Political Victory Fund,*
6 F.3d 821 (D.C. Cir. 1993) ......................................................................14

*Gooch v. Clark,* 433 F.2d 74 (9th Cir. 1970)..............................................9–10

*J. W. Hampton, Jr., & Co. v. United States,*
276 U.S. 394 (1928) ..............................................................................13–14

*Int'l Union of Bricklayers & Allied Craftsmen v. Meese,*
761 F.2d 798 (D.C. Cir. 1985) ..............................................................9–10

*Int'l Union of Bricklayers & Allied Craftsmen v. Meese,*
616 F. Supp. 1387 (N.D. Cal. 1985)........................................................9–10

*Int'l Longshoremen's & Warehousemen's Union v. Meese,*
891 F.2d 1374 (9th Cir. 1989) ...................................................................10

*Loving v. United States,* 517 U.S. 748 (1996) ...........................................13–14

*Lubrizol Corp. v. Envtl. Prot. Agency,*
562 F.2d 807 (1977) ...................................................................................11

*Merck & Co. v. United States HHS,*
385 F. Supp. 3d 81 (D.D.C. 2019) ............................................................10

*Merck & Co. v. United States HHS,*
962 F.3d 531 (D.C. Cir. 2020) ...................................................................10

*Nat'l Mut. Ins. Co. v. Tidewater Transfer Co.,*
337 U.S. 582 (1949).....................................................................................13

*Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.,*
29 F.3d 655 (D.C. Cir. 1994) ..............................................................10–11

*Sierra Club v. EPA,* 719 F.2d 436 (1983) .....................................................11

*Truax v. Raich,* 239 U.S. 33 (1915)...............................................................12

*Marshall Field & Co. v. Clark,* 143 U.S. 649 (1892) ......................................14

*Metro. Wash. Airports Auth. v. Citizens for Abatement of*
    *Aircraft Noise*, 501 U.S. 252 (1991) ..............................................14

*Perales v. Casillas*, 903 F.2d 1043 (5th Cir. 1990) ............................2

*Platt v. Union P. R. Co.*, 99 U.S. 48 (1879) .......................................6

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ....................3

Statutes:

    Pub. L. No. 91-225, 84 Stat. 116 (1970) ......................................11

    Immigration and Nationality Act of 1965,
        Pub. L. No. 89-236, 79 Stat. 911

    Immigration Reform and Control Act of 1986,
        Pub. L. No. 99-603, 110 Stat. 3359 ..............................................14

    Immigration Act of 1990,
        Pub. L. No. 101-649, 104 Stat. 4978 ............................................14

    Haitian Refugee Immigration Fairness Act of 1998,
        Pub. L. No. 105-277, § 908, 112 Stat. 2681.....................................6

    Violence Against Women and Department of Justice
        Reauthorization Act of 2005,
        Pub. L. No. 109-162, 119 Stat. 2960 (2006) ..................................6

    8 U.S.C. § 1101(a)(15)(H) ..........................................................10

    8 U.S.C. § 1103 ....................................................................... 6–8

        8 U.S.C. § 1103(a) .........................................................7–8, 11

            8 U.S.C. § 1103(a)(3)............................................... 11–12

    8 U.S.C. § 1158 ....................................................................... 4, 6

        8 U.S.C. § 1158(d)(2)...................................................................4

    8 U.S.C. § 1324a ..................................................................... 3, 8–9

        8 U.S.C. § 1324a(h)(3) ................................................ 1–8, 11–12

Regulations:

    Employment Authorization for Certain H-4 Dependent
        Spouses, 80 Fed. Reg. 10,284 (Feb. 25, 2015) ......................... 1, 2, 7, 10–12

    Agricultural Marketing Service, Milk In the Paducah, Ky.,
        Marketing Area, 44 Fed. Reg. 43,480 (July 25, 1979) ..................2

iv

Other Authorities:

The Federalist No. 48 ........................................................................... 13

*United States v. Texas*, Br. for *Amicus Curiae* U.S. House of
    Representatives, 136 S. Ct. 2271 (2016) (No. 15-674) ............................ 2–3

*United States v. Texas*, No. 15-674, Br. for the Pet'rs,
    136 S. Ct. 2271 (2016) (No. 15-674) ....................................................7

S. Rept. 82-1173 (1952) ..................................................................... 8–9

H.R. Rept. 82-1365 (1952) ................................................................. 8–9

1

## ARGUMENT

The Immigration Reform and Control Act of 1986 ("IRCA"), for the first time, imposed criminal penalties on employers who hired aliens not authorized to work in the United States. Pub. L. No. 99-603, 110 Stat. 3359. The Act defined those aliens not authorized to work ("unauthorized aliens"):

> As used in this section, the term "unauthorized alien" means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General.

*Id*. § 101, Stat. at 3368 (codified at 8 U.S.C. § 1324a(h)(3)).

In recent years the U.S. Department of Homeland Security ("DHS") has promulgated several regulations authorizing alien employment without a directive from Congress, and in doing so has made the ludicrous claim that the clause "or by the Attorney General" in this definition conferred on DHS dual authority to make classes of aliens eligible for employment. The rule at issue here, permitting certain spouses of H-1B non-immigrant guestworkers to be employed, was the very first of these rules. Employment Authorization for Certain H-4 Dependent Spouses, 80 Fed. Reg. 10,284 (Feb. 25, 2015) ("H-4 Rule").[1] Plaintiff, Save Jobs USA, alleges that the H-4 Rule is in excess of DHS authority because no statutory provision authorizes DHS to define classes of aliens eligible for employment.

---

[1] Contrary to DHS's claim, there has never been a "multitude of agency invocations of authority under Section 1324a(h)(3) to grant employment authorization." Resp. 16; Resp. 13–14. The H-4 Rule in 2015 was *the very first* to make such a claim in a published rule granting alien employment.

## I. DHS does not have "dual authority" with Congress to legislate in the area of work authorization.

DHS claims that the agency has "dual authority" with Congress to create classes of aliens eligible for employment. Resp. 16, 18. In striking contrast with the vast scope of the claimed authority (on a par with that of Congress), there is no provision that explicitly confers such authority on DHS, no mention in any congressional reports that such authority was conferred on the agency, and no precedent holding such authority exists.[2]

The H-4 Rule claims the source of this "dual authority" is definition of the term *unauthorized alien* in 8 U.S.C. § 1324a(h)(3). DHS distorts the structure of the Immigration and Nationality Act as amended ("INA") to argue that the clause "or by the attorney general" is meaningless unless DHS has "dual authority" with Congress to create classes of aliens eligible for employment. Resp. 15–18; Int. Resp. 5.

That clause is hardly meaningless. The House of Representatives, as *amicus curiae*, has explained:

> Other provisions of the immigration laws expressly authorize, or even obligate, the Attorney General (or now the Secretary) to grant work authorization in certain circumstances. *See*, *e.g.*, *id.* §§ 1160(a)(4), (d)(1)(B), (d)(2)(B), 1255a(b)(3)(B), (e)(1)(B), (e)(2)(B). These provisions are not

---

2  DHS repeatedly cites irrelevant sources stating that the agency has broad authority to issue regulations. For example, DHS cites *Perales v. Casillas*, 903 F.2d 1043, 1048–50 (5th Cir. 1990) for the proposition that its authority to deny work authorizations is "unfettered." Resp. 21. Yet DHS's power to grant or deny work permits to individuals within classes of aliens that Congress has granted DHS authority to permit employment to has never been an issue in this case. The issue here is whether DHS has the independent authority to define classes of aliens eligible for employment. There is no precedent holding DHS has such power.

 DHS cites 44 Fed. Reg. 43,480 (July 25, 1979) as an example of the agency asserting its claimed authority to authorize alien employment. Resp. 11. That is actually a proposed Department of Agriculture regulation governing milk. No proposed rules governing immigration were issued that day.

3

recent innovations; many were added to the code along with section 1324a. *Compare* Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 101(a)(1), 100 Stat. 3359, 3368 (enacting section 8 U.S.C. §1324a(h)(3)), *with*, *e.g.*, *id.* § 201 (enacting 8 U.S.C. § 1255a(b)(3)(B), (e) (1), (2)), and id. § 302(a)(1) (enacting 8 U.S.C. § 1160(a)(4), (d)(1)(B)), (d)(2) (B)); *see also* Refugee Act of 1980, Pub. L. No. 96-212, § 401(b), 94 Stat. 102, 118 (codified as amended at 8 U.S.C. § 1255 note (1982)). Section 1324a(h)(3) thus reflects nothing more than the unremarkable reality that work authorization sometimes comes directly from a statute and other times must come from the Attorney General, pursuant to statute.

*United States v. Texas*, Br. for *Amicus Curiae* U.S. House of Representatives at 26, 136 S. Ct. 2271 (2016) (No. 15-674).[3]

Indeed, DHS's claim "that Congress drafted 8 U.S.C. § 1324a(h)(3) to recognize the Attorney General's authority to grant work authorization" is facially ridiculous. Resp. 13. That provision's obvious purpose was that the "IRCA prohibits knowingly or intentionally hiring or continuing to employ an unauthorized alien, 8 U.S.C. § 1324a(a), which it defines as an alien either not lawfully admitted for permanent residence or not authorized to be employed by IRCA or the U.S. Attorney General, 8 U.S.C. § 1324a(h)(3)." *Chicanos Por La Causa, Inc. v. Napolitano*, 544 F.3d 976, 980 (9th Cir. 2008). Section § 1324a clearly was not drafted for the purpose of recognizing any power conferred on the agency and a short definition limited in scope to its own section would be an obscure place for Congress to recognize (or grant) the power DHS claims. "Congress ... does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

---

3   Intervenors also ignore this structural reality of the Immigration and Nationality act the House of Representatives explains. Int. Resp. 5–6, 17–18.

4

In fact, DHS adduces a provision that illustrates the very point made by the House of Representatives. Resp. 18. Under 8 U.S.C. § 1158(d)(2), DHS, at its discretion, may authorize employment to asylees through regulation. In that provision Congress conferred on DHS the power (which it may use or not use) to authorize alien employment in a specific circumstance, with the restriction that the aliens may only be permitted to start work 180 days after filing for asylum. § 1158. Had Congress omitted from § 1324a(h)(3) the clause "or by the attorney general," DHS would have the power to permit certain asylees to work under § 1158 but it would be unlawful for employers to hire them. 8 U.S.C. § 1324a.

Bizarrely, DHS tries to show that the 180-day restriction on asylee employment in § 1158 is "superfluous" unless DHS has dual authority with Congress to permit alien employment where Congress does not forbid such employment. Resp. 17–18.[4] DHS asserts:

> 8 U.S.C. § 1158(d)(2) ("Asylum applicant who is not otherwise eligible for employment authorization shall not be granted such authorization prior to 180 days after the date of filing of the application for asylum."). Such provisions are superfluous under Plaintiff's proposed construction, which nullifies the effect of any express prohibitions.

Resp. 17–18. But the full text of the provision paints a different picture:

> An applicant for asylum is not entitled to employment authorization, but *such authorization may be provided under regulation by the Attorney General*. An applicant who is not otherwise eligible for employment authorization shall not be granted such authorization prior to 180 days after the date of filing of the application for asylum.

8 U.S.C. § 1158(d)(2) (emphasis added). This provision is not a prohibition on DHS's granting employment. It is an authorization for DHS to grant em-

---

4  Intervenors also ignore statutory provisions allowing DHS to permit alien employment to make the same flawed argument that restrictions on such employment are superfluous unless DHS has unlimited authority to permit foreign labor. Int. Resp. 6–7.

5

ployment, in its discretion, with a restriction. Without the 180-day restriction that DHS finds superfluous, DHS would have the discretion to extend employment to any asylee. With the restriction, DHS has the discretion to extend employment to any asylee 180 days after an asylum petition is filed. The restriction is hardly superfluous.

The Immigration Reform and Control Act also illustrates the necessity of the phrase "or by the Attorney General." The Act contains directives to the Attorney General (now DHS Secretary) to extend employment to classes of aliens who lack a visa status. Pub. L. No. 99-603, § 201 ("Legalization") 100 Stat. 3397, 3399 (two), § 301 ("Lawful Residence for Certain Special Agriculture Workers") 100 Stat. 3418, 3421 (two), 3428. Had Congress omitted the phrase "or by the Attorney General" in § 1324a(h)(3), it would have created an absurd situation in which that Act directed the Attorney General to authorize certain aliens to work but also (in § 101 of the same Act) made hiring these aliens unlawful.[5]

---

5  Intervenor's state that "[t]he history of the INA makes clear that the Secretary has the authority to issue work authorizations" without making a distinction between those authorized by Congress and those not authorized by Congress. Int. Resp. 9. The Immigration Reform and Control Act is one of many examples where Congress has authorized the DHS Secretary to issue work authorizations. Intervenors, however, take the fatal leap of trying to transform DHS's power to extend work authorizations pursuant to statute into the "dual authority" with Congress. Int. Resp. 7. A strange example is that Intervenors interpret an amendment to the Farm Labor Contractor Registration Act of 1963 that originally sanctioned farm contractors who "utilized the services of a person with knowledge that such person is violating the provisions of the immigration and nationality laws of the United States" to the more restrictive "utilized with knowledge, the services of any person, who is an alien not lawfully admitted for permanent residence, or who has not been authorized by the Attorney General to accept employment" somehow showed the agency had dual authority with the Congress to define classes of aliens eligible for employment. Int. Resp. 10–11.

Another example of where Congress has authorized DHS to permit employment through regulation is the Violence Against Women and Department of Justice Reauthorization Act of 2005, which provides that DHS "may" grant Violence Against Women Act petitioners work authorization. Pub. L. No. 109-162, § 814, 119 Stat. 2960, 3059 (2006). The same section also provided that DHS "may authorize" battered spouses, including those who happen to be H-4 visa holders, "to engage in employment." *Id*. Similarly, the Haitian Refugee Immigration Fairness Act of 1998, Pub. L. No. 105-277, § 908, 112 Stat. 2681, 2681-539, provided that the Attorney General (now DHS Secretary) "may" extend employment to certain Haitian nationals. Under the agency's new interpretation of § 1324a(h)(3), DHS already had the power to grant these discretionary work authorizations. That claim of authority compels the impermissible conclusion that all Congress did by enacting these provisions was to create useless surplusage. *See Platt v. Union P. R. Co.*, 99 U.S. 48, 59 (1879) (explaining that in statutory construction, "no words are to be treated as surplusage or as repetition.").

Indeed, under DHS's claim of dual authority with Congress, it is the numerous enactments of discretionary authority to permit alien employment that are pointless surplusage because DHS asserts it already has the power to allow any alien to work. Resp. 16–18.[6] DHS has not identified any reason—because there is none—why Congress would grant DHS discretionary authority to permit specific classes of aliens to work when it had already

---

6  One can imagine a perverse argument that discretionary employment under § 1158 falls under "authorized by this chapter" in § 1324a(h)(3) so that the "or by the attorney general" clause would still be surplusage. Such an argument would get DHS nowhere because § 1103 is in the same chapter and this reasoning produces the same surplusage. Ultimately, all immigration powers flow from the Immigration and Nationality Act.

granted DHS discretionary authority to permit any class of aliens to work (except those specifically forbidden work authorization by Congress).

## II.  No legislative history supports DHS's position.

After the Fifth Circuit rejected DHS's preposterous claim that the term definition in § 1324a(h)(3) conferred upon the agency unbounded power to permit alien employment, DHS put forth before the Supreme Court the new claim that this power actually came from § 1103(a)—an argument that it had not made below. *United States v. Texas*, Br. for the Pet'rs at 63, 136 S. Ct. 2271 (2016) (No. 15-674). Since then, DHS has vacillated between these two provisions as its source of authority to define classes of aliens eligible for employment in litigation, attempting to select the one that is less absurd in any specific argument.[7] The usual pattern has been that DHS has based its claim on

---

7  DHS points to the Federation for American Immigration Reform petition for rulemaking in 1986 that claimed 1324a(h)(3) conferred such authority. Unfortunately, the petitioners did not follow up and seek a judicial interpretation. It is notable that the agency did not exercise this claim of authority to permit employment for a class of aliens until the H-4 Rule in 2015. Furthermore, if DHS's authority flows from § 1103 (1952), the response to the petition is not a contemporary interpretation.

Intervenors take the further leap that a 1983 letter from the Department of Justice (reproduced *infra*) stating that agency has the ability to enforce employer sanctions is feasible because it has the ability to define which classes of aliens may be employed out of context. Int. Resp. 13. In context, the author is using the word "define" as "to fix or mark the limits of." Websters' Dictionary. Continuing down this rathole, Intervenors cite *Diaz v. Immigration & Naturalization Serv.*, 648 F. Supp. 638, 644 (E.D. Cal. 1986) for the proposition that "INS's work-authorization authority was subject to litigation by the time Congress considered IRCA." Int. Resp. 13. In reality, that authority was not at issue in *Diaz* and the court specifically noted that "[n]either party challenges the validity of the regulations in this case." 648 F. Supp. at 644. Similarly, Intervenors cite *Vidal v. Nielsen*, 279 F. Supp. 3d 401, 412 (E.D.N.Y. 2018) and *Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476 (9th Cir. 2018) as supporting DHS claim of dual authority but this was not an issue in either of these cases because, as in *Diaz*, both parties asserted DHS had such power. Int. Resp. 25.

DHS's power to issue regulations in § 1103(a) when the agency wants to show a longstanding agency interpretation, and that DHS relies on § 1324a(a)(3) when it wants to show "dual authority" with Congress that is unbounded by the limitation in § 1103(a) that DHS regulations be necessary to carrying out its authority.

DHS responds to the fact that there is no mention in the extensive legislative history of the Immigration Reform and Control Act of conferring on DHS the vast authority it claims from §1324a by shifting provisions and arguing that Congress had already conferred that power on DHS in the Immigration and Nationality Act of 1952 (8 U.S.C. § 1103) and just took it "for granted" in 1986. Resp. 12–13. There DHS just plays a shell game with the Court because DHS faces the exact same problem with § 1103 being its source of "dual authority." Resp. 12–13. The House and Senate reports on the Immigration and Nationality Act of 1952 (creating § 1103) make no mention of conferring "dual authority" either. S. Rept. 82-1173 (1952) & H.R. Rept. 82-1365 (1952). And where the reports on the 1986 Act make no mention of conferring "dual authority" on DHS, the reports on the 1952 Act contradict DHS's claim of such authority. Both the Senate and House reports on the Immigration and Nationality Act state that the Act's labor protections apply to *all* aliens other than those where other provisions give them special treatment, aliens entitled to preferential treatment due to their relationship to U.S. citizens, or those admitted for permanent residence. S. Rept. 82-1173 at 11 (1952) & H.R. Rept. 82-1365 at 50–51 (1952). If Congress had conferred on DHS independent authority to permit alien employment through regulation with the ability to circumvent labor protections under the Act, Congress would have listed this as one of the exceptions to the labor protection requirement—*but it did not*. The congressional reports walk through every imaginable aspect

of the Immigration and Nationality Act, yet they contain no mention that the Act confers on DHS the vast power to authorize alien employment that it claims. S. Rept. 82-1173 & H.R. Rept. 82-1365. Furthermore, it would have been pointless for Congress to create the elaborate system of labor protections it described while authorizing the agency to undermine that system through regulation. *Id*.

### III. The fact that the agency has been independently authorizing alien employment for a long time reflects long-term agency abuse that the courts have restrained in the past.

DHS notes that the attorney general authorized employment to classes of aliens prior to the enactment of § 1324a to argue this is a longstanding policy. Resp. 19. This simply reflects the long history of agency abuse in the area alien employment. DHS fails to note that such employment authorizations had also been challenged in the courts.[8] *E.g.*, *Gooch v. Clark*, 433 F.2d 74 (9th Cir. 1970); *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798 (D.C. Cir. 1985). In some cases, such as *Gooch*, the agency prevailed. In others, such as *Bricklayers*, the agency lost. *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 616 F. Supp. 1387, 1406 (N.D. Cal. 1985). All such cases were decided on admission provisions of the Immigration and Nationality Act and not on whether the agency had "dual authority" with Congress to permit alien employment. In *Gooch*, the Ninth Circuit held commuting aliens were immigrants who were not subject to labor protections of the Immigration and Nationality Act. 433 F.2d at 82. In *Bricklayers*, the court held that the Immigration and Naturalization Service did not have the power to permit employment on the B visitor visa. *Int'l Union of Bricklayers & Al-*

---

8  Intervenors also argue longstanding policy while failing to note that agency created work authorizations have been challenged in the past and rejected by the courts. Int. Resp. 9–17. Furthermore, the longstanding policy of the agency was that H-4 visas did not permit employment.

*lied Craftsmen v. Meese*, 616 F. Supp. 1387, 1406 (N.D. Cal. 1985). There are no earlier cases that even mention the "dual authority" with Congress that DHS claims here to permit alien employment. Resp. 16. It is striking that litigation over agency regulations authorizing alien employment have spanned decades yet there has never been a claim that the agency has "dual authority" until now. The claim of dual authority is a recent invention and the fact that agency-created labor authorizations have been rejected by the courts, illustrates that no such power exists. *E.g., Bricklayers*, 616 F. Supp. 1387, 1406; *Int'l Longshoremen's & Warehousemen's Union v. Meese*, 891 F.2d 1374, 1376–77 (9th Cir. 1989).

In the past, this case would have been decided on whether the H-4 visa statute permits alien employment and not whether DHS has mythical dual authority with Congress to permit alien employment. *E.g., Gooch*, 433 F.2d. at 82. The H-4 Rule never justifies its work authorization under the provisions of the H-4 Visa. 80 Fed. Reg. at 10,284–312. Nonetheless, the lack of a prohibition on H-4 employment in the statute does not constitute a gap. 8 U.S.C. § 1101(a)(15)(H). "An agency's general rulemaking authority plus statutory silence does not [] equal congressional authorization." *Merck & Co. v. United States HHS*, 385 F. Supp. 3d 81, 92 (D.D.C. 2019) *aft'd*, 962 F.3d 531 (D.C. Cir. 2020). Yet that is exactly what DHS argues. Resp. 16–17. DHS's description of the Immigration and Nationality Act whereby Congress can intervene to block a work authorization made by DHS has the American system backwards (and ignores the veto power of the executive).[9] Resp. 19. "Were courts to presume a delegation of power absent an express withholding of such power, agencies would enjoy virtually limitless hegemony, a re-

---

9   Intervenors make the same silence confers authority argument consistently rejected by the D.C. Circuit. Int. Resp. 20.

11

sult plainly out of keeping with *Chevron* and quite likely with the Constitution as well." *Ry. Labor Execs.' Ass 'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (referring to *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984)).

### IV.  DHS ignores the limitations on section 1103.

To address the constitutional issues with DHS's interpretation of § 1324a(h)(3) as its source of authority, DHS shifts back to § 1103(a) as the source of its mythical power of dual authority with Congress. Resp. 20–23. Here, DHS ignores that the fact that the source of its authority is the functions assigned to it by Congress and not its power to make regulations. *See Sierra Club v. EPA*, 719 F.2d 436, 455 (1983) (citing *Lubrizol Corp. v. Envtl. Prot. Agency*, 562 F.2d 807, 815 n.20 (1977)); *see also* § 1103(3) (describing the duties and powers of the DHS Secretary). DHS's power to make regulations is limited to that *necessary* to carry out those duties. § 1103(a)(3). The D.C. Circuit "categorically reject[s] [the suggestion" that an agency "possesses *plenary* authority to act within a given area simply because Congress has endowed it with *some* authority to act in that area." *Ry. Labor Execs' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 670 (D.C. Cir. 1994). The H-4 Rule does not describe any duty of DHS for which it was necessary to extend employment to H-4 nonimmigrants. 81 Fed. Reg. at 10,284–312.

The reason for the rule's lack of such a showing is obvious: The H-4 visa was created in 1970. Pub. L. No. 91-225, 84 Stat. 116. For forty-five years the agency was able to carry out its authority to administer the Immigration and Nationality Act without granting H-4 employment.[10] The agency cannot suddenly claim that, after a half century of interpreting the statute as not

10   This illustrates that DHS claim of consistent agency interpretation of the Immigration and Nationality Act for "nearly seven decades" is nonsense. Resp. 19. For forty-five years, the H-4 statute was interpreted as not permit-

12

permitting employment that it suddenly became necessary for DHS to carry out its duties by interpreting the statute as permitting employment.[11] The agency's longstanding interpretation was that the H-4 visa did not permit employment.

Instead, DHS switched and the H-4 Rule asserted its source of authority was "8 U.S.C. 1324a(h)(3)(B), [which] recognizes that employment may be authorized by statute or by the Secretary" with no limitations indicated. 80 Fed. Reg. at 10,294. The power "necessary for carrying out [DHS's] authority under the INA" (Resp. 20) and "dual authority" with Congress to authorize classes of aliens eligible for employment (Resp. 16, 18, 21–22) are not the same thing. *See also* Resp. 19 (stating that Congress could pass a work authorization for H-4 spouses instead of "waiting for the Secretary to decide").

The fact of the matter is that employment under the H-4 Rule was promulgated pursuant to a claim of "authority to extend employment to noncitizens in the United States" under § 1324a(h)(3); not under a claim of authority to promulgate regulations "necessary for carrying out [DHS's] authority under the provisions of this chapter" (§ 1103(a)(3)). Since promulgating the H-4 Rule, DHS has not acknowledged any bounds on its "dual authority" to permit alien employment. Instead, DHS makes the extraordinary claim that "there are no statutory prohibition or limits on the Secretary." Resp. 19.

---

ting employment. The longstanding policy of the agency was that H-4 visas did not permit employment.

11    Intervenors note the "necessary" requirement under § 1103(a)(3) but they also provide no explanation why H-4 employment became necessary for DHS to carry out its authority. Instead, they raise the irrelevant *Truax v. Raich*, 239 U.S. 33, 42 (1915) that describes the need to work for support while ignoring the fact that the H-1B-holding spouse is on a guestworker visa and can work. Furthermore, there are no additional restrictions imposed on H-4-holding spouses if they wish to get a guestworker visa on their own and work within the restrictions of the Immigration and Nationality Act.

Therefore, even if one accepts the implausible claim that Congress attempted to create dual authority for the agency, such a delegation without any guidance at all would be unconstitutional. *J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928) (a delegation of power requires providing an "intelligible principle" to which the agency must conform). DHS and the Intervenors both fail to identify any intelligible principle Congress provided to guide DHS's exercise of its claimed "dual authority" to grant work authorizations to aliens.

### V. DHS escalates the constitutional issues of the H-4 Rule in its response.

The doctrine of separation of powers is fundamental in our system. *Nat'l Mut. Ins. Co. v. Tidewater Transfer Co.*, 337 U.S. 582, 590 (1949).  As James Madison observed, "the powers properly belonging to one of the departments ought not to be directly and completely administered by either of the other departments." The Federalist No. 48. In spite of this basic constitutional principle, DHS asserts that Congress has created a system of "dual authority" to define classes of aliens eligible for employment that is completely contrary to our system of separation of powers. Resp. 16, 18, 21 ("shared authority"). There is no provision that explicitly created such a system as "dual authority" and no legislative history showing Congress even attempted to create such a system.

Furthermore, the Constitution does not permit Congress to create the kind of shared authority that DHS describes.[12] Resp. 19–20. "The lawmaking function belongs to Congress, U.S. Const., Art. I, § 1, and may not be conveyed to another branch or entity." *Loving v. United States*, 517 U.S. 748, 758 (1996); *see also Clinton v. City of N.Y.*, 524 U.S. 417, 481 (1998) (holding the

---

12   Int. Resp. 7–9 describes the same.

14

statutory creation of a line-item veto was an unconstitutional delegation of power to the executive branch). Congress has defined classes of aliens eligible for employment in nearly every major immigration act. *E.g.*, INA, § 101, 66 Stat. at 166–69; Immigration and Nationality Act of 1965, Pub. L. No. 89-236, § 9, 79 Stat. 911, 917; Immigration Act of 1990, Pub. L. No. 101-649, §§ 204–21, 104 Stat. 4978, 5019–28. Clearly, defining such classes is a lawmaking function that cannot be transferred to an agency. *See Loving*, 517 U.S. at 758; *see also Loving v. Internal Revenue Serv.*, 742 F.3d 1013, 1020–21 (D.C. Cir. 2014) (finding that Congress's continued enactments regulating tax preparers indicated that it had not delegated that authority to the IRS). "That Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892). *Cf. Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise*, 501 U.S. 252, 274 (1991) (Holding Congress "may not 'invest itself or its Members with either executive power or judicial power.'") (quoting *J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928)); *Consumer Energy Council v. Fed. Energy Regulatory Comm'n.*, 673 F.2d 425, 448 (D.C. Cir. 1982) (holding "the one-house veto contravenes the separation of powers principle … because it authorizes the legislature to share powers properly exercised by the other two branches."); *Fed. Election Comm'n v. NRA Political Victory Fund*, 6 F.3d 821, 827 (D.C. Cir. 1993) (Congress exceeded its legislative authority when it placed its agents on the commission exercising executive powers.). It is notable that no similar example of where Congress and an agency share dual authority to enact legislation to cross-purposes has been identified.

15

The unconstitutionality of DHS's position means that the agency, contrary to its assertion (Resp. 11, 15, 22–27), is not entitled to *Chevron* deference when it claims its sweeping, dual authority. After all, agencies lack any expertise entitled to deference in interpreting the Constitution. *See, e.g.*, *U.S. West, Inc. v. FCC*, 182 F.3d 1224, 1231 (10th Cir. 1999) ("[A]n unconstitutional interpretation is not entitled to *Chevron* deference…. [D]eference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions.") (citing, *e.g., Rust v. Sullivan*, 500 U.S. 173, 190–91 (1991)). DHS cannot create what is, at minimum, a constitutionally suspect power out of (supposed) ambiguity.

## CONCLUSION

For the reasons stated above and in Plaintiff's opening brief, Save Jobs USA's motion for summary judgment should be granted and DHS's cross-motion for summary judgment should be denied.

Respectfully submitted,
Dated: May 31, 2021

John M. Miano
D.C. Bar No. 1003068
Attorney of Record for Save Jobs USA
(908) 273-9207
miano@colosseumbuilders.com

Christopher Hajec
D.C. Bar No. 492551
Immigration Reform Law Institute
25 Massachusetts Ave., N.W. Suite 335
Washington, D.C. 20001
(202) 232-5590

# IMMIGRATION REFORM AND CONTROL ACT OF 1983

# HEARINGS

BEFORE THE

## SUBCOMMITTEE ON
## IMMIGRATION, REFUGEES, AND INTERNATIONAL LAW

OF THE

## COMMITTEE ON THE JUDICIARY
## HOUSE OF REPRESENTATIVES

NINETY-EIGHTH CONGRESS

FIRST SESSION

ON

## H.R. 1510

IMMIGRATION REFORM AND CONTROL ACT OF 1983

MARCH 1, 2, 9, 10, 14, AND 16, 1983

## Serial No. 2

Printed for the use of the Committee on the Judiciary



U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1983

18-556 O

H521·47

18

1441



U.S. Department of Justice

Office of Legislative Affairs

---

Office of the Assistant Attorney General   *Washington, D.C. 20530*

April 4, 1983

Honorable Romano L. Mazzoli, Chairman
Subcommittee on Immigration, Refugees,
 and International Law
House Committee on the Judiciary
Washington, D. C. 20515

Dear Mr. Chairman:

  Thank you for your letter of March 2, 1983 to the
Attorney General requesting the Department's response
to certain questions with regard to the immigration
reform legislation pending before your Subcommittee,
H.R. 1510.  The Attorney General has asked that I
forward the attached responses which will be made a
part of the hearing record on this important
legislation.

  Please don't hesitate to ask if we can be of
further assistance in this matter.

      Sincerely,

      Robert A. McConnell
      Assistant Attorney General

1449

#### EMPLOYER SANCTIONS

1.  The ABA last month opposed employer sanctions because
    they were alleged to be "unworkable and expensive."
    Specifically, the ABA background papers criticized the
    bill for failure to:

    1) Specify exactly how INS will execute the

       investigation, detection and apprehension

       of employer violators;

    2) Specify whether INS would have to obtain a

       warrant to inspect employer records; and

    3) Grant INS any additional enforcement powers.

    4) The ABA material further points out that "the

       already overburdened and understaffed INS

       hardly has the resources to investigate and

       prosecute even those cases where a violation

       may be suspected."

1) Preliminarily it should be noted that such specifica-
tion in the statute itself is not consistent with normal
drafting conventions. INS will pursue specific leads and
concentrate its investigative resources on targets which meet
established criteria for high enforcement impact. Investiga-
tive techniques which are currently in use will be augmented
by the inclusion of inquiries conducted by DOL and INS to
inspect employment eligibility verification records. Addi-
tionally, employer violators would not be apprehended in most
circumstances since the initial stages of the progressive
penalty structure provide for administrative fine proceedings.

1450

Violators would only be subject to arrest in cases of repeated
violations, where the U.S. Attorney has authorized prosecution
or an indictment has been issued.

2)  The statute requires that employer records be made
available for inspection.  Regulations will be published which
clarify that records will be made available upon request for
administrative inspection.  The statute does not require a
subpoena or warrant.

3)  INS authority will be expanded to include the author-
ity to initiate administrative, civil, or criminal proceedings
against employers who employ unauthorized aliens.  INS cur-
rently has authority to define classes of aliens who may be
employed in the U.S. but can take no action against employers
who disregard an unauthorized alien's status.

4)  INS presently directs about 50% of its investigation
resources to area control investigations at places where
illegal aliens are believed to be employed.  These resources
will continue to be focused on such employment sites, but the
investigation will generate a new outcome - in addition to
expulsion proceedings against the alien INS will initiate
employer sanctions proceedings.  With regard to resources for
this program, the Service has stated that it will enthusias-
tically begin its employer sanctions program with its present
resources as soon as the statute is enacted.  However, as I
have mentioned before, we intend to provide additional inves-
tigative resources as needed.

In the

# United States District Court

for the

## District of Columbia

| | |
|---|---|
| Save Jobs USA<br>31300 Arabasca Circle<br>Temecula CA 92592<br><div align="right">*Plaintiff,*</div><br><div align="center">*v.*</div><br>U.S. Dep't of Homeland Security;<br>Office of General Counsel<br>Washington, DC 20258<br><div align="right">*Defendant.*</div><br><div align="center">*and*</div><br>Anujkumar Dhamija, *et al.*<br><div align="right">*Intervenors..*</div> | Civil Action No. 1:15-cv-00615 (TSC) |

### Certificate of Service

I certify that on May 31, 2021, I filed the attached Plaintiff's Reply with the Clerk of the Court using the CM/ECF system that will provide notice and copies to the Defendant's attorneys of record.

John M. Miano
D.C. Bar No. 1003068
Attorney of Record
Save Jobs USA